T.C. Memo. 2001-182


UNITED STATES TAX COURT


ESTATE OF FRANK JOHNSON, DECEASED, LARRY T. JOHNSON, PERSONAL
REPRESENTATIVE AND ESTATE OF KATHARINE JOHNSON, DECEASED,
LARRY T. JOHNSON, PERSONAL REPRESENTATIVE, ET AL.,[1] Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14518-97, 14519-97,   Filed July 20, 2001.
            14520-97, 14521-97,
            14522-97.


Kenneth B. Wheeler, for petitioners.

James F. Kearney, for respondent.

---

[1] Cases of the following petitioners are consolidated
herewith:  Estate of Frank Johnson, Deceased, Et Al., docket No.
14519-97; Larry T. Johnson, Transferee, Docket No. 14520-97;
Sylvia Johnson, Transferee, docket No. 14521-97; and Ronnie
Johnson, Transferee, docket No. 14522-97.

CONTENTS

FINDINGS OF FACT ............................................... 8

I.  Facts Relating to Issues Involving Deficiencies ......... 8
    A.  Background ......................................... 8
    B.  Tax Returns ....................................... 10
        1.  Frank and Katherine's Returns .................. 10
        2.  Larry's Returns ............................... 13
        3.  Ronnie's Returns .............................. 15
        4.  Sylvia's Returns .............................. 16
    C.  IRS Audits and Notices of Deficiency .............. 18
        1.  Frank and Katherine's Audit and Notices of
                Deficiency ................................ 18
        2.  Larry's Audit and Notice of Deficiency ......... 20
        3.  Ronnie's Audit and Notice of Deficiency ........ 22
        4.  Sylvia's Audit and Notice of Deficiency ........ 22
    D.  Source and Application of Funds Analyses ........... 23
    E.  Cash Hoard ........................................ 28
    F.  Other Facts ....................................... 33
    G.  Capital Gain for 1989 ............................. 37

II.  Facts Relating to Issues Involving Transferee
        Liability ......................................... 38
    A.  Larry ............................................. 38
    B.  Ronnie ............................................ 39
    C.  Sylvia ............................................ 41
    D.  Specific Transfers ................................ 42
        1.  U.S. Savings Bonds ............................ 42
        2.  Account At Glendale Federal Savings and Loan .... 42
        3.  Longwood Property ............................. 43
        4.  Port St. Lucie Property ....................... 43
        5.  Automobiles ................................... 43

OPINION ....................................................... 44

I.  Issues Relating to Deficiencies ......................... 44
    A.  Background ........................................ 44
    B.  Statute of Limitations and Fraud Issues ............ 45
        1.  In General .................................... 45
        2.  Fraud ......................................... 46
            a.  Existence of an Underpayment ............... 47
                (1)  Likely Sources of Income .............. 50
                (2)  Nontaxable Source ..................... 53
                (3)  Summary Relating to Existence of an
                        Underpayment ...................... 61
            b.  Intent To Evade Taxes ...................... 63

    (1) Pattern of Unreporting Substantial
       Amount of Income ........................ 64
    (2) Lack of Records ......................... 65
    (3) Filing History .......................... 67
    (4) Dealings in Cash ........................ 68
    (5) Concealing Transactions ................. 69
    (6) Failure To Cooperate with Respondent ..... 70
    (7) Credibility of Witnesses ................ 71
    (8) Level of Education, Age, and State
       of Health ............................ 72
    (9) Summary Regarding Intent ................ 73
   c. Conclusion Regarding Fraud and Statute of
      Limitations ................................ 73
C. Amount of Understatement of Income ................... 74
 1. Adjustments to BLS Figures ....................... 75
 2. Adjustment for Specific Gift ..................... 79
 3. Adjustment for Proceeds of Automobile
   Transactions ...................................... 80
 4. Adjustment for Larry's Audit Results ............. 81
 5. Adjustment for Sylvia's Gambling
   Expenditures ...................................... 83
 6. Additional Items Identified as in Dispute ........ 84
   a. Withholding on Gambling Winnings ........... 84
   b. Birthing Costs for Nicole .................. 85
   c. Estimated Tax Payments ..................... 85
   d. Tax Payment ................................ 86
   e. Wedding Ceremony for Sylvia................. 86
   f. Detective Expenses ......................... 87
   g. Janie's Living Expenses .................... 88
   h. Duplications Regarding Johnson Limousine ... 89
 7. Other Adjustments ................................ 89
   a. Rental Income .............................. 90
   b. Duplication of Rental Expenses and
     Mortgage Payments ....................... 90
   c. Depreciation ............................... 91
   d. Cash and Jewelry ........................... 91
 8. Summary Relating to Amount of Understatement
    of Income ...................................... 93
D. Capital Gain for 1989 ................................ 94
E. Taxable Social Security Benefits ..................... 95
F. Self-Employment Taxes ................................ 97
G. Self-Employment Deduction ............................ 99
H. Married Couples Deduction ............................ 99
I. Additions to Tax and Penalties ....................... 100
 1. Sections 6653(b) and 6663 ........................ 100
 2. Section 6661 ..................................... 102

II.  Issues Relating to Transferee Liability ................104
     A.  Background ........................................104
     B.  Florida's Statutory Provisions ....................106
         1.  Pre-1988 Transfers ............................106
         2.  Post-1987 Transfers ...........................108
     C.  Discussion .......................................111

Appendix A .............................................118
Appendix B .............................................124
Appendix C .............................................126
Appendix D .............................................128
Appendix E .............................................130
Appendix F .............................................133
Appendix G .............................................136
Appendix H .............................................139
Appendix I .............................................142
Appendix J .............................................145
Appendix K .............................................152
Appendix L .............................................157
Appendix M .............................................164
Appendix N .............................................169

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These five cases have been consolidated for trial, briefing, and opinion.  Respondent, by two notices of deficiency dated April 4, 1997, determined deficiencies, additions, and penalties with respect to Federal income taxes owed by petitioners the Estate of Frank Johnson, Larry T. Johnson, Personal Representative, and the Estate of Katherine Johnson, Larry T. Johnson, Personal Representative (hereinafter referred to as petitioners).  Such deficiencies, additions, and penalties are on account of returns of income tax made by Frank and Katherine Johnson (sometimes decedents), and are as follows:

| Docket No. | Year | Deficiency | Additions to Tax and Penalties | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Sec. 6653 (b)(1) | Sec. 6653 (b)(2) | Sec. 6653 (b)(1)(A) | Sec. 6653 (b)(1)(B) | Sec. 6663 | Sec. 6661 |
| 14518-97 | 1983 | $37,058 | $18,529 | [1] | – | – | – | $9,265 |
| 14519-97 | 1984 | 39,763 | 19,882 | [2] | – | – | – | 9,941 |
| | 1985 | 51,732 | 25,866 | [3] | – | – | – | 12,933 |
| | 1986 | 43,537 | – | – | $32,653 | [4] | – | 10,884 |
| | 1987 | 67,496 | – | – | 50,622 | [5] | – | 16,874 |
| | 1988 | 74,169 | 55,627 | – | – | – | – | 18,542 |
| | 1989 | 73,600 | – | – | – | – | $55,200 | – |
| | 1990 | 96,275 | – | – | – | – | 72,206 | – |

[1]50 percent of the interest due on $37,058.
[2]50 percent of the interest due on $39,763.
[3]50 percent of the interest due on $51,732.
[4]50 percent of the interest due on $43,537.
[5]50 percent of the interest due on $67,496.

By notices of liability dated April 4, 1997, respondent asserted transferee liability against the following petitioners relating to the above deficiencies, additions to tax, and

- 6 -

penalties to the extent of the net value of assets they

purportedly received from decedents,[2] as follows:

| Docket No. | Transferee | Net Value of Assets Asserted |
|---|---|---|
| 14520-97 | Larry T. Johnson | $861,668 |
| 14521-97 | Sylvia Johnson | 229,685 |
| 14522-97 | Ronnie Johnson | 766,003 |

The issues for decision are as follows:

(1) Whether the statute of limitations bars assessment of the deficiencies for each of the years in issue,

(2) whether decedents understated their income for each of the years in issue,

(3) whether decedents' capital gain income should be increased for 1989,[3]

(4) whether decedents' taxable Social Security income should be increased for each of the years 1985 through 1990,

(5) whether decedents' self-employment taxes under section 1401 should be increased for each of the years in issue,

---

[2] A transferee's liability generally is limited to the value of the assets received from the transferor. See Hagaman v. Commissioner, 100 T.C. 180 n.1 (1993).

[3] Respondent also identifies as an issue the question of whether decedents' capital gain income for 1986 should be increased. We assume that respondent meant 1985 inasmuch as respondent made a $6 adjustment to capital gain income for that year, but no adjustment to capital gain income for 1986. In their briefs, petitioners do not address the issue of capital gain income for either 1985 or 1986. Accordingly, we deem that issue conceded by them. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

(6) whether decedents may increase their self-employment tax deduction for 1990,

(7) whether decedents are entitled to a married couples deduction for each of the years 1983, 1984, 1985, and 1986,

(8) whether decedents are liable for the additions to tax or penalties for fraud under sections 6653(b) or 6663, as applicable, for each of the years in issue,

(9) whether decedents are liable for additions to tax under section 6661 for substantial understatement of income for each of the years 1983 through 1988,

(10) whether petitioner Larry Johnson is liable as a transferee of Frank and Katherine Johnson for $861,668,

(11) whether petitioner Sylvia Johnson is liable as a transferee of Frank and Katherine Johnson for $229,685,

(12) whether petitioner Ronnie Johnson is liable as a transferee of Frank and Katherine Johnson for $766,003.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  For convenience, monetary amounts have been rounded to the nearest dollar.  References to cash include cash equivalents such as cashier's checks and money orders.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, amendment to stipulation of facts, first supplemental stipulation of facts, and second supplemental stipulation of facts filed by the parties, together with the exhibits attached thereto, are incorporated herein by this reference. Some of respondent's proposed findings of fact have been conceded by petitioners, and, accordingly, they are so found. Some of petitioners' proposed findings of fact have been conceded by respondent and, accordingly, they are so found.

Petitioner Larry Johnson (Larry) is here in his own right, in docket No. 14520-97, and, also, as personal representative of the estates of both Frank T. and Katherine Johnson. He resided in Longwood, Florida, when he filed the petitions in his case and in petitioners' cases. Petitioner Ronnie Johnson (Ronnie) resided in Longwood, Florida, when he filed the petition in his case. Petitioner Sylvia Johnson (Sylvia) resided in Longwood, Florida, when she filed the petition in her case.

I. Facts Relating to Issues Involving Deficiencies

A. Background

Frank Johnson (Frank) was born on December 12, 1918. Katherine Stanton Johnson (Katherine) was born on December 25, 1923. They were raised in the gypsy culture, custom, and tradition. Frank and Katherine married in the gypsy custom

around 1938.  They moved to Florida during the late 1960s.
During the years in issue, Frank and Katherine lived in a house
located in Longwood, Florida (Longwood property).  Frank died at
the age of 74 on September 27, 1993.  Katherine died at the age
of 72 on June 9, 1996.

Frank and Katherine had one son, Larry, and two daughters,
Patricia and Janie.  At the time of trial, Larry had seven
children, among whom are Ronnie and Sylvia.  In addition to their
own children, Frank and Katherine raised Ronnie and Sylvia
(grandchildren) in the gypsy culture, custom, and tradition.
Hereinafter, reference to the Johnson family means Frank,
Katherine, Larry, Ronnie, and Sylvia, collectively.

During the years in issue, Larry was married to Nancy
Johnson (Nancy).  They lived in a separate residence from
Katherine and Frank during those years.  Ronnie lived with Frank
and Katherine until approximately February 1985.  During 1985
through 1990, Ronnie was married to Linda Johnson (Linda), and
they lived in a separate residence from Frank and Katherine.
Sylvia came to live with Frank and Katherine at least by 1983.
Her boyfriend, Jack Miller, moved into the Longwood property in
late 1986.  Sylvia and Jack Miller married in 1987, and their
child, Nicole, was born in 1988.  Sylvia, Jack Miller, and Nicole
lived in the Longwood property until August 1990 when they moved
into a separate residence.

While living with Frank and Katherine, Sylvia performed many services for them, including grocery shopping, paying bills, and accompanying them to their doctors' offices. When her help was needed, she assisted Katherine in getting out of bed, bathing, and dressing.

In June or July 1990 Katherine hired Carolyn White (Carolyn) to perform housekeeping and caregiver duties for Katherine and Frank. Carolyn's husband, Jack White, burglarized the Longwood property in November 1990 and stole a safe which he claimed contained $200,000 in cash together with jewelry, bank books, stocks, bonds, and coins. Frank and Katherine reported to the police the theft of $30,000 in cash and over $100,000 in jewelry. The police subsequently recovered the jewelry and all but $16,000 of the cash. Jack White was convicted of the theft. Carolyn pleaded guilty to being an accessory after the fact and was put on probation for 5 years.

B. Tax Returns

1. Frank and Katherine's Returns

Frank was retired during the years in issue. Before, during, and after the years in issue, Katherine operated a palmistry business out of the Longwood property under the name "Madame Katherine". For some of the years, Sylvia helped Katherine in that palmistry business.

Frank and Katherine filed timely joint Federal individual income tax returns for 1983 through 1985. They filed late returns for 1986, 1987, and 1988 on December 5, 1989, after Internal Revenue Service (IRS) Revenue Officer Robert Budde (Revenue Officer Budde) served a summons requesting information needed to prepare delinquent tax returns for 1986 through 1988. Frank and Katherine filed timely joint Federal individual income tax returns for 1989 and 1990. On their returns for the years in issue, Frank and Katherine claimed exemptions for themselves and no exemptions for dependents.

On Schedules C, Profit or Loss From Business, filed with the returns for 1983 through 1985 and for 1990,[4] Frank and Katherine reported the following gross receipts, expenses, and net income from the palmistry business:

| Year | Gross Receipts | Business Deductions | Net Income |
|------|----------------|---------------------|------------|
| 1983 | $16,550 | $10,069 | $6,481 |
| 1984 | 15,800 | 9,609 | 6,191 |
| 1985 | 19,550 | 11,009 | 8,541 |
| 1990 | 8,000 | 250 | 7,750 |

Frank and Katherine did not file any Schedules C with the returns for 1986 through 1989. Business deductions claimed on the

---

[4] The Schedules C filed with the 1983 through 1985 returns listed Frank and Katherine as the proprietors of the business, but the Form SE, Computation of Social Security Self-Employment Tax, identified Katherine as the self-employed person. The Schedule C filed with the 1990 return listed Frank as the proprietor of the business. No Form SE was included with the copy of the 1990 return admitted into evidence at the trial.

Schedules C for 1983, 1984, and 1985 included advertising expenses of $4,029, $4,109, and $5,109, respectively. The Schedule C filed with the 1990 return reported no advertising expenses. From 1988 through 1990, Katherine's advertising expenses included the cost of a television (T.V.) commercial that Katherine had taped on September 28, 1988, for viewing on Fox TV Channel 35.[5] Miss Lisa Ruby began managing Katherine's TV ad account in late 1989, and thereafter she periodically visited with Katherine at the Longwood property to discuss that account and collect payment. Katherine's TV advertising expenses averaged approximately $3,000 per year which she always paid with cash.

On their returns for the years in issue, Frank and Katherine reported the following interest income, income from capital gains, income from gambling, and adjusted gross income:

---

[5] Katherine continued to use the television commercial after 1990.

| Year | Interest Income | Income from Capital Gains | Income from Gambling | Adjusted Gross Income |
|------|------|------|------|------|
| 1983 | $344 | - | - | $6,825 |
| 1984 | 229 | - | - | 6,420 |
| 1985 | 379 | $7,897 | - | 16,817 |
| 1986 | 922 | - | - | 922 |
| 1987 | 1,040 | - | - | 1,040 |
| 1988 | 1,438 | - | - | 1,438 |
| 1989 | 2,847 | 3,421 | $1,002 | 7,270 |
| 1990 | 3,316 | - | 2,452 | 12,971 |

They also reported total Social Security benefits received for 1989 and 1990 of $5,591 and $6,257, respectively, none of it taxable.

Frank and Katherine's returns for the years in issue were prepared by their accountant, Jack Baptiste (Baptiste). He prepared the returns on the basis of information they furnished to him.

2.  Larry's Returns

Larry and Nancy filed joint Federal individual income tax returns for each of the years in issue. For 1983 through 1986, Larry and Nancy claimed exemptions for themselves and for three dependent children living with them (Sylvia, Tony, and David). For 1987 through 1990, they claimed exemptions for themselves and for two dependent children living with them (Tony and David).

Katherine trained Nancy to read palms. Larry and Nancy filed Schedules C with their returns for the years in issue

reporting income from a palmistry business.[6] The Schedules C for the years in issue reported the following gross receipts, expenses, and net income from the palmistry business:

| Year | Gross Receipts | Business Deductions | Net Income |
|------|----------------|---------------------|------------|
| 1983 | $20,160 | $12,428 | $7,732 |
| 1984 | 20,500 | 11,809 | 8,690 |
| 1985 | 28,500 | 17,732 | 10,768 |
| 1986 | 33,800 | 23,904 | 9,896 |
| 1987 | 36,325 | 26,453 | 9,872 |
| 1988 | 39,455 | 25,319 | 14,136 |
| 1989 | 40,310 | 19,797 | 20,513 |
| 1990 | 40,820 | 17,912 | 22,909 |

On their returns for the years in issue, Larry and Nancy reported the following interest income, Schedule E Supplemental Income and Loss income or loss,[7] income from capital gains, income from gambling, miscellaneous income, and adjusted gross income:

---

[6] The Schedule C for 1983 listed Larry and Nancy as the proprietors of the palmistry business, and the Schedule SE, Self-Employment Tax, identified Larry and Nancy as the self-employed persons. The Schedules C for 1984 through 1990 listed Larry as the proprietor and the Schedules SE for 1984 and 1986 through 1990 identified Larry as the self-employed person. No Schedule SE was included with the copy of the 1985 return admitted into evidence at trial. The Schedules C for 1983 through 1985 showed a business name for the palmistry business of "Madam Nancy". The Schedule C for 1986 did not show a business name. The Schedules C for 1987 through 1990 showed a business name of "Madam Bessie". Larry testified at trial that he did not actively participate in the palmistry business operated by Nancy.

[7] For 1984 through 1990, the Schedules E reported losses from rentals. The net loss for 1990 also included a loss from Johnson's Limousine Service, Inc., an S corporation.

| Year | Interest Income | Sch. E Loss | Income from Capital Gains | Income from Gambling | Misc. Income | Adjusted Gross Income |
|------|------|------|------|------|------|------|
| 1983 | $392 | – | – | $25,000 | – | $32,124 |
| 1984 | 647 | ($81) | – | – | – | 8,675 |
| 1985 | 639 | (201) | – | 10,000 | – | 19,205 |
| 1986 | 428 | (1,709) | – | – | – | 8,614 |
| 1987 | 144 | (1,242) | – | – | – | 8,773 |
| 1988 | 52 | (2,234) | – | – | – | 11,954 |
| 1989 | 2,059 | (3,418) | – | – | – | 19,154 |
| 1990 | 2,770 | [1](7,704) | $2,608 | – | $215 | 19,046 |

[1]$2,130 of the Schedule E loss for 1990 was from Johnson's Limousine Service, Inc.

### 3. Ronnie's Returns

Ronnie and Linda filed joint Federal individual income tax returns for 1985 through 1990. Ronnie and Linda claimed exemptions for themselves and no exemptions for dependents on those returns. The 1985 return was the first tax return Ronnie filed.

Ronnie and Linda filed Schedules C with their returns reporting income from a palmistry business.[8] The Schedules C reported the following gross receipts, expenses, and net income from the palmistry business:

---

[8] The Schedule C for 1985 listed Ronnie as the proprietor of the palmistry business, and the Schedule SE identified Ronnie as the self-employed person. The Schedules C for 1986 through 1990 listed Ronnie and Linda as the proprietors, and they filed separate Schedules SE for each of those years on which the Schedule C income was divided equally between Ronnie and Linda. No business name was given for the palmistry business on any of the Schedules C. Ronnie did not testify at trial.

|  | Gross | Business | Net |
| Year | Receipts | Deductions | Income |
| 1985 | $17,575 | $9,158 | $8,417 |
| 1986 | 18,975 | 9,487 | 9,488 |
| 1987 | 22,851 | 10,168 | 12,683 |
| 1988 | 25,785 | 11,781 | 14,004 |
| 1989 | 39,410 | 24,761 | 14,649 |
| 1990 | 36,580 | 19,915 | 16,665 |

On their returns for 1985 through 1990, Ronnie and Linda reported the following interest income, Schedule E loss, income from gambling, and adjusted gross income:

|  |  |  | Income | Adjusted |
|  | Interest | Rental | from | Gross |
| Year | Income | Loss | Gambling | Income |
| 1985 | – | – | – | $8,417 |
| 1986 | – | – | – | 9,014 |
| 1987 | $77 | – | $20,000 | 32,760 |
| 1988 | – | – | – | 14,004 |
| 1989 | 321 | – | – | 14,970 |
| 1990 | 310 | [1]($2,131) | – | 13,668 |

[1]The Schedule E loss was from Johnson's Limousine Service, Inc.

### 4. Sylvia's Returns

Katherine also trained Sylvia to read palms. At least by 1986, Sylvia worked with Katherine at the Longwood property in Katherine's palmistry business. For 1987 through 1990, Sylvia reported income from a palmistry business[9] under the name "Madame Sylvia" on Schedules C she filed with her returns.

The 1987 return was the first Federal individual income tax return Sylvia filed. On that return, she filed as "single" and

---

[9] Until August 1990 Sylvia operated her palmistry business out of the Longwood property.

claimed an exemption for herself and no exemptions for dependents.  For 1988, she filed as "head of household" and claimed an exemption for herself and an exemption for a dependent child (Nicole Johnson).  Sylvia and Jack Miller filed joint Federal individual income tax returns for 1989 and 1990.  They claimed exemptions for themselves and an exemption for a dependent child (Katherine N. Johnson).

For 1987 through 1990, Sylvia reported the following income, expenses, and net profit from her palmistry business on Schedules C:

| Year | Gross Receipts | Business Deductions | Net Income |
|---|---|---|---|
| 1987 | $10,450 | $5,540 | $4,910 |
| 1988 | 12,350 | 5,650 | 6,700 |
| 1989 | 19,710 | 8,597 | [1]11,113 |
| 1990 | 24,510 | 12,804 | 11,706 |

[1]The face of the Form 1040 shows business income from Schedule C of $11,531.  No explanation is given for the discrepancy.

On the Schedules C, Sylvia claimed rent expenses of $1,200 for 1987 through 1989 and $2,880 for 1990.  Frank and Katherine did not report any rental income on their Federal individual income tax returns for 1987 through 1990.  On the Schedules C, Sylvia claimed advertising expenses of $3,990 for 1987, $4,100 for 1988, $5,900 for 1989, and $5,950 for 1990.

On the returns for 1987 through 1990, Sylvia, or Sylvia and Jack Miller, reported the following interest income, Schedule E loss, income from gambling, and adjusted gross income:

| Year | Interest Income | Sch. E Loss | Income from Gambling | Adjusted Gross Income |
|------|-----------------|-------------|----------------------|-----------------------|
| 1987 | – | – | – | $4,910 |
| 1988 | $29 | – | $1,727 | 8,456 |
| 1989 | 153 | – | – | 11,684 |
| 1990 | 130 | [1]($2,131) | 1,685 | 10,563 |

[1]The Schedule E loss was from Johnson's Limousine Service, Inc.

## C. IRS Audits and Notices of Deficiency

### 1. Frank and Katherine's Audit and Notices of Deficiency

On August 15, 1991, IRS Revenue Agent Robert Combs (Agent Combs) notified Frank and Katherine that their returns for the years in issue were under audit.[10] Agent Combs did not meet with Frank or Katherine regarding income and expense items pertaining to their returns at any time during the course of the audit of their tax returns for the years in issue.

On September 22, 1995, respondent mailed 30-day letters to Frank and Katherine for 1983 through 1990 in which respondent proposed adjustments for those years relating, among other things, to understatements of income. Subsequently, on April 4, 1997, respondent issued two notices of deficiency to petitioners for the years in issue in which respondent determined, among

---

[10] On Feb. 5, 1991, Agent Combs had notified Larry and Nancy that their 1988 Federal income tax return was under audit. Subsequently, Agent Combs expanded the audit to include additional years and family members.

other things, that Frank and Katherine had unreported "other income" for those years in the following amounts:

| | Other Income | | |
|---|---|---|---|
| Year | Frank | Katherine | Total |
| 1983 | $46,301 | $46,301 | $92,602 |
| 1984 | 49,261 | 49,261 | 98,522 |
| 1985 | 57,588 | 57,588 | 115,176 |
| 1986 | 54,723 | 54,723 | 109,446 |
| 1987 | 90,517 | 90,517 | 181,034 |
| 1988 | 112,803 | 112,803 | 225,606 |
| 1989 | 97,295 | 97,295 | 194,590 |
| 1990 | 145,537 | 145,537 | 291,074 |
| Total | 654,025 | 654,025 | 1,308,050 |

Respondent calculated the amount of unreported other income using a source and application of funds method of reconstructing income.

In the notices of deficiency, respondent determined further that Frank and Katherine together had taxable Social Security benefits of $1,287, $957, $1,385, $2,195, $2,796, and $3,129 for years 1985, 1986, 1987, 1988, 1989, and 1990, respectively.[11]  In addition, respondent increased Frank's and Katherine's income from capital gains for 1985 and 1989 by $6 and $20,557, respectively.  For the years in issue, respondent treated Frank and Katherine as co-owners of the palmistry business.  Thus, respondent determined that they each were liable for self-employment taxes for 1983, 1984, 1985, 1986, 1987, 1988, 1989, and 1990, of $3,338, $4,271, $4,673, $5,166, $5,387, $5,859,

---

[11]  For those years, respondent determined that Frank and Katherine had received total Social Security benefits of $2,574, $1,914, $2,770, $4,390, $5,591, and $6,257, respectively.

$6,250, and $7,849, respectively. Respondent allowed them a $7,310 self-employment tax deduction for 1990. For each of the years 1983 through 1986, respondent also allowed Frank and Katherine a $3,000 married couples deduction.

### 2. Larry's Audit and Notice of Deficiency

Agent Combs met with Larry, Nancy, and Baptiste in February 1991 regarding the audit of Larry and Nancy's 1988 return. He subsequently expanded the audit to include their returns for earlier and later years as well as the returns of Frank and Katherine, Ronnie, and Sylvia. Larry and Nancy initially provided information to Agent Combs relating to amounts claimed on their returns. Subsequently, they refused Agent Combs' requests for additional information and for an extension of the statute of limitations for the 1987 return. Larry and Baptiste refused to cooperate further in the audit on the advice of counsel because they believed that Agent Combs was prejudiced against Gypsies and had referred, or intended to refer, their returns to the IRS Criminal Investigation Division.

During 1994, respondent made a jeopardy assessment against Larry and Nancy after Agent Combs received information from the Daytona Beach Shores police department that both Larry and his daughter Sylvia had obtained driver's licenses issued in false names and had opened safe deposit boxes under those names into which they were transferring moneys from other safe deposit

boxes. Respondent seized property from Larry's home on June 15, 1994, and from Katherine's home on June 17, 1994. Larry and Nancy filed an administrative protest on July 15, 1994, in which they requested abatement of the jeopardy assessment. Respondent abated the jeopardy assessment on or about November 18, 1994, but imposed an equitable lien on Larry's real property.

On August 12, 1994, respondent mailed a notice of deficiency to Larry and Nancy for the years 1983 through 1990. Respondent determined the deficiencies set forth in that notice of deficiency on the basis of a source and application of funds analysis for each of those years. On November 14, 1994, Larry and Nancy filed a petition with the Tax Court seeking a redetermination of those deficiencies (docket No. 20854-94). Respondent, Larry, and Nancy subsequently settled docket No. 20854-94. The decision document, entered February 20, 1996, reflected, among other things, that (1) no deficiencies in tax were due for the years 1983 through 1988, (2) no additions to tax were due for the years 1983 through 1988, (3) deficiencies in tax were due for years 1989 and 1990 in the amounts of $7,140 and $6,606, respectively,[12] (4) additions to tax were due for years

---

[12] In the notice of deficiency, respondent determined tax deficiencies for 1989 and 1990 of $13,317 and $16,461, respectively. Those deficiencies were calculated on the basis of the following adjustments to income:

(continued...)

1989 and 1990 in the amounts of $1,428 and $1,289, respectively, and (5) the settlement was based on the assertions of both Larry and Katherine that for the years in issue Frank and Katherine had paid all of Larry's expenditures in excess of his income.

### 3. Ronnie's Audit and Notice of Deficiency

Agent Combs notified Ronnie and Linda of the audit of their returns on August 15, 1991. On August 31, 1995, respondent mailed 30-day letters to Ronnie for 1983 and 1984 and to Ronnie and Linda for 1985 though 1990 in which respondent proposed adjustments for those years. Respondent determined those adjustments on the basis of a source and application of funds analysis for each of those years. Subsequently, respondent closed Ronnie's audit without issuing any notice of deficiency.

### 4. Sylvia's Audit and Notice of Deficiency

Agent Combs notified Sylvia of the audit of her returns on August 15, 1991. On August 31, 1995, respondent mailed 30-day letters to Sylvia for 1985 through 1988, and to Sylvia and Jack for 1989 and 1990, in which respondent proposed adjustments for

---

[12](...continued)

| | 1989 | 1990 |
|---|---|---|
| Self-employment income | $38,018 | $43,404 |
| Capital gain income | -0- | 3,725 |
| Loss from an S corporation | -0- | 2,130 |
| Depreciation expense - Schedule C | (3,969) | (3,969) |
| Depreciation expense - Schedule E | 10,517 | 10,517 |
| Self-employment tax deduction | -0- | (2,786) |
| Total adjustments | 44,566 | 53,021 |

those years.  Respondent determined those adjustments on the basis of a source and application of funds analysis for each of those years.  Subsequently, respondent closed Sylvia's audit without issuing a notice of deficiency.

D.  Source and Application of Funds Analyses

Following trial, the parties met in an effort to resolve their differences regarding the source and application of funds analyses for the Johnson family members.  In a joint finding of fact set forth in their opening briefs, the parties indicate that Appendix 5 of respondent's opening brief shows in black the items of the source and application of funds analyses for which the parties are in agreement, and that Appendix 5 shows in red the items for which the parties are not in agreement.  We show the items reflected on respondent's Appendix 5 in our Appendices A through I.  To the extent possible, in those appendices, we have incorporated explanations for the differences in amounts reflected on the source and application of funds analyses for Frank and Katherine as gifts to Larry, Ronnie, and Sylvia, from the amounts reflected as excess applications of funds over sources of funds on the separate source and application of funds analyses for Larry, Ronnie, and Sylvia.  Except for the items specified below, the parties agree on the amounts shown in source and application of funds analyses set forth infra in Appendix A.

- 24 -

<u>1983</u>

| <u>Items in Dispute</u> | | <u>Amount</u> |
|---|---|---|
| Gifts to Larry | | $34,317 |
| Gifts to Ronnie | | 35,946 |
| Personal living expenses for 2 persons | | 19,377 |
| Less: Housing costs | $3,280 | |
| Vehicle acquisition costs | 1,502 | (4,782) |
| Total of items in dispute for 1983 | | 84,858 |

<u>1984</u>

| <u>Items in Dispute</u> | | <u>Amount</u> |
|---|---|---|
| Gifts to Larry | | [1]37,270 |
| Gifts to Ronnie | | 52,672 |
| Personal living expenses for 2 persons | | 20,561 |
| Less: Housing costs | $3,485 | |
| Vehicle acquisition costs | 1,733 | (5,218) |
| Total of items in dispute for 1984 | | 105,285 |

[1]Respondent concedes that this item is overstated by $4,500. See <u>infra</u> Appendix C for an explanation of the difference.

<u>1985</u>

| <u>Items in Dispute</u> | | <u>Amount</u> |
|---|---|---|
| Gifts to Larry | | $53,357 |
| Gifts to Ronnie | | 30,834 |
| Gifts to Sylvia | | 20,862 |
| Personal living expenses for 2 persons | | 22,056 |
| Less: Housing costs | $3,873 | |
| Vehicle acquisition costs | 1,833 | (5,706) |
| Total of items in dispute for 1985 | | 121,403 |

<u>1986</u>

| <u>Items in Dispute</u> | | <u>Amount</u> |
|---|---|---|
| Gifts to Larry | | [1]$39,723 |
| Gifts to Ronnie | | [2]27,525 |
| Gifts to Sylvia | | 19,775 |
| Personal living expenses for 2 persons | | 23,442 |
| Less: Housing costs | $3,999 | |
| Vehicle acquisition costs | 2,449 | (6,448) |
| Total of items in dispute for 1986 | | 104,017 |

[1]Larry's analysis reflects $69,150. See <u>infra</u> Appendix E for an explanation of the difference.

[2]Ronnie's analysis reflects $26,063.  See infra Appendix E for an explanation of the difference.

### 1987

| Items in Dispute | | Amount |
|---|---|---|
| Gifts to Larry | | $95,819 |
| Gifts to Ronnie | | [1]48,010 |
| Gifts to Sylvia | | 23,946 |
| Personal living expenses for 2 persons | | 24,761 |
| Less: Housing costs | $4,108 | |
| Vehicle acquisition costs | 1,950 | (6,058) |
| Total of items in dispute for 1987 | | 186,478 |

[1]Appendix 5 (Ronnie 1987) reflects $49,760.  See infra Appendix F for an explanation of the difference.

### 1988

| Items in Dispute | | Amount |
|---|---|---|
| Gifts to Larry | | [1]$68,359 |
| Gifts to Ronnie | | [2]64,360 |
| Gifts to Sylvia | | 52,197 |
| Personal living expenses for 2 persons | | 26,350 |
| Less: Housing costs | $4,420 | |
| Vehicle acquisition costs | 2,581 | (7,001) |
| Total of items in dispute for 1988 | | 204,265 |

[1]Larry's analysis reflects $94,067.  See infra Appendix G for an explanation of the difference.
[2]Ronnie's analysis reflects $63,860.  See infra Appendix G for an explanation of the difference.

### 1989

| Items in Dispute | | Amount |
|---|---|---|
| Gifts to Larry | | $38,018 |
| Gifts to Ronnie | | 73,937 |
| Gifts to Sylvia | | 50,359 |
| Personal living expenses for 2 persons | | 28,622 |
| Less: Housing costs | $4,903 | |
| Vehicle acquisition costs | 2,301 | (7,204) |
| Wedding ceremony for Sylvia | | 10,000 |
| Total of items in dispute for 1989 | | 193,732 |

1990

| Items in dispute | | Amount |
|---|---|---|
| Gifts to Larry | | [1]$43,404 |
| Gifts to Ronnie | | [2]60,223 |
| Gifts to Sylvia | | [3]62,546 |
| Personal living expenses for 2 persons | | 28,836 |
| Less: Housing costs | $4,930 | |
| Vehicle acquisition costs | 2,026 | (6,956) |
| Investigative fees (Dennis Dayle) | | 7,000 |
| Room & board for Janie and her children | | 6,000 |
| Less: Duplication re limo | | (46,490) |
| Total of items in dispute for 1990 | | 154,563 |

[1]Larry's analysis reflects $41,404.  See infra Appendix I for an explanation of the difference.
[2]Ronnie's analysis reflects $60,923.  See infra Appendix I for an explanation of the difference.
[3]Sylvia's analysis reflects $60,546.  See infra Appendix I for an explanation of the difference.

Included in the source and application of funds analysis for Frank and Katherine for each of the years in issue are amounts identified as gifts to Larry, Ronnie, and Sylvia.  For the most part, those amounts constitute the excess of applications of funds over sources of funds reflected on source and application of funds analyses respondent performed for each of Larry, Ronnie, and Sylvia.  See infra Appendices B through I.  Respondent included those amounts as applications of funds for Frank and Katherine because, in a deposition to preserve testimony for docket No. 20854-94 given on June 14, 1995, Katherine claimed that she and Frank provided funds for purchases of assets by Larry, Ronnie, and Sylvia as well as for their vacations and normal living expenses in excess of their incomes.  In separate sworn affidavits, Larry, Ronnie, and Sylvia attested that

Katherine and Frank had provided funds for their asset purchases and living expenses.

For purposes of the source and application of funds analyses for each year, to determine personal living expenses for Frank and Katherine's household, Larry's household, Ronnie's household, and Sylvia's household, respondent used Bureau of Labor Statistics (BLS) figures which detailed average annual expenditures of consumers based on the size of the consumer unit. Respondent reduced the BLS figures for shelter costs and vehicle acquisition costs. Respondent considered Frank and Katherine's household to consist only of themselves for each year in issue. Respondent considered Larry's household to consist of four persons for each year in issue. Respondent considered Ronnie's household to consist of one person for 1983 and 1984 and two persons for 1985 through 1990. Respondent considered Sylvia's household to consist of one person for 1985 through 1987, two persons for 1988, and three persons for 1989 and 1990. See infra Appendices A through I for the amounts respondent used for personal living expenses in the source and application of funds analyses.

During 1987, Larry purchased a 1977 Excaliber for $25,060.[13]

Frank and Katherine paid for the birthing costs of Sylvia's daughter, Nicole. Respondent estimated those costs to be $2,500.

Sometime during the years in issue, Frank and Katherine's daughter Janie was married to Miller Johnson (Miller). Janie suspected that Miller stole property from her safe deposit box. During 1990, Janie and Frank hired a private investigator, Denis Dayle (Dayle), to help recover the stolen property and to hide Janie and her children from Miller. Shortly before they hired Dayle, Miller had hired Dayle to find Janie and her children. Dayle decided to keep Miller as a client while at the same time he worked for Janie and Frank. Frank paid Dayle $7,000 in 1990 for his services.

E. Cash Hoard

Katherine was the eldest child of Edward Peter Stanton (Edward) and Mary Stephens Stanton (Mary). In addition to Katherine, Edward and Mary had nine other children, including a daughter Tina Stanton Ephraim (Tina), and sons Joe Mills[14] (Joe),

---

[13] That acquisition is not reflected on Frank and Katherine's or Larry's source and application of funds analyses for 1987. See infra Apps. A and F. The parties do not explain why it was omitted as an application of funds for that year. We have made no adjustment for this item in our findings regarding unreported income since it was not identified as an item in dispute.

[14] Joe actually was Edward's stepson. It is not clear from the record whether Katherine, Tina, and their sister Margie

(continued...)

Jack Stanton (Jack), Duyo Peter Stanton (sometimes referred to as Dewey), and Chuck Stanton (Chuck). Tina's husband is Frank's half-brother.

For most of his life Edward worked as a coppersmith and welder. Until around 1951, Edward and his family moved from job site to job site approximately every week to 10 days.[15] His family lived in tents and, later, in trailers. Around 1951, Edward, Mary, and the children remaining at home settled in Maryland, first in the Emmitsburg area and later in the Hagerstown area.[16] While living in Maryland, Edward purchased some real estate, including a trailer park, some apartment buildings, and a lot on which he built a home. Edward also bought and sold some livestock.

Edward and Mary did not trust banks. They kept cash as well as gold coins and jewelry hidden in their home. Although Edward generally lived frugally, on occasion he helped his children out

---

[14](...continued)
actually were Mary's stepdaughters although certain statements in the record give that impression.

[15] Joe testified that for some of those years Edward and his family traveled with a carnival at which Mary worked as a fortune teller.

[16] Although the testimony is somewhat contradictory as to exactly which of Edward and Mary's children were living with them when Mary and Edward settled in Maryland, it is clear that both Katherine and Tina already were married and living in separate residences while Chuck and possibly Dewey were living with their parents at that time.

financially, especially Chuck and Katherine.  At times, Edward asked Katherine or Tina for money to pay some of his or Mary's living expenses.

The records of the Social Security Administration reflect the following earnings reported for Edward over his lifetime:

| Period | Amount |
|---|---|
| 1937 to 1950 (cumulative) | $31 |
| 1951 through 1961 | -0- |
| 1962 | 659 |
| 1963 through 1965 | -0- |
| 1966 | 465 |
| 1967 | 720 |
| 1968 | 1,217 |
| 1969 through 1974 | -0- |
| Total | 3,092 |

Mary worked as a fortune teller both before and after the family settled in Maryland.  However, the Social Security Administration has no record of any earnings reported for Mary.  Respondent has no record showing that Mary or Edward filed any Federal income tax returns.

Dewey was born on April 1, 1940.  During his lifetime, Dewey was involved in at least two serious automobile accidents.  The first accident occurred on or about December 15, 1960.  Dewey, his wife Helen, and their son Michael, were injured in that accident, and Dewey's car was destroyed.  They filed a law suit against the driver of the tractor trailer which struck their car and the driver's employer.  The case was subsequently settled before trial, and some time thereafter, the following settlement amounts were paid to or for Dewey, Helen, and Michael:

| Beneficiary | Amount |
|---|---|
| Helen Stanton | $29,082 |
| Michael Stanton | 7,725 |
| Bobby Stanton[1] | 10,389 |
| Total | 47,196 |

[1]It appears that "Bobby" was another name for Dewey.

Dewey acquired a new Cadillac as a result of the first accident.  However, it is not clear from the record whether he paid the cost of the Cadillac out of the settlement proceeds or received the car in a side agreement to the settlement.  At some time, Edward obtained control over the settlement proceeds.  It is not clear from the record whether Edward used some of the settlement proceeds to acquire property described infra.

Dewey and Michael died on June 15, 1964, as a result of a second accident.  There is no evidence in the record that Dewey's or Michael's survivors received any settlement proceeds as a result of the second accident.

Property records reveal that Mary and Edward engaged in the following real property transactions between 1963 and 1971:

| Date | Description of Transaction |
|---|---|
| 11/29/63 | Purchased Lot 178 in Prospect Place for $5,000 |
| 12/13/63 | Purchased Lot 179 in Prospect Place for $1,000 |
| 3/26/64 | Purchased Lot 174 in Prospect Place for $2,000 |
| 3/26/64 | Obtained a $1,700 mortgage on Lot 174 |
| 1/5/65 | Obtained a $751 mortgage on Lots 175, 176, 177 & 178 |
| 2/11/66 | Purchased Lot 3 on Michael Beckley Plat for $10,000 |

| 2/11/66 | Obtained $5,400 mortgage on Lot 3 on Michael Beckley Plat |
|---|---|
| 4/11/68 | Obtained $4,250 mortgage on Lot 3 on Michael Beckley Plat |
| 10/19/70 | Obtained $564 mortgage on Lots 175, 176, 178 & 179 in Prospect Place |
| 9/24/71 | Sold Lots 174, 175, 176, 177, 178 & 179 in Prospect Place for $10,000 |

The record does not reflect when or for how much Edward and Mary acquired interests in Lots 175 and 176 in Prospect Place, or what happened to Lot 3 on Michael Beckley Plat. The mortgage obtained on October 19, 1970, was released on November 1, 1971. The mortgage obtained on April 11, 1968, was released on February 10, 1976.

Mary died on July 21, 1970. Following Mary's death, Edward sold his home in the Hagerstown area.[17] He stayed with Katherine for a period of time, and then moved to New York where he lived first with Chuck and then with his brother's widow, Bolita. Edward's children did not know whether Edward and Bolita subsequently married in the gypsy custom or merely lived together.

---

[17] It is not clear whether that home was located on Lots 174, 175, 176, 177, 178, and 179 in Prospect Place, which Edward sold on Sept. 24, 1971. Although it is not clear from the record, Edward may have sold his home through the use of a land contract. Joe testified that, following Edward's death, Jack began receiving the payments on a land contract Edward had entered into sometime before his death.

Sometime during 1974, Edward was admitted to New York City Hospital because of problems he had related to diabetes. One of his legs was amputated during that hospital stay. Sometime while he was hospitalized, Katherine and Jack removed all of Edward's property from a safe deposit box he had at Chase Manhattan Bank. See infra for additional discussion relating to the removal of Edward's property from his safe deposit box. After Edward's release from the hospital, he moved to Ohio to live with Jack. Edward died in Ohio on September 3, 1974. In the gypsy culture, Edward's money would go to a son because it was a gypsy custom for the first-born son to inherit everything.

Respondent has no record showing that Edward or Mary ever filed a gift tax return. Respondent has no record showing that an estate tax return was filed for either Edward or Mary.

F.  Other Facts

Frank and Katherine dealt exclusively in cash. Katherine maintained writing tablets on which she recorded receipts. She gave those tablets and their bills to Baptiste for use in preparing the tax returns. There is no evidence that Katherine or Baptiste presented any of those tablets or bill receipts to respondent during the audit or afterward.

Frank loved to gamble. He frequently went to greyhound races in Seminole County, Florida. Once or twice a year, at Katherine's expense, the Johnson family, including spouses and

their children, took trips together to gamble in places such as the Bahamas, Atlantic City, New Jersey, and Las Vegas, Nevada.

Over their lifetimes, Frank and Katherine made numerous gifts to their children and grandchildren. Frank and Katherine also gave them money and paid for some of their personal expenses. At some time, Frank and Katherine gave their daughter Janie jewelry valued at $22,800. Katherine also paid for the weddings and divorces of her children and grandchildren. She paid for vacations for her children and grandchildren and their families. She gave them money to gamble. Katherine and Frank also purchased U.S. Savings Bonds as birthday gifts for Larry, Ronnie, and Sylvia. In addition, she gave them cash for asset acquisitions, including houses, cars, and boats.

Respondent was unable to locate any record showing that Frank or Katherine had ever filed a gift tax return.

Katherine and Frank received little or no formal education. They had only minimal reading and writing skills and only basic math skills.

During the years in issue, Katherine suffered from various medical problems, including a heart condition, diabetes, vision impairment, high blood pressure, high cholesterol levels, water retention, and obesity. At various time during the years in issue, she was admitted to the hospital for treatment. Her vision was impaired due to cataracts and retinal hemorrhages;

however, during the years in issue she could see well enough to sort mail, review advertisements or other literature, and make notations on the tablets she used to record income. One of her legs was amputated during 1988, and she used a wheelchair or an artificial leg which enabled her to walk with a cane. At least toward the end of her life, Katherine's health condition impaired her ability to work a full 8-hour day.

During the period 1984 through 1990, Frank suffered from various medical problems, including a heart condition, high blood pressure, and obesity. During 1985, Frank suffered a slight to moderate heart attack. His health problems, however, did not prevent him from undertaking activities during the years in issue such as mowing his lawn, fishing, gambling, and helping Larry and Ronnie renovate property.

Frank and Katherine experienced numerous medical expenses during the years in issue. The record does not reveal what portion, if any, of those expenses were paid by Medicare or Medicaid.

Frank and Katherine purchased the Longwood property during June 1969 for $26,000. They financed $18,000 of the purchase price. Sometime before 1983, Frank and Katherine purchased a lot for $5,000. It is not clear from the record whether this lot was the Port St. Lucie property transferred to Larry and Ronnie on January 7, 1991.

During 1971, Frank purchased a 1971 Corvette for $4,160.
Frank purchased a 1967 Rolls Royce during 1982 for $18,500.  He
paid cash for the vehicle, primarily in $100 bills.

As of January 1, 1983, Katherine and Frank had cash on hand
of approximately $30,000.  Throughout the years in issue, they
kept approximately $30,000 cash on hand at the beginning and end
of each year.

At a meeting with Frank and Katherine on or about
December 5, 1989, Revenue Officer Budde prepared a Form 433-A,
Collection Information Statement For Individuals (collection
statement), on the basis of information provided by them.  The
collection statement, among other things, indicated that Frank
and Katherine's only assets were (1) two bank accounts of $1,200
and $13,000 at Glendale Federal, (2) a residence valued at
$60,000 and monthly payments of $500, (3) a 1986 Cadillac having
zero value, and (4) a 1986 Chevy having zero value.  The
collection statement further indicated that Frank and Katherine's
only source of income at that time consisted of $900 per month in
Social Security benefits.

Larry purchased a 1977 Corvette during 1977 for $3,480.
During 1982, Larry purchased a 1978 Chevrolet Suburban for
$2,699.

Respondent was unable to locate any record showing that an estate tax return had been filed on behalf of Frank or Katherine.

G.  Capital Gain for 1989

Frank and Katherine reported a long-term capital gain on their joint Federal income tax return for 1989 from the sale of a lot (lot).  They calculated that gain as follows:

| | |
|---|---|
| Sales price | $40,000 |
| Basis | 36,579 |
| Gain from sale | 3,421 |

Frank conveyed the lot to Russell A. Sachs (Sachs) by warranty deed dated March 20, 1989.  The settlement statement relating to the sale of the lot to Sachs shows that $11,033 of the $40,000 sales price was used to pay off a mortgage loan.  The settlement statement also shows expenses of the sale of $4,990.

Frank had acquired his interest in the lot from a Patricia A. Johnson (Patricia)[18] on March 18, 1989, by means of a quitclaim deed.  The quitclaim deed stated that the transfer was for no consideration.

Patricia had acquired her interest in the lot with John M. Johnson (John) for $25,000 on April 6, 1979, from Charles and Annie Mobley (Mobleys) pursuant to an Articles of Agreement which specified that title would not be conveyed until after payment of the $25,000 purchase price.  By quitclaim deed John transferred

_____

[18]  The record does not reveal whether Patricia A. Johnson was Frank and Katherine's daughter Patricia or an unrelated party with the same name.

his interest in the property to Patricia in October 1987 for a stated consideration of $5,000. The Mobleys transferred title to Frank by warranty deed on March 20, 1989.

On audit, respondent increased the gain from the sale of that lot to $23,978 and determined that the gain was a short-term gain. The notice of deficiency indicates that the adjustment was made because of a change in verified basis and holding period. In the source and application of funds analysis for Frank and Katherine for 1989, respondent treats the $23,978 as a source of funds.

II. Facts Relating to Issues Involving Transferee Liability

A. Larry

By notice dated April 4, 1997, respondent determined transferee liability against Larry relating to the deficiencies, additions to tax, and penalties that respondent determined Frank and Katherine owed for the years in issue. Previously, by letter dated July 26, 1996, respondent had determined that Frank and Katherine had transferred the following assets to Larry upon which transferee liability attached:

|                                                      |   |
|------------------------------------------------------|--------:|
| <u>Description</u>                                   | <u>Amount</u> |
| Annual gifts in the form of excess of applications of funds over sources of funds: | |
| 1983                                                 | $34,317 |
| 1984                                                 | 37,270 |
| 1985                                                 | 53,357 |
| 1986                                                 | 39,723 |
| 1987                                                 | 95,819 |
| 1988                                                 | 68,359 |
| 1989                                                 | 38,018 |
| 1990                                                 | 43,404 |
| Cash to purchase Sanford property                    | 30,000 |
| Glendale Federal savings account transfer            | 21,550 |
| Longwood property equity                             | 311,000 |
| One-half interest in St. Lucie County property       | 4,000 |
| Transfer of vehicles:                                | |
| 1967 Rolls Royce                                     | 25,000 |
| 1986 Lamborghini                                     | 52,000 |
| 1986 Chevy C30                                        | 7,850 |
| Total transferred                                    | 861,667 |

The parties agree that for the years 1983 through 1990,

Larry acquired the following assets:

| Year | Description of Asset | Cash Paid |
|------|----------------------|----------:|
| 1983 | 1981 Mercedes 380 SL CR | $15,000 |
| 1984 | 1984 GM Suburban | 7,242 |
| 1985 | 1985 Chris Craft boat | 35,000 |
| 1985 | 1974 Ford truck | 315 |
| 1985 | 1982 Ferrari | 10,295 |
| 1986 | Sanford property | 29,427 |
| 1986 | Renovation to Sanford property | 25,900 |
| 1986 | 1986 Lamborghini | 14,435 |
| 1988 | 1979 Cadillac | 4,662 |
| 1989 | 1964 Ford Thunderbird | 27 |
| 1989 | 1985 Jeep CJ | 4,285 |
| 1989 | Chevrolet Astro van | 13,000 |
| 1990 | 1988 Cadillac limousine | 18,831 |
| 1990 | 1985 Lincoln limousine | 14,890 |
|      | Total | 193,309 |

B. <u>Ronnie</u>

By notice dated April 4, 1997, respondent determined

transferee liability against Ronnie for the deficiencies,

additions to tax, and penalties that respondent determined Frank and Katherine owed for the years in issue.  Previously, by letter dated July 20, 1996, respondent determined that Frank and Katherine had transferred the following assets to Ronnie upon which transferee liability attached:

| Description | Amount |
|---|---|
| Annual gifts in form of excess of applications of funds over sources of funds: | |
| 1983 | $35,946 |
| 1984 | 52,672 |
| 1985 | 30,834 |
| 1986 | 27,525 |
| 1987 | 48,010 |
| 1988 | 64,360 |
| 1989 | 73,937 |
| 1990 | 60,223 |
| Glendale Federal savings account transfer | 21,550 |
| Longwood property equity | 311,000 |
| One-half interest in St. Lucie County property | 4,000 |
| Total assets transferred | 730,057 |

The parties agree that for the years 1983 through 1990, Ronnie acquired the following assets:

| Year | Description of Asset | Cash Paid |
|------|----------------------|-----------|
| 1983 | 1983 Porsche | $25,200 |
| 1985 | 1985 Porsche | 10,826 |
| 1986 | 1979 Ford truck | 788 |
| 1986 | 1968 Chevy Camaro | 1,050 |
| 1987 | 1977 AMF boat | 2,625 |
| 1987 | Ridgewood property | 25,165 |
| 1987 | Renovation to Ridgewood property | 13,800 |
| 1988 | Renovation to Ridgewood property | 1,750 |
| 1988 | 1986 Ford 150 | 10,563 |
| 1988 | 1987 Ferrari | 19,000 |
| 1989 | Renovation to Ridgewood property | 13,200 |
| 1989 | 1974 Corvette | 11,500 |
| 1989 | 1980 Jeep | 2,156 |
| 1989 | 1982 Jeep | 3,025 |
| 1989 | Landscaping | 17,000 |
| 1990 | 1979 Triumph | 1,200 |
| 1990 | 1990 Ford Bronco | 4,000 |
| | Total | 162,848 |

C. Sylvia

By notice dated April 4, 1997, respondent determined transferee liability against Sylvia for the deficiencies, additions to tax, and penalties that respondent determined Frank and Katherine owed for the years in issue. Previously, by letter dated July 26, 1996, respondent determined that Frank and Katherine had transferred the following assets to Sylvia upon which transferee liability attached:

| Description | Amount |
|-------------|--------|
| Annual gifts in the form of excess of applications of funds over sources of funds: | |
| 1985 | $20,862 |
| 1986 | 19,775 |
| 1987 | 23,946 |
| 1988 | 52,197 |
| 1989 | 50,359 |
| 1990 | 62,546 |
| Total assets transferred | 229,685 |

The parties agree that for the years 1983 through 1990, Sylvia acquired the following assets:

| Year | Description of Asset | Cash Paid |
|------|----------------------|-----------|
| 1985 | 1985 Corvette | $27,785 |
| 1988 | 1988 Porsche | 10,000 |
| | Total | 37,785 |

D.  Specific Transfers

1.  U.S. Savings Bonds

During the years in issue, Larry, Ronnie, and Sylvia acquired U.S. Savings bonds in the following amounts (face values):

| Year | Larry | Ronnie | Sylvia |
|------|-------|--------|--------|
| 1983 | $7,200 | – | – |
| 1984 | 7,500 | $40,925 | – |
| 1985 | 200 | – | – |
| 1986 | – | – | – |
| 1987 | – | – | $5,000 |
| 1988 | – | – | 200 |
| 1989 | – | – | 3,450 |
| 1990 | – | – | 2,250 |
| Total | 14,900 | 40,925 | 10,900 |

2.  Account at Glendale Federal Savings and Loan

Account No. 096-601219-9 was maintained at Glendale Federal Savings and Loan in the names of Frank and Larry.  On December 12, 1989, $26,189 was deposited into that account, representing the proceeds of a Certificate of Deposit.  An additional $13,613 was deposited into that account on December 29, 1989.  Account No. 096-601219-9 had a balance of $43,101 as of December 14, 1990, when it was transferred into Account No. 096-601615-9 in the names of Larry and Ronnie.

### 3. Longwood Property

On January 7, 1991, Frank and Katherine transferred the Longwood property to Larry and Ronnie by quitclaim deed for a stated nominal consideration.  Pursuant to the quitclaim deed, Frank and Katherine retained for themselves "the exclusive possession, use, and enjoyment of the rents, issues, and profits of the above-granted premises for and during the[ir] natural lifetime".  A real estate tax bill dated January 1, 1991, showed a real estate tax value for the Longwood property of $236,110.  A real estate tax bill dated November 16, 1992, showed a real estate tax value for the Longwood property of $209,110.

### 4. Port St. Lucie Property

On January 7, 1991, Katherine transferred to Larry and Ronnie by quitclaim deed property located in Port St. Lucie for a stated nominal consideration.

### 5. Automobiles

In August 1992, Frank transferred his 1967 Rolls Royce to Larry for no consideration.  At the time of the transfer, the Rolls Royce had a value of $25,000.  Also in August 1992, Frank transferred the 1986 Lamborghini to Larry for no consideration.  At the time of transfer, the Lamborghini had a value of $52,000.

OPINION

I.  Issues Relating to Deficiencies

   A.  Background

Petitioners contend that for each of the years in issue the expiration of period of limitations precludes the assessment of any deficiency.  Respondent, however, contends that the fraud exception to the statute of limitations applies for each year in issue; consequently, respondent maintains, assessment of the deficiencies is not barred for any year in issue.  Alternatively, respondent argues that the period of limitations for 1990 has not expired because the unreported income for that year exceeds 25 percent of the income Frank and Katherine included on their return for that year; therefore, a 6-year statute of limitations applies for 1990.  Petitioners, however, maintain that Frank and Katherine did not understate their income for any year in issue.

Respondent used an indirect method to reconstruct Frank and Katherine's income for the years 1983 through 1990, specifically the source and application of funds method, to determine that Frank and Katherine had understated their income for those years. Petitioners contend that, during those years, Frank and Katherine used a previously acquired cash hoard to purchase assets and to pay personal expenses for themselves and other family members.

B.  Statute of Limitations and Fraud Issues

1.  In General

A deficiency in tax generally must be assessed within 3 years of the date on which the return was filed.  See sec. 6501(a).  Section 6501(c)(1) provides one of the exceptions to the general 3-year limitation period.  Under that exception, the tax may be assessed at any time in the case of a false or fraudulent return filed with the intent to evade tax.  Respondent has the burden of proving the applicability of an exception to the general 3-year limitation period.  See Rule 142; Harlan v. Commissioner, 116 T.C. 31, 39 (2001).  Respondent must prove the same elements of fraud under section 6501(c)(1) as are required for imposing a fraud penalty under section 6653(b).  See, e.g., Mobley v. Commissioner, T.C. Memo. 1993-60, affd. without published opinion 33 F.3d 1382 (11th Cir. 1994).  To prevail under section 6653(b), respondent must show through clear and convincing evidence both that (1) an underpayment of tax exists, and (2) some part of the underpayment is due to fraud.  See sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

Section 6501(e) provides another exception to the 3-year general limitation period for assessing a tax.  Under that exception, the 3-year limitation period is extended to 6 years where a taxpayer omits properly includable income from his or her

return in an amount in excess of 25 percent of the amount of gross income stated on the return. See sec. 6501(e)(1)(A). In determining whether the 25-percent requirement is met, any amount omitted from gross income that is adequately disclosed in the return or in a statement attached to the return is not taken into account. See sec. 6501(e)(1)(A)(ii).

We turn first to the issue of fraud because, except possibly for 1990, where the 6-year limitation period may apply, absent fraud, the statute of limitations bars the assessment of the deficiencies for the years in issue. See sec. 6501(a), (c), (e); see also York v. Commissioner, 24 T.C. 742, 743 (1955). If fraud exists for 1990, we need not address whether the 6-year limitation period applies for that year.

### 2. Fraud

Respondent contends that Frank and Katherine acted fraudulently in understating their income tax liability for the years in issue; thus, respondent asserts, the resulting underpayments of tax for the years in issue were due to fraud. Petitioners, however, deny that Frank and Katherine under reported any income for the years in issue.

Fraud is the intentional wrongdoing on the part of a taxpayer designed to evade a tax believed to be owing. See, e.g., Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Thus, courts must decide whether, by the taxpayer's conduct, he or she

intended to conceal, mislead, or otherwise prevent the collection of taxes owed or believed to be owed.  See, e.g., Danenberg v. Commissioner, 73 T.C. 370, 393 (1979).  Respondent has the burden of proving the existence of fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980).  Where fraud is determined for each of several years, respondent's burden applies separately for each of the years.  See, e.g., Temple v. Commissioner, T.C. Memo. 2000-337.  The issue of whether fraud exists is factual and must be determined upon the basis of the entire record.  See, e.g., Recklitis v. Commissioner, 91 T.C. 874, 909 (1988).  Fraud cannot be presumed, nor can a finding of fraud rest on mere suspicion.  See, e.g., id.  However, since direct evidence of fraud generally is not available, we may rely on circumstantial evidence and draw reasonable inferences from the record as a whole.  See, e.g., id. at 910.  We consider first for each year in issue the question of whether a deficiency exists.

a.  Existence of an Underpayment

The first element in establishing fraud is determining whether any underpayment of tax exists.  For 1983 through 1988, section 6653(c)(1) defines an "underpayment" for purposes of section 6653 as a "deficiency" defined by section 6211.  Section 6211 generally defines a deficiency as the excess of the correct amount of tax over the amount shown on the return.  For 1989 and

1990, section 6664(a) defines "underpayment" as "the amount by which any tax imposed by this title exceeds the excess of (1) the sum of (A) the amount shown as the tax by the taxpayer on his return, plus (B) amounts not so shown previously assessed (or collected without assessment), over (2) the amount of rebates made." Thus, for purposes of this case, the term "deficiency" as defined by section 6211 has the same meaning as the term "underpayment" as defined by section 6664(a). Respondent used the source and application of funds method of reconstructing income in determining that Frank and Katherine had underreported their income for the years in issue and that unreported income resulted in deficiencies in tax for each year in issue.

Taxpayers are required to keep adequate records with which respondent may determine their correct tax liability. See sec. 6001; see also Petzoldt v. Commissioner, supra at 687; sec. 1.6001-1(a), (d), Income Tax Regs. When a taxpayer keeps no books, or keeps books that are inadequate, section 446(b) authorizes the Commissioner to compute the taxpayer's income by any method that clearly reflects income. See, e.g., Petzoldt v. Commissioner, supra; see also Cebollero v. Commissioner, 967 F.2d 986, 989 (4th Cir. 1992), affg. T.C. Memo. 1990-618. For that purpose, respondent may use indirect methods to reconstruct income as long as they are reasonable in light of all surrounding facts and circumstances. See Holland v. United States, 348 U.S.

121, 131-132 (1954); Erickson v. Commissioner, 937 F.2d 1548, 1552-1553 (10th Cir. 1991), affg. T.C. Memo. 1989-552; Giddio v. Commissioner, 54 T.C. 1530, 1532-1533 (1970).

The source and application of funds method (also sometimes referred to as the expenditures method) is an accepted indirect method of reconstructing income. See, e.g., Williams v. Commissioner, 999 F.2d 760, 763 (4th Cir. 1993), affg. T.C. Memo. 1992-153. Under that method, any amount by which the taxpayer's total application of funds during the taxable year exceeds the total funds available to him from known sources for that year is attributed to unreported taxable income absent some showing by the taxpayer of a nontaxable source. See, e.g., id., Troncelliti v. Commissioner, T.C. Memo. 1971-72 ("As explanation the taxpayer may show that the difference between the total application [of] funds and the total reported sources of funds is attributable to such nontaxable items as loans, gifts, inheritances, or assets on hand at the beginning of the taxable period."). Thus, as part of the reconstruction of income using the source and application of funds method, respondent must exclude funds that the taxpayer had accumulated before the first taxable year under examination insofar as those funds are a source of subsequent expenditures. See Flood v. Commissioner, T.C. Memo. 2001-39. Frank and Katherine dealt primarily in cash and provided to respondent no

books and records relating to Katherine's palmistry business.[19]
Under the circumstances, respondent's use of the source and
application of funds method to reconstruct Frank and Katherine's
income for the years in issue was reasonable.

Where the allegation of fraud is intertwined with unreported
and indirectly reconstructed income, respondent can satisfy the
burden of proving an underpayment of tax in one of two ways.  See
Parks v. Commissioner, 94 T.C. 654, 661 (1990).  First,
respondent may prove a likely source of the unreported income;
second, where the taxpayer alleges a nontaxable source for the
funds, respondent may prove that the nontaxable source did not
exist.  See id.

### (1) Likely Sources of Income

Respondent contends that Katherine's palmistry business was
a likely source for the unreported income.  Respondent also
contends that unreported gambling winnings were another likely
source.  Additionally, respondent contends that Frank may have
unreported income from work as a real estate broker as he alleged
in certain loan applications.[20]

---

[19] Although there is testimonial evidence that Katherine
made some recordations of income on tablets that she kept for
that purpose, there is no evidence that those tablets were
submitted to respondent, nor were they introduced at trial.

[20] We made no findings of fact relating to the loan
applications because we find that the statements contained
therein lack trustworthiness.

Petitioners contend that Frank and Katherine did not have any likely source for the unreported income in the amounts determined by respondent. Petitioners assert that Frank was retired and seriously ill for all of the years in issue, and his only source of income was Social Security benefits. Petitioners further assert that Katherine's palmistry business could not have generated the substantial receipts needed to produce the unreported income calculated by respondent for the years in issue. They maintain that she was seriously ill much of that period, and she was retired between January 1986 and August 1990 during which period her only income was Social Security benefits. They further maintain that Frank accurately reported his gambling winnings. As for the loan applications, petitioners argue that the applications were prepared by third parties, and that there is no documentary evidence to support the claim that Frank worked as a real estate broker for the years in issue.

We believe that petitioners paint an overly dramatic picture of Frank's and Katherine's health conditions for the years in issue. In our opinion, the record does not show that Frank and Katherine were too ill to conduct the activities that would generate income from two of the likely sources identified by respondent (i.e., palmistry and gambling), and we have made findings that they did conduct those activities during the years in issue. The testimony of Dr. Kerry M. Schwartz, M.D. (Dr.

Schwartz), Frank and Katherine's cardiologist during the years in issue, does not indicate that he advised them not to work during those years. Rather, his records indicate that, during those years, he recommended they undertake exercise and weight reduction programs. Indeed, Katherine continued her palmistry business after the period petitioners allege she was retired even though, from Dr. Schwartz's records, it appears she was experiencing more severe medical problems in the later years than she had experienced during the earlier years. The record reveals, furthermore, that, during the years in issue, Frank and Katherine went on gambling junkets with other family members, and he went fishing, performed jobs around his home, and assisted Larry and Ronnie in remodeling their properties.

Other than petitioners' self-serving statements, there is no support in the record for petitioners' contention that Katherine was retired from her palmistry business during 1986 through August 1990. Baptiste's testimony reveals that he merely assumed that Katherine was retired during that period because she did not furnish to him records of receipts for the preparation of their tax returns. In her deposition, Katherine never testified that she had ever retired from her business. Indeed, her testimony shows that she was conducting readings during 1986, one of the years petitioners' contend she was retired. Furthermore, Lisa Ruby's testimony supports a finding that Katherine continued to

read palms during 1988 and 1989 as well as 1990. The TV commercial Katherine filmed during 1988 also gives the impression that she continued to read palms over her entire 50-year career as a palmist. Our review of the whole record leads us to conclude that Katherine remained actively involved in her palmistry business throughout all of the years in issue, and we have so found. Katherine's palmistry business constitutes a likely source of funds for the unreported income.

Additionally, the record reveals that both Katherine and Frank gambled during the years in issue. Thus, the record supports an inference that gambling provided another likely source for the unreported income.

Accordingly, we conclude that respondent has proved likely sources for the unreported income for the years in issue. The large excess of expenditures over income revealed by respondent's source and application of funds analysis for the years in issue supports respondent's determination of unreported income absent a nontaxable source for the expenditures.

### (2) Nontaxable Source

Petitioners contend that Frank and Katherine used a cash hoard Katherine had received from her father during or before 1974 to acquire assets and pay expenditures for themselves and for Larry, Ronnie, and Sylvia during the years in issue. They assert that Katherine's father gave her about $750,000 in cash

plus gold coins and jewelry worth around $50,000 to $60,000 at the time of transfer.  Additionally, they assert that the value of gold increased substantially over the years thereby providing a larger available cash hoard for the years in issue.  Respondent disputes petitioners' claim of a cash hoard.  Rather, respondent asserts that Frank and Katherine could not have had cash on hand at the beginning of 1983 in the amounts claimed by petitioners.  We agree with respondent.

In her deposition, Katherine told conflicting stories relating to the acquisition of a cash hoard she allegedly received from her father.  According to one of those stories, to keep Bolita from taking Edward's money while he was in New York City Hospital to have his leg amputated, Katherine and her brother Jack[21] went to Edward's safe deposit box at Chase Manhattan Bank and removed cash totaling $750,000 (in nothing less than $100, $500, and $1,000 dollar bills), plus gold coins and jewelry worth at the time between $50,000 to $60,000.  According to that story, Katherine returned to her home in Florida with the cash, gold coins, and jewelry carried in a gypsy pillowcase, and she kept Edward's property in her home in Callahan, Florida, and later in Longwood, Florida, or in a safe

---

[21]  Petitioners did not offer any evidence from Jack relating to Edward's cash hoard or explain why Jack was unavailable.  Katherine testified in her deposition both that Jack had died 6 or 7 years before the deposition, and that he was living in an unknown location in England.

deposit box with a bank in Longwood, Florida.  Purportedly,
Katherine used some of the money to build her home in Longwood,
Florida; she gave Larry some of it to buy cars, jewelry, and his
properties in Callahan, Florida, Sanford, Florida, and Daytona
Beach Shores, Florida; she gave Ronnie and Sylvia some of the
money to buy cars, jewelry, and their homes; she spent some of it
for vacations and to pay living expenses of Larry, Ronnie, and
Sylvia; Jack White stole some of the money; and Chuck's son also
stole some it.  Additionally, Katherine stated that she sold some
of the jewelry to other gypsy women; she gave some of it away to
her relatives; and Chuck's son also stole some of the jewelry.

In another version of the cash hoard story, Edward came to
live with Katherine after Mary's death, and he stayed with
Katherine for 6 or more years.  Allegedly, Edward gave Frank and
Katherine $750,000 sometime before he came to live with them
because he did not want Joe to take his money.[22]  Katherine
purportedly used the cash in the same manner as described above.
Katherine further testified that her father gave her all of his
and her mother's jewelry and, under threat of a curse, told
Katherine not to give any of it to her siblings.  We believe that
much of Katherine's implausible and conflicting testimony

---

[22]  We know from the record that the chronology of this
story cannot be accurate.  Katherine moved into the Longwood
property in 1969, Mary died on July 21, 1970, and Edward died on
Sept. 3, 1974.

regarding Edward's cash hoard was false or exaggerated. Our belief is strengthened by the inconsistent testimony relating to Edward's cash hoard offered on deposition by three of Katherine's siblings.

Tina testified that while her father was in the hospital to have his leg amputated, she and Katherine decided they needed money to obtain better medical care for him. She also stated that they wanted to keep Edward's money away from Bolita. Tina stated that she was not present when Katherine and Jack removed Edward's property from his safe deposit box, but she went with them to the bank and she saw Katherine dump from a pillowcase cash, gold coins, and jewelry on a bed in her motel room. She alleged that the cash was in denominations of nothing less than $500 and $1,000 dollar bills and the safe deposit box's contents covered Katherine's bed. Tina stated that no one counted the money in her presence, and that she returned to her home both before Katherine returned to Florida and her father was discharged from the hospital. Tina had no first-hand knowledge as to the amount of money in Edward's safe deposit box or the final disposition of the box's contents.[23] Tina's recount of the

---

[23] Tina testified that "If Katherine said that he gave her that money, I am sure that he did because Katherine had it in her possession." Tina's conclusion that Katherine had possession of the contents of the safe deposit box ignores the fact that Jack and, as will be recounted, other siblings purportedly were in Katherine's motel room when the contents were revealed and that

(continued...)

safe deposit story was inconsistent, tentative, and appeared to have been scripted.

In his deposition, Joe testified that he was not present when Katherine and Jack allegedly emptied their father's safe deposit box, but he saw the contents on a bed in Katherine's motel room. He stated that he saw only gold coins, and that, on his urging, Katherine later returned those coins to Edward's safe deposit box. Joe further testified that Edward had only $1,500 at the time of his hospitalization, and that Jack asked Joe to help pay Edward's medical expenses.

Chuck was not present in New York City at the time Katherine and Jack emptied Edward's safe deposit box. Thus, he had no first-hand knowledge as to the contents of Edward's safe deposit box or as to the ultimate disposition of those contents. Although Chuck testified generally about his father's financial dealings and accumulation of cash, he did not quantify the amount of money or the value of property that his father had accumulated over his lifetime, how much money Edward had at the time of his hospitalization, or how much of that money, if any, Edward gave to Katherine. The objective evidence does not support Chuck's testimony that Edward was highly successful in his welding business or that he dealt heavily in property and livestock.

---

[23](...continued)
any one of them could have assumed custody of Edward's property subsequent to Tina's return home.

Other evidence in the record leads us to conclude that Katherine did not receive $750,000 from Edward. Edward's and Mary's earnings records, property transaction records, accident settlement information, and testimony relating to Edward's and Mary's borrowing history, medical history, and life style indicate that Edward could not have accumulated anywhere near the $750,000 claimed by petitioners. Furthermore, Katherine testified that Gypsies did not believe in carrying insurance, and that neither Mary nor Edward had insurance. If that is true, then Edward probably did not have medical insurance to pay his medical expenses. It would follow that some of Edward's life savings, if any, would have been used to pay his medical expenses. Moreover, according to gypsy custom, Edward's money would have gone to a son. Even if Edward had not wanted Joe to get his money, there was no showing that he also did not want Jack to get it. Indeed, Joe testified that Jack acquired Edward's interest in a land contract. We find it implausible that Jack, who ultimately took responsibility for Edward's physical care after his discharge from the hospital, would permit Katherine to appropriate all of Edward's property at a time when Edward was most in need of it. Yet petitioners would have us believe that Edward willingly gave all of his property to Katherine at a time he was experiencing extreme medical problems

and needed funds himself.[24]  Accordingly, we find petitioners'

allegation that Edward gave Katherine all of his cash, gold

coins, and jewelry implausible and incredible.  We are not

required to accept incredible, implausible, or biased testimony.

See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Even if we accepted Katherine's story that Edward gave her

all of his cash, gold coins, and jewelry, which we do not, the

record contains no verification that any of it remained on hand

by the end of 1982.  The record indicates that, over their

lifetimes, Frank and Katherine acquired properties and expensive

automobiles and made numerous gifts to their children and

grandchildren.  Larry also acquired expensive automobiles before

the years in issue.  Furthermore, the circumstances of Larry,

Ronnie, and Sylvia financing some of the cost of the properties

and vehicles (for which Frank and Katherine purportedly provided

the remaining funds) they acquired during the years in issue are

inconsistent with petitioners' allegation that, at the beginning

of 1983, Frank and Katherine were in possession of the

substantial cash hoard they claim.  See, e.g., Appendices B

through I.

---

[24]  Petitioners contend that Katherine used some of the
money from Edward's safe deposit box to pay for his
hospitalization.  That contention, however, is not supported by
the references to the record they cited.

Accordingly, on the basis of the entire record, we find that respondent has shown petitioners' contention of the existence of a $750,000 or greater[25] cash hoard at the beginning of 1983 to be inconsistent, implausible, and without objective support in the record.

Petitioners do not contend, and the record does not suggest, that Katherine and Frank had accumulated a substantial cash hoard separate from Edward's alleged accumulation.  Indeed, Katherine implied the opposite when she testified that "My husband didn't believe in banks.  We spent it as we got it to raise the children."  Nonetheless, on the basis of the entire record, we believe that throughout the years Frank and Katherine maintained a practice of keeping cash on hand (as evidenced by the amount of cash in their home safe when Jack White burglarized their home in 1990).  In our best judgment, based on the entire record, we estimate that amount to be $30,000.  See Mikelberg v. Commissioner, 23 T.C. 342, 352 (1954), affd. per curiam 234 F.2d

---

[25]  Petitioners contend that the dramatic increase in the price of gold substantially increased the value of the gold coins and jewelry that Katherine received from her father; thus, that increased the amount of the available cash hoard.  Even if we had accepted Katherine's cash hoard story, the record does not establish how much of the coins and jewelry she sold or when they were sold.  In her deposition, Katherine testified that she kept the jewelry until she was robbed in 1990, and then she gave some away to relatives and sold some to other Gypsies.  She never testified as to when she sold the items, the number of items sold, or the price that she received for them.  Katherine made no mention of the disposition of the gold coins.

34 (3d Cir. 1956).  We have made a finding of fact to that effect.  Except for 1990, our finding that Frank and Katherine had $30,000 cash on hand as of January 1, 1983, does not affect respondent's source and application of funds analyses for the years in issue because we also have found that the amount of cash on hand at the beginning and end of each year in issue remained approximately the same.  Thus, since there was no net change in the amount of cash on hand at the beginning and end of any year in issue, that cash, in effect, constitutes neither a source nor an application of funds for any year.  See infra section I C(7)(d) of the Opinion, however, where we discuss the effect of our finding regarding the $30,000 cash on hand on the source and application of funds analysis for 1990.

On the basis of the foregoing, we conclude that respondent has established that petitioners did not utilize funds from a nontaxable source to finance the excess applications of funds over sources of funds for any year in issue.  Consequently, respondent has negated petitioners' claim of a nontaxable source for the income.

(3)  Summary Relating to Existence of an Underpayment

To establish an underpayment of tax for purposes of fraud penalties and additions to tax for fraud, respondent had to prove an understatement of income and either establish a likely source for that income or negate nontaxable sources for the income.  See

United States v. Massei, 355 U.S. 595 (1958) (per curiam);
Holland v. United States, 348 U.S. 121, 137-138 (1954); United
States v. Smith, 890 F.2d 711, 714 (5th Cir. 1989). We have
concluded that respondent has proved likely sources for the
unreported income and negated petitioners' claimed nontaxable
source for those excess applications of funds. Respondent's
negation of a nontaxable source combined with petitioners'
concessions relating to items reflected in respondent's source
and application of funds analyses for Frank and Katherine, Larry,
Ronnie, and Sylvia establish that Frank and Katherine omitted
income for each year in issue. Each omission of income resulted
in a deficiency in tax; Frank and Katherine's omissions of income
over the years in issue, thus, clearly and convincingly establish
underpayments of tax for 1983 through 1990.[26]  See, e.g., Biaggi
v. Commissioner, T.C. Memo. 2000-48, affd. in unpublished opinion
__ F.3d __ (2d Cir. 2001).

Accordingly, we hold that respondent has satisfied the first
element of establishing fraud by showing through clear and
convincing evidence that Frank and Katherine had underpayments of
tax for each of the years in issue. We next address whether

---

[26] However, see infra sec. I.C. of this Opinion wherein we
discuss various adjustments we have made to the source and
application of funds analyses for purposes of deciding the amount
of understated income for each year in issue.

- 63 -

respondent has fulfilled the second element of fraud which is intent to evade taxes.

(b) Intent to Evade Taxes

Intent to conceal or mislead may be inferred from a course or pattern of conduct.  See Spies v. United States, 317 U.S. 492, 499 (1943); Petzoldt v. Commissioner, 92 T.C. at 699 (1989); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).  The courts have relied upon a number of indicia, or badges, of fraud in deciding whether an underpayment of tax is due to fraud.  See, e.g., Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Clayton v. Commissioner, 102 T.C. 632, 647 (1994); Petzoldt v. Commissioner, supra at 700.  Although no single factor is necessarily sufficient to establish fraud, the existence of several factors constitutes persuasive circumstantial evidence of fraud.  See, e.g., Petzoldt v. Commissioner, supra.

Consistent failure to report substantial amounts of income over a number of years is, standing alone, highly persuasive evidence of fraudulent intent.  See, e.g., Kurnick v. Commissioner, 232 F.2d 678, 681 (6th Cir. 1956), affg. per curiam T.C. Memo. 1955-31.  Consistent use of cash, and failure to maintain adequate books and records also constitute badges of fraud.  See, e.g., Bradford v. Commissioner, supra at 307-308.

- 64 -

Giving false, misleading, and inconsistent testimony is another badge of fraud. See, e.g., <u>Kim v. Commissioner</u>, T.C. Memo. 2000-83. Failure to cooperate with revenue agents during the audit phase of a case is an additional indication of guilty knowledge on a taxpayer's part. See <u>Profl. Servs. v. Commissioner</u>, 79 T.C. 888, 932-933 (1982). Concealing assets also indicates fraudulent intent. See <u>Spies v. United States</u>, 317 U.S. at 499. In determining fraudulent intent, courts also have considered a taxpayer's level of education and his or her prior history of filing Federal income tax returns. See, e.g., <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968).

Respondent contends that the following indicia of fraud are present in the instant cases: Failing to report substantial amounts of income, failing to maintain records, dealing exclusively in cash, failing to voluntarily file tax returns, concealing transactions through fraudulent conveyances, and failing to cooperate in the examination. In addition, respondent asserts that the lack of credibility of petitioners and their witnesses is another indicium of fraud.

(1) <u>Pattern of Underreporting Substantial Amounts of Income</u>

Respondent contends that the source and application of funds analysis for Frank and Katherine shows that they consistently and substantially understated their income for at least 8 years. Petitioners contend that Frank and Katherine reported their

correct income for each year in issue. They maintain that neither Frank nor Katherine was capable of generating the kind of income determined by respondent for the years in issue.

We agree with respondent that the substantial understatements of income we found for the years in issue are a strong indication of fraudulent intent. From each of the years 1983 through 1990, Frank and Katherine failed to report a substantial amount of income. The record does not support a finding that neither Frank nor Katherine could generate the unreported income in issue. Katherine maintained her palmistry business throughout the years in issue, and she and Frank frequently engaged in gambling activities. The pattern of underreporting substantial amounts of income over a period of 8 years leads to a strong inference of fraudulent intent.

        (2)  Lack of Records

Respondent contends that Frank and Katherine failed to provide respondent with whatever records they maintained and provided to their tax preparer. Respondent contends that the following circumstances negate any attempt by petitioners to assert that neither Katherine nor Frank could keep records: Both Frank and Katherine could write numbers; Frank could add numbers; Katherine could add a column of numbers and count money; she could figure the cost of her advertising spots; and she kept a writing tablet to record receipts.

Petitioners contend that Katherine kept records of daily receipts and bills and delivered them to Baptiste for preparation of the tax returns, but they are no longer available due to the passage of time.  Petitioners maintain that Katherine did the best she could, but her ability to keep records was limited because of her lack of education, illiteracy, lack of sophistication, and poor health.  Petitioners, however, do not explain why no records were presented to respondent for any year in issue during the course of the audit which commenced in 1991.

We agree with respondent that the record does not support a finding that Frank or Katherine was incapable of keeping records during the years in issue.  They did present at least some records to their tax preparer.  Moreover, Sylvia lived with them for most of that time, and she performed bill-paying services for them.  Petitioners do not explain why Sylvia also could not have maintained their records while she lived with them.  The circumstances of the large understatements of income over the years in issue show that Frank and Katherine failed to maintain adequate records of income and expenses.  Their lack of recordkeeping, coupled with a clear pattern of underreporting substantial amounts of income over a period of 8 years, leads to a particularly strong inference of fraudulent intent.

(3)  Filing History

Respondent contends that Frank and Katherine's failure to file Federal income tax returns for 1986, 1987, and 1988 until contacted by Revenue Office Budde and their failure to file gift tax returns for any year in spite of vast amounts of gift giving to family members each year are indicia of fraud.  Petitioners maintain that Frank and Katherine were not required to file returns for 1986 through 1988 because their income for those years did not meet the threshold income requirement.  Petitioners do not explain why Frank and Katherine did not file gift tax returns to report the gifts they gave their children and grandchildren during the years in issue.

Frank and Katherine filed timely income tax returns for some of the years in issue, which shows that they understood their obligation to file returns and pay tax.  We agree with respondent that the circumstance of Frank and Katherine's not filing income tax returns for 1986 through 1988 even though Katherine continued to operate her business during those years is another indicium of fraudulent intent.  Additionally, we agree that Frank and Katherine's failure to file gift tax returns relating to the substantial gifts they made to their children and grandchildren during those years also indicates an intent to conceal and mislead.

(4) Dealings in Cash

Respondent contends that the fact that Frank and Katherine dealt exclusively in cash is another indicium of fraud. Petitioners contend that Frank and Katherine always conducted their transactions in cash because they were illiterate and because they learned the practice of using cash from their parents. Respondent maintains, however, that only self-serving evidence indicates that Frank and Katherine dealt in cash because of illiteracy. Respondent contends that Frank and Katherine could have used a checking account system as evidenced by the facts that they obtained mortgages and loans, had competency in adding numbers, could keep some records, could sign their names, and could read and write to some degree.

There is no evidence that Frank and Katherine could not have used banks to deposit receipts and pay expenditures. Nor do petitioners explain why Sylvia did not maintain a checking account system for Frank and Katherine while she lived with them. Frank and Katherine made numerous and substantial cash expenditures for real property and luxury automobiles. We agree with respondent that their extensive use of cash for those types of expenditures supports a reasonable inference that Frank and Katherine knowingly and willfully attempted to conceal taxable income.

(5)  Concealing Transactions

Respondent contends that Frank's and Katherine's dealings in cash and their failure to file any gift tax returns enabled them to conceal transfers of property from respondent until long after those transactions occurred.  Respondent asserts that the concealment of assets is another indicium of fraud.

Petitioners assert that there is no evidence that Frank or Katherine concealed any of the gifts they made to Larry, Ronnie, and Sylvia.  Petitioners, however, do not allege that Frank or Katherine filed gift tax returns for the substantial gifts they admittedly gave to their children and grandchildren during the years in issue, nor do petitioners explain why Frank or Katherine failed to file gift tax returns relating to those gifts. Petitioners further assert that the fact that Frank and Katherine purchased assets for Larry, Ronnie, and Sylvia that were easy to trace (such as real estate and automobiles) shows that Frank and Katherine did not intend to conceal any transfers.  Petitioners apparently overlook the fact that for the most part Frank and Katherine gave Larry, Ronnie, and Sylvia cash to purchase those assets, many of which were titled solely in Larry's, Ronnie's, and Sylvia's names thereby making it difficult to trace the cash.

We agree with respondent that Frank and Katherine tried to conceal their unreported income by giving Larry, Ronnie, and

Sylvia cash or by placing assets in their names. That conduct is evidence of fraudulent intent.

(6) Failure To Cooperate with Respondent

Respondent asserts that petitioners failed to cooperate with respondent's agents during the examination of their returns. Respondent maintains that petitioners' justification for their lack of cooperation (i.e., that in 1990 or 1991 respondent's revenue agent referred to all Gypsies as crooks), does not provide a basis for failing to cooperate.

Petitioners, however, maintain that respondent is attempting to attribute the actions of Larry and Baptiste to Frank and Katherine. They contend that there is no evidence that Frank and Katherine failed to cooperate with respondent's agents during the course of the examination of their returns, or that Katherine made false or misleading statements to respondent's revenue agents. Petitioners maintain that the only employee of respondent who requested records from Frank and Katherine was Revenue Officer Budde, and that request related to a delinquent filing investigation of their 1986 through 1988 returns. Petitioners contend that Frank and Katherine cooperated with Revenue Officer Budde by filing returns for those years even though they were not required to file them because of the income threshold requirements.

We agree with petitioners that there is no evidence that either Frank or Katherine failed to cooperate with respondent's revenue agents regarding the examination of their returns for the years in issue. Agent Combs never interviewed Frank or Katherine in the course of that examination. It also appears that respondent's revenue agents never requested verification for items reflected on Frank and Katherine's returns for the years in issue. Rather, the adjustments to their returns resulted from statements Katherine made during a deposition she gave relating to docket No. 20854-94 to the effect that she and Frank furnished funds to Larry, Ronnie, and Sylvia to purchase assets and pay expenditures in excess of their incomes. Under those circumstances, we find that the factor of cooperation supports neither party's position.

(7) Credibility of Witnesses

Petitioners assert that Katherine made no false or misleading statements to respondent's revenue agents. Moreover, petitioners contend, respondent did not rebut Katherine's cash hoard testimony, which they assert was corroborated by Katherine's siblings. Respondent, on the other hand, contends that petitioners and their witnesses offered inconsistent, vague, unsupported, and self-serving testimony commencing with the examination and continuing through trial.

We found Katherine's and her siblings' testimony conflicting and implausible for the most part.  We agree with respondent that Katherine's highly implausible and incredible story of receiving a substantial cash hoard from her father is another indication of fraudulent intent.

(8)  <u>Level of Education, Age, and State of Health</u>

Petitioners contend that Frank and Katherine had no formal education and were illiterate.  Additionally, petitioners contend that during the years in issue Frank and Katherine were elderly, unsophisticated, and suffering from serious illnesses. Petitioners assert that Frank and Katherine relied on their accountant to prepare their returns because of their lack of education.  Petitioners, in effect, argue that those factors negate any inferences of fraud on the part of Frank or Katherine.

Under the circumstances here presented, we do not agree with petitioners' position that Frank's and Katherine's lack of formal education, illiteracy, age, lack of sophistication, or health negate inferences of fraud.  Although Frank and Katherine may have had no formal education, they do not appear from the record to have lacked business acumen or sophistication.  Dr. Schwartz described Katherine as a bright woman and sharp most of the time. Katherine ran a successful palmistry business for more than 50 years.  The circumstance that Katherine kept some records relating to her business that she gave to Baptiste for the

preparation of the tax returns shows that she was aware of the requirements to report income. Frank purchased a number of expensive vehicles over the years and paid for Larry's, Ronnie's, and Sylvia's acquisitions of property and vehicles. He applied for loans and mortgages. The record does not show that Frank's and Katherine's age and health conditions affected their mental capacity. Thus, the record does not demonstrate that Frank's and Katherine's lack of formal education, age, or health conditions prevented them from being aware that they were required to report all of their income. Accordingly, we conclude that the factors raised by petitioners do not negate the inferences of fraud raised by the other badges of fraud present in the instant cases.

(9) Summary Regarding Intent

On the basis of the foregoing, we conclude that for each year in issue respondent has proven through clear and convincing evidence that Frank and Katherine intended to evade taxes they knew or believed were owed.

c. Conclusion Regarding Fraud and Statute of Limitations

We have considered the other arguments raised by petitioners in their briefs but find them to be without merit. On the basis of the foregoing, we hold that for each year in issue respondent has proven, by clear and convincing evidence, an underpayment of tax and that some portion of the underpayment was attributable to fraud. Accordingly, the fraud exception to the statute of

limitations applies for each year in issue; therefore, the statute of limitations does not bar respondent from assessing tax liability against Frank and Katherine for any year in issue. See sec. 6501(c). Since we have found fraud for all of the years in issue, we need not address whether the 6-year period of limitations under section 6501(e) applies for 1990. We next address the question of the amount of income Frank and Katherine omitted from their income for each of the years in issue.

C. Amount of Understatement of Income

Respondent contends that the source and application of funds analyses, as adjusted and set forth infra in Appendix A, properly show the amount of income Frank and Katherine understated for all years in issue. Petitioners contend, on the other hand, that respondent's source and application of funds analyses for Frank and Katherine, Larry, Ronnie, and Sylvia are faulty.

Agent Combs never interviewed Frank or Katherine about the source and application of funds analyses he performed for the years in issue. To a large extent, in calculating their applications of funds for the years in issue, Agent Combs relied upon source and application of funds analyses he performed for Larry, Ronnie, and Sylvia for the years in issue, information he gathered regarding specific asset purchases, Bureau of Labor Statistics (BLS) estimates of annual expenditures, and Katherine's deposition statement that during the years in issue

she and Frank gave Larry, Ronnie, and Sylvia funds to purchase assets and to pay their personal living expenses.  Both Frank and Katherine were deceased by the time of trial.

Petitioners have the burden of proving that respondent's determinations as to the amount of the understated income are incorrect.  Rule 142(a).  The parties have agreed as to the amounts reflected on the source and application of funds analyses for Frank and Katherine, Larry, Ronnie, and Sylvia set forth infra in Appendices A through I except as noted therein.  Consequently, we focus primarily on the items that the parties have identified as in dispute.  There are a few additional items in the source and application of funds analyses, however, which we believe from the record also need to be addressed.  Those items also are discussed below.

### 1.  Adjustments to BLS Figures

Because of the absence of specific information relating to the Johnson family's personal living expenses, in the source and application of funds analyses for Frank and Katherine, Larry, Ronnie, and Sylvia, respondent used data from Table 4 of the Bureau of Labor Statistics Consumer Expenditure Survey for each year in issue to calculate personal living expenditures.  Petitioners contend that respondent's use of the BLS tables is flawed because those tables do not accurately reflect Frank and Katherine's lifestyle.  Petitioners assert that respondent did

not account for the circumstances that the Johnson family members frequently lived and dined together in a communal lifestyle typical of their gypsy heritage; Frank and Katherine were not able to drive but relied on Larry, Ronnie, and Sylvia for their transportation; they were illiterate; they did not own life insurance; and they did not participate in a retirement plan. Additionally, petitioners contend that, in the source and application of funds analysis for Sylvia, respondent failed to adjust the BLS amounts to reflect that she lived with Frank and Katherine for the years 1985 through August 1990.

Under certain circumstances, courts have found reasonable respondent's use of data compiled by the BLS to reconstruct income or to estimate personal living expenses. See, e.g., Pollard v. Commissioner, 786 F.2d 1063, 1066 (11th Cir. 1986), affg. T.C. Memo. 1984-536; Giddio v. Commissioner, 54 T.C. at 1532. The rationale for use of BLS data is that "[w]here * * * there is evidence of taxable income but no information can be acquired to ascertain the amount of such income, we do not think it is arbitrary for the Commissioner to determine that the taxpayer had income at least equal to the normal cost of supporting his family." Giddio v. Commissioner, supra at 1533.

Unquestionably, the Johnson family members incurred personal living expenses during the years in issue. Frank and Katherine did not maintain checking accounts or provide to respondent other

records relating to their expenditures for the years in issue. Consequently, in the absence of records, we find reasonable respondent's use of BLS data to estimate personal living expenses for the Johnson family. Petitioners offered no proof rebutting respondent's position that, with certain adjustments, Frank and Katherine, Larry, Ronnie, and Sylvia must have incurred personal living expenses during the years in issue at least equal to the amounts reflected in the BLS tables. See Pollard v. Commissioner, supra. Nonetheless, we agree with petitioners that additional adjustments to the BLS figures are necessary.

We do not agree with petitioners that the Johnson family lived together in a communal lifestyle. Although they may have come together often for meals and vacations, Larry maintained his own residence during all of the years in issue, Ronnie maintained his own residence from 1985 through 1990, and Sylvia maintained her own residence from August through December 1990. Thus, we agree that personal living expenses should be calculated separately for Larry, Ronnie, and Sylvia, at least for the periods they maintained separate households.

Thus, we find reasonable respondent's methodology of calculating separately personal living expenses for Larry for all of the years in issue and for Ronnie for 1985 through 1990. However, we believe that personal living expenses should be deleted from Ronnie's source and application of funds analyses

for 1983 and 1984 inasmuch as he lived with Frank and Katherine during those years. The personal living expenses for Frank and Katherine should be adjusted correspondingly to include Ronnie as a member of their household for 1983 and 1984.[27] As for Sylvia, she lived with Frank and Katherine until August 1990 at which time she established her own residence. Accordingly, personal living expenses should be deleted from Sylvia's source and application of funds analyses for 1985 through July 1990, and the personal living expenses for Frank and Katherine should be adjusted to include Sylvia (as well as Jack Miller and Nicole, as appropriate) as members of their household for those years.[28]

As for petitioners' contention that adjustments to transportation items included in the BLS average annual expenditure figures should be made in addition to vehicle acquisition costs, except for one item (public transportation), we do not agree because the record reflects that Frank acquired vehicles before and during the years in issue. The record does

_____

[27] Although Ronnie lived with Frank and Katherine for part of 1985, we make no allocation for that year because the record shows that he established his own residence in February 1985, and we believe that any adjustment for 1 month would be nominal.

[28] Although the record shows that Jack Miller moved into the Longwood property in late 1986, we do not include him as a member of Frank and Katherine's household for 1986 because the record does not show exactly when he moved into the Longwood residence. Additionally, although the record shows that Sylvia's daughter was born in 1988, we do not include her as a member of Frank and Katherine's household for 1988 because the record does not show exactly when she was born.

not show that Frank did not drive or maintain those vehicles during the years in issue. However, we believe that public transportation figures should be deleted from the BLS figures for all of the Johnson family members because we do not believe that they would use public transportation in light of the number and kinds of vehicles they acquired before and during the years in issue.

As for personal insurance and pension figures in the BLS figures, we agree with petitioners that those items should be deleted for all Johnson family members on the basis of Katherine's testimony that they did not believe in carrying insurance. In addition, we think that reading, education, and tobacco figures should be deleted for Frank and Katherine because of their ages, illiteracy, and health conditions. As for Ronnie and Sylvia, we believe that education figures should be deleted for them because of their ages and schooling history. Accordingly, we hold that adjustments to the BLS figures are needed in accordance with the above. See infra Appendix J for revised personal living expenses for Frank and Katherine, Larry, Ronnie, and Sylvia reflecting those adjustments.

2. Adjustment for Specific Gift

Petitioners contend that, for 1990, respondent failed to credit either Larry or Ronnie with a $43,101 specific gift that is charged to Frank and Katherine as an application of funds for

that year.  See infra Appendices (A), (I).  Petitioners maintain

that the gift consisted of a deposit of $43,101 which Frank and

Katherine made into a joint account in Larry's and Ronnie's

names.

Respondent maintains that no adjustment is required in

Larry's or Ronnie's source and application of funds analyses to

account for the $43,101 gift because there is no evidence that

any of the money in the account was withdrawn during that year.

Thus, respondent maintains, the $43,101 gift would have no impact

on the source and application of funds analysis for Larry or

Ronnie because the gift would be both a source of funds upon its

transfer to the account and an application of funds at the close

of the year in an equal amount.  We agree with respondent that no

adjustment is required for this item because petitioners did not

show a net change in the bank account balance, and we hold

accordingly.

### 3.  Adjustment for Proceeds of Automobile Transactions

Petitioners assert that respondent failed to credit Frank

and Katherine with the proceeds from at least three automobiles

that Frank sold or traded during the years in issue.  See infra

Appendix A.  Respondent maintains that no adjustment is needed

for the proceeds of the three alleged automobile transactions

because the record does not establish that those transactions

occurred nor do petitioners quantify the trade-in value or sales

proceeds they claim Frank received for those vehicles.  We agree with respondent that petitioners have not established in the record that the transactions occurred, or, if they did occur, the amount of trade-in allowance or sales proceeds received. Statements in briefs are not evidence, and they cannot be used as such to supplement the record.  See, e.g., Rule 143(b); Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992).  Thus, we agree with respondent that no adjustment is required for additional proceeds from automobile transactions, and we hold accordingly.

### 4.  Adjustments for Larry's Audit Results

Petitioners contend that respondent failed to adjust Larry's source and application of funds analyses for 1989 and 1990 to account for unreported income he agreed to include in his income for those years pursuant to the settlement of docket No. 20854-94.  See infra Appendices (H), (I).  Petitioners assert that an adjustment to Larry's source and application of funds analyses for unreported income for 1989 and 1990 would result in a corresponding reduction to the $38,018 and $43,404 "gifts to Larry" respondent included as applications of funds by Frank and Katherine for those years.  Respondent asserts that an adjustment to Larry's source and application of funds analyses for 1989 and 1990 for unreported income cannot be made because the record does not show to what extent, if any, the settlement related to any

issue in the instant cases because unreported income was only one of several adjustments involved in docket No. 20854-94.

We agree with petitioners that an adjustment to Larry's source and application of funds analysis is needed for 1989 and 1990 to account for the compromise settlement of docket No. 20854-94.  However, we do not agree with petitioners as to the amounts to be added as sources of funds for those years.  The tax deficiencies Larry and Nancy ultimately agreed to for those years ($7,140 for 1989 and $6,606 for 1990) are less than the tax deficiencies set forth in the notice of deficiency ($13,317 and $16,461, respectively).  Thus, it is apparent that not all of the total adjustments to income set forth in the notice of deficiency ($44,566 for 1989 and $53,012 for 1990) were included in income in the compromise settlement.  See supra note 12.  According to our calculations, Larry and Nancy agreed to 53.6 percent of the deficiency proposed for 1989 ($7,140 divided by $13,317) and 40.1 percent of the deficiency proposed for 1990 ($6,606 divided by $16,461).  Thus, using our best judgment, applying those percentages to the total proposed adjustments to income for those years, we hold that Larry's sources of funds for 1989 and 1990 should be increased by $23,887 and $21,261, respectively.  See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930).

5.  <u>Adjustment for Sylvia's Gambling Expenditures</u>

Petitioners maintain that gambling expenditures included in Sylvia's source and application of funds analyses for 1987 through 1989 should be eliminated because respondent did not substantiate those items at trial.  See <u>infra</u> Appendices F through H.  Respondent maintains that Sylvia's source and application of funds analyses are correct.  Respondent asserts that petitioners agreed to these gambling expenditures in proposed joint findings of fact No. 4.  In addition, respondent states that the record establishes that Sylvia went on one or two gambling vacations each year, and that she participated in gambling activities.

Joint findings of fact No. 4 states as follows:  "The parties agree that the figures shown in black are the items of the source and application of funds analysis for which the parties are in agreement and in red for which the parties are not in agreement."  The gambling expenditures to which petitioners now take exception were shown in black on respondent's Appendix 5.  We take the statements in joint findings of fact No. 4 to represent a concession by petitioners that Sylvia incurred the gambling expenditures in the amounts stated.  Cf. <u>Hodges v. Commissioner</u>, 50 T.C. 428, 434, 435 n.2 (1968) (certain statements in respondent's brief found to be a concession); <u>Armour v. Commissioner</u>, 41 B.T.A. 777, 795 (1940) (statement in

taxpayer's brief found tantamount to concession), affd. 125 F.2d 467 (7th Cir. 1942); Water Resource Control v. Commissioner, T.C. Memo. 1991-104 (statements at trial and on opening brief deemed concession of interest deductions claimed on returns), affd. without published opinion sub nom. Whitehouse v. Commissioner, 972 F.2d 1328 (2d Cir. 1992). Nothing in the record contradicts that concession. Accordingly, we hold that no adjustment is required in Sylvia's source and application of funds analysis for gambling expenditures.

### 6. Additional Items Identified as in Dispute

The parties have identified the following items through joint finding of fact No. 4 as items to which they do not agree.

#### a. Withholding on Gambling Winnings

In the source and application of funds analysis for Sylvia for 1988, see infra Appendix G, respondent included as an application of funds $345 for estimated withholding on gambling winnings. Petitioners do not explain why they disagree with that item. In the source and application of funds analysis for 1988, respondent credited Sylvia with $38,550 in winnings from gambling activities on December 23, 1988. Petitioners do not disagree with that item. We conclude that an estimated $345 withholding at source is reasonable considering the amount of Sylvia's gambling winnings on December 23, 1988; accordingly, we hold that

no adjustment is required for that item in Sylvia's source and application of funds analysis for 1988.

### b. Birthing Costs for Nicole

In the source and application of funds analysis for Sylvia for 1988, see infra Appendix G, respondent included as an application of funds $2,500 for birthing costs for Nicole Johnson, Sylvia's daughter.  In an affidavit dated November 15, 1995, Sylvia stated that Frank and Katherine paid her medical bills relating to Nicole's birth.  Respondent does not explain how the $2,500 was derived other than by estimation.  Petitioners do not explain why they disagree with this item.  The record indicates that Nicole was born in 1988, but it does not show the amount of medical expenses attributable to her birth nor when those expenses were paid.  On the basis of the foregoing, we conclude that it is not reasonable to include $2,500 birthing costs as an application of funds in Sylvia's source and application of funds analysis for 1988; accordingly, we hold that Sylvia's applications of funds for 1988 should be reduced by $2,500.

### c. Estimated Tax Payments

In the source and application of funds analysis for Ronnie for 1988, see infra Appendix G, respondent included as an application of funds $1,500 for estimated tax payments made during 1988.  Ronnie's tax return for 1988 shows $3,000 estimated

tax payments made during 1988.  Respondent does not explain why $1,500 is used instead of $3,000.  Petitioners do not explain why they disagree with this item.  Statements in tax returns constitute admissions unless overcome by cogent evidence that they are wrong.  See, e.g., Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126.  On the basis of the foregoing, we conclude that respondent's use of $1,500 for estimated tax payments is reasonable; accordingly, we hold that no adjustment for that item is required in Ronnie's source and application of funds analysis for 1988.

### d.  Tax Payment

In the source and application of funds analysis for Ronnie for 1988, see infra Appendix G, respondent included as an application of funds $5,319 for 1987 tax payments.  Ronnie's tax return for 1987 shows zero tax payments made during 1987 and a tax due of $5,216.  Respondent does not explain why $5,319 is used instead of $5,216.  Petitioners do not explain why they disagree with this item.  On the basis of the foregoing, we conclude that a charge for 1987 tax payments is reasonable; we hold, however, that the amount for that item should be $5,216.

### e.  Wedding Ceremony for Sylvia

In the source and application of funds analysis for Frank and Katherine for 1989, see infra Appendix A, respondent included as an application of funds $10,000 for a wedding ceremony for

Sylvia. Respondent does not explain how that amount was derived other than by estimation. Petitioners do not explain why they disagree with that item. The record shows that Sylvia married Jack Miller during 1987. Although Katherine testified that she paid for the weddings of her grandchildren, the record does not show how much she paid for Sylvia's wedding ceremony or when it was paid. Furthermore, the record does not reflect what bride price Jack Miller, through gypsy custom, would have paid to Frank and Katherine for Sylvia. On the basis of the foregoing, we conclude that it is not reasonable to include $10,000 wedding ceremony costs as an application of funds in Frank and Katherine's source and application of funds analysis for 1987 or 1989; accordingly, we hold that their applications of funds for 1989 should be reduced by $10,000 to account for this item.

f. Detective Expenses

In the source and application of funds analysis for Frank and Katherine for 1990, see infra Appendix A, respondent included as an application of funds $7,000 paid to Dennis Dayle for detective expenses. We have found that their daughter Janie and Frank hired Dayle and that Frank paid Dayle $7,000 in 1990. Petitioners question Dayle's credibility, but they did not introduce any proof showing that his testimony was inaccurate. Although we may question Dayle's ethics in working for both Janie and her ex-husband, we do not find Dayle's testimony regarding

this item to be incredible as it comports with Frank and Katherine's lifelong practice of paying expenses for their children. Janie did not testify at trial; therefore, there is no evidence that she paid Dayle's expenses. The failure of a party to introduce evidence that is within his or her control gives rise to a presumption that the evidence, if provided, would be unfavorable to the party who has control over the evidence. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). On the basis of the foregoing, we conclude that respondent's charge of $7,000 for detective expenses is reasonable; accordingly we hold that no adjustment for that item is required in Frank and Katherine's source and application of funds analysis for 1990.

g. Janie's Living Expenses

In the source and application of funds analysis for Frank and Katherine for 1990, see infra Appendix A, respondent included as an application of funds $6,000 paid for room and board for their daughter Janie and her children. The record does not establish whether Frank or Janie paid those expenses. Dayle testified that Frank told him he paid Janie's expenses. Dayle, however, did not have any first-hand knowledge regarding who actually paid the expenses. Petitioners question Dayle's credibility. Larry testified that Frank and Katherine did not pay for Janie's expenses because she had her own money. On the

basis of the foregoing, we conclude that it is not reasonable to include $6,000 for Janie's living expenses as an application of funds in Frank and Katherine's source and application of funds analysis for 1990; accordingly, we hold that their applications of funds for 1990 should be reduced $6,000 to account for this item.

h.  Duplications Regarding Johnson Limousine

In the source and application of funds analysis for Frank and Katherine for 1990, see infra Appendix A, respondent reduced gifts to Larry, Ronnie, and Sylvia by $46,490 to account for duplications regarding Johnson Limousine.  These adjustments are not explained further.  Petitioners do not explain why they disagree with this item.  Since the adjustment favors petitioners and they do not explain why it should not be made in the amount allowed by respondent, we hold that no adjustment is required for that item in Frank and Katherine's source and application of funds analysis for 1990.

7.  Other Adjustments

After reviewing the record and the source and application of funds analyses for the Johnson family members for the years in issue, we believe that the following additional adjustments are needed to calculate excess applications of funds over sources of funds for those years.

### a.  Rental Income

Respondent has stipulated that during 1987 Larry received $14,000 in cash as rental income for use of the Sanford Property, and that Larry included that amount in income on his 1987 tax return.  Respondent did not include the rental income as a source of funds for 1987.  See infra Appendix F.[29]  Accordingly, we find that Larry's source of funds for 1987 should be increased by $14,000 to account for that rental income.

### b.  Duplication of Rental Expenses or Mortgage Payments

In the source and application of funds analyses for Ronnie and Sylvia for the years in issue, respondent included as applications of funds, among other things, business expenses claimed on their Schedules C and amounts they paid for rent or for mortgage payments for their residences.  See infra Appendices D through I.  The record indicates that Ronnie and Sylvia operated their businesses out of their personal residences.  We believe that respondent included the portion of the rental expenses or mortgage payments attributable to Ronnie's business for 1985 through 1990 and to Sylvia's business for 1990 twice as

_____

[29]  On Appendix 5 of respondent's opening brief, Larry's source and application of funds analysis for 1987 reflects as sources of funds both "Gross Receipts-Schedule E (Rental)" of $14,000 and "Adjustments:  Return Rental Income" of ($14,000). The ultimate result of including both sources of funds was that respondent did not credit Larry with any rental income for 1987. For convenience, we did not show either source of funds on Appendix F.

applications of funds. Accordingly, we find that the source and application of funds analyses for Ronnie and Sylvia should be adjusted to exclude those duplicated expenses. See infra Appendices M and N for the amount of those adjustments.

### c. Depreciation

Ronnie claimed depreciation expenses on his Schedules C for 1989 ($10,350) and 1990 ($700). In Ronnie's source and application of funds analysis for 1989, respondent reduced applications of funds by the amount of depreciation claimed on his Schedule C, but respondent made no adjustment for depreciation for 1990. See infra Appendices H and I. Respondent did not explain why depreciation was not excluded from applications of funds for 1990. We believe that the adjustment should be made, and accordingly hold that Ronnie's application of funds analysis for 1990 should be reduced by $700 to account for this item.

### d. Cash and Jewelry

Respondent included $30,000 cash and $100,000 jewelry as applications of funds in the source and application of funds analysis for Frank and Katherine for 1990. See infra Appendix A. Those items constitute the cash and jewelry that Frank and Katherine reported to the police were in their safe when Jack White burglarized their home during 1990. Respondent contends that, if Frank and Katherine did not have the $30,000 cash and

$100,000 in jewelry on December 5, 1989, when Revenue Officer Budde prepared the collection statement, then Frank and Katherine must have accumulated $30,000 cash and $100,000 in jewelry between the date of the collection statement and the date of the theft. Petitioners contend, however, that there is no evidence that the cash and jewelry were accumulated between those dates. We agree with petitioners.

On the basis of our review of the entire record, we believe that the collection statement did not accurately list all of the assets Frank and Katherine owned as of December 5, 1989. We have made a finding of fact that Frank and Katherine had cash on hand of approximately $30,000 as of January 1, 1983, and that throughout the years in issue Frank and Katherine kept approximately $30,000 cash on hand at the beginning and end of each year. Thus, there was no net change in the amount of cash on hand during the years in issue.

In addition, we believe that Frank and Katherine accumulated significant amounts of jewelry over their lifetimes. The record does not establish that Frank and Katherine purchased any jewelry during 1990. It is not clear, furthermore, that all of the jewelry in their safe actually belonged only to Frank and Katherine. Frank and Katherine had a lifelong practice of gifting property, including jewelry, to their children and grandchildren. Some of their children's and grandchildren's

jewelry could have been in the safe that Jack White stole. Therefore, we conclude that it is not reasonable to include the $30,000 cash and $100,000 jewelry as applications of funds for 1990 merely on the circumstance that Frank and Katherine reported their theft to the police. Accordingly, we hold that Frank and Katherine's applications of funds for 1990 must be reduced by $130,000 to account for the exclusion of that cash and jewelry.

8.  Summary Relating to Amount of Understatement of Income

Taking into consideration the foregoing adjustments to respondent's source and application of funds analyses for Frank and Katherine, Larry, Ronnie, and Sylvia for the years in issue, our computations show that Frank and Katherine had excess applications of funds over sources of funds in the following amounts:

| Year | Amount |
|------|--------|
| 1983 | $80,350 |
| 1984 | 80,253 |
| 1985 | 87,757 |
| 1986 | 90,989 |
| 1987 | 145,303 |
| 1988 | 193,387 |
| 1989 | 119,017 |
| 1990 | 92,609 |
| Total | 889,665 |

See infra Appendix K for our revisions to the source and application of funds analysis for Frank and Katherine for the years in issue. See infra Appendices L, M, and N for our revisions to the source and application of funds analyses for Larry, Ronnie, and Sylvia, respectively, for those years.

D.  Capital Gain for 1989

On their return for 1989, petitioners reported the sale of property from which they realized a long-term gain of $3,421 (sales price of $40,000 less basis of $36,579).  Respondent contends that Frank and Katherine had a short-term gain of $23,978 ($40,000 less mortgage payoff of $11,030 and expenses of sale of $4,989).

In their reply brief, petitioners claim that Frank and Katherine's daughter Patricia transferred the subject property to them for no consideration at a time when she had an adjusted basis in the property of at least $30,000.  Petitioners contend that she gifted the property to Frank; therefore, he had the same basis and holding period for the property as she did. Petitioners contend further that Frank's adjusted basis in the property, at a minimum, was $34,990 ($30,000 basis plus $4,990 expenses of sale).  They maintain that Frank's daughter may have had an additional basis of $1,590 in the property which accounts for the $36,579 basis claimed on the 1989 tax return.  Respondent asserts that petitioners have offered no evidence establishing that Frank and Katherine had a basis of more than $11,030 in the property they sold in 1989.

The record indicates that Frank acquired his interest in the property by quitclaim deed from a Patricia Johnson on March 18, 1989, for no stated consideration, and that he sold that property

2 days later by warranty deed for $40,000. The settlement statement indicated a remaining balance on the mortgage loan of $11,033 and sales expenses of $4,990.

Petitioners bear the burden of proof in this issue. Rule 142(a). The record, however, does not establish a filial relationship between Frank and the Patricia Johnson who transferred that property to Frank or the circumstances relating to her transfer of the property to Frank during 1989. See supra note 18. This Court does not consider statements in briefs to be evidence. See Niedringhaus v. Commissioner, 99 T.C. 202, 204 n.7 (1992); Evans v. Commissioner, 48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969). Patricia did not testify at trial; therefore, there is no proof in the record that Frank's daughter gifted property to him. The presumption is that her testimony would be unfavorable to petitioners. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Thus, we agree with respondent that petitioners have not shown a basis in the property greater than the amount allowed by respondent or a holding period greater than 2 days. Accordingly, we sustain respondent's determination on this issue.

E. Taxable Social Security Benefits

Respondent contends that Frank and Katherine's taxable Social Security income for the years in issue should be increased as follows:

| Year | Amount |
|------|--------|
| 1985 | $1,287 |
| 1986 | 957 |
| 1987 | 1,385 |
| 1988 | 2,195 |
| 1989 | 2,796 |
| 1990 | 3,129 |

The increase in taxable Social Security income resulted from the adjustments respondent made to Frank and Katherine's income for those years.

Section 86(a) provides that gross income includes a portion of Social Security benefits received by individuals whose (1) modified adjusted gross income increased by one-half of the Social Security benefits received during the years (readjusted modified adjusted gross income) exceeds (2) the base amount. See sec. 86(a) and (b)(1). Modified adjusted gross income is adjusted gross income without regard to Social Security benefits and other adjustments not pertinent to these cases. See sec. 86(b)(2). The base amount for a joint return is $32,000. See sec. 86(c). For the years in issue, the portion of Social Security benefits included in gross income equals the lesser of one-half of the Social Security benefit received or one-half of the excess of the taxpayer's readjusted modified adjusted gross income over the base amount. See sec. 86(a)(1).

Petitioners contend that respondent's determination was made on the erroneous assumption that Frank and Katherine underreported their income for the years in issue; therefore, no

adjustment for taxable Social Security benefits is required. Respondent agrees that the adjustment is computational. We have found that Frank and Katherine understated their income for the years in issue. Accordingly, Frank and Katherine's income for 1985 though 1990 must be increased to include taxable Social Security benefits which are to be computed in accordance with our holdings in the instant cases.

F.  Self-Employment Taxes

Respondent contends that Frank and Katherine's self-employment taxes should be increased as follows:

| Year | Amount |
| --- | --- |
| 1983 | $6,676 |
| 1984 | 8,542 |
| 1985 | 9,346 |
| 1986 | 10,332 |
| 1987 | 10,774 |
| 1988 | 11,718 |
| 1989 | 12,500 |
| 1990 | 15,698 |

Petitioners contend that no adjustment is required for this issue.

Section 1401(a) imposes a tax on the self-employment of every individual. Net earnings from self-employment means the gross income derived by an individual from any trade or business carried on by the individual, less allowable deductions attributable to the trade or business, plus certain items not relevant here. See sec. 1402(a). The term "trade or business" for purposes of the self-employment tax generally has the same

meaning as used for purposes of section 162.  See sec. 1402(c).
Thus, to be engaged in a trade or business within the meaning of
section 1402(a), an individual must be involved in an activity
with continuity and regularity, and the primary purpose for
engaging in the activity must be for income and profit.  See
Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  Petitioners
have the burden of proving that Frank and Katherine are not
liable for self-employment taxes.  See Rule 142(a).

In the notices of deficiency, respondent determined that
both Frank and Katherine were involved in Katherine's palmistry
business and calculated Social Security taxes for each of them.
Petitioners contend, on the other hand, that Frank never worked
or participated in the operation of the palmistry business.  We
agree that the record supports petitioners' position that Frank
was not actively involved in Katherine's palmistry business.
Additionally, the record does not support a finding that Frank
was engaged in the trade and business of gambling even though he
may have had income from gambling during the years in issue.
Thus, we conclude that Frank did not have net earnings from self-
employment during the years in issue; therefore, he is not liable
for self-employment taxes for those years.  We have found,
however, that Katherine was involved in her palmistry business
during all of the years in issue; therefore, she is liable for

the self-employment tax for each of those years to the extent of her net earnings from self-employment.

G.  Self-Employment Deduction

For 1990, section 164(f) provides a deduction for one-half of the taxes imposed by section 1401 for such year.  Respondent contends that petitioners are entitled to increase their self-employment tax deduction for 1990 in the amount of $7,301.  Petitioners contend that respondent is incorrect.  This item is a computational adjustment and must be recalculated to reflect our holding in the instant cases that Frank and Katherine understated their 1990 income by $92,306, and that only Katherine is liable for the self-employment tax imposed by section 1401 for that year.

H.  Married Couples Deduction

Respondent contends that Frank and Katherine are entitled to a $3,000 married couples deduction for the years 1983 through 1986.  Petitioners contends that Frank was retired for all of those years; therefore, Frank and Katherine are not entitled to a married couples deduction for any year in issue.  We agree with petitioners.

In the case of a joint return for 1983 through 1986, section 221 allows a deduction for two-earner married couples equal to 10 percent of the lesser of $30,000 or the "qualified earned income" of the spouse with the lower qualified earned income for

the taxable year.  Qualified earned income is defined as an amount equal to the excess of (a) the earned income of the spouse for the taxable year, over (b) an amount equal to the sum of certain deductions allowable under section 62 and properly allocable to or chargeable against earned income.  See sec. 221(b).

Respondent determined that both Frank and Katherine were involved in Katherine's palmistry business and, thus, allowed a $3,000 married couples deduction for each of 1983 through 1986. We have found that Frank was not actively involved in Katherine's palmistry business but was retired during the years 1983 through 1986.  He had no earned income for those years.  Consequently, we hold that Frank and Katherine are not entitled to the married couples deduction for 1983 through 1986.

### I.  Additions to Tax and Penalties

#### 1.  Sections 6653(b) and 6663

Respondent also determined additions to tax for fraud under section 6653(b)(1) and (2) for 1983, 1984, and 1985; under section 6653(b)(1)(A) and (B) for 1986 and 1987; and under section 6653(b)(1) for 1988; and penalties for fraud under section 6663 for 1989 and 1990.  For 1983, 1984, and 1985, section 6653(b)(1) imposes an addition to tax equal to 50 percent of any underpayment in tax if any part of the underpayment was due to fraud, and section 6653(b)(2) imposes a separate addition

to tax equal to 50 percent of the interest payable under section 6601, determined on the portion of the underpayment attributable to fraud.  For 1986 and 1987, section 6653(b)(1)(A) imposes an addition to tax equal to 75 percent of the portion of an underpayment of tax attributable to fraud if any part of the underpayment was due to fraud, and section 6653(b)(1)(B) imposes a separate addition to tax equal to 50 percent of the interest payable under section 6601, determined on the portion of the underpayment attributable to fraud.  For 1988, section 6653(b)(1) imposes an addition to tax equal to 75 percent of the portion of the underpayment that is attributable to fraud if any part of any underpayment of a tax required to be shown on a return was due to fraud.  For 1989 and 1990, section 6663(a) imposes a penalty for fraud equal to 75 percent of the portion of an underpayment that is attributable to fraud.  If any portion of an underpayment is attributable to fraud, then the entire underpayment is treated as due to fraud unless the taxpayer can establish that some portion of the underpayment is not attributable to fraud.  See sec. 6653(b)(2), as in effect for 1986, 1987, and 1988; sec. 6663(b), as in effect for 1989 and 1990.  The elements of fraud under section 6663 are essentially the same as those considered under section 6653(b).  See, e.g., Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533, 548 (2000), appeal dismissed and remanded 249 F.3d 175 (3d Cir. 2001).

We have found that respondent proved with clear and convincing evidence that Frank and Katherine fraudulently understated their income for the years in issue. Thus, respondent has proved that Frank and Katherine are liable for the additions to tax for fraud under section 6653(b) and penalties for fraud under section 6663. Accordingly, we sustain respondent's determination as to the imposition of additions to tax, or penalties, for fraud for each of the years in issue. However, as to the interest-sensitive additions to tax imposed under section 6653(b)(2) for 1983, 1984, and 1985,[30] we sustain respondent's determination only as to the portion of the underpayments of tax for each of those years that respondent has shown to be attributable to fraud in accordance with our findings addressed in subsection B of this opinion.

2. <u>Section 6661</u>

Respondent determined that petitioners are liable for the addition to tax under section 6661 for 1983 through 1988 as a result of the "substantial understatement of income tax" in each of those years. If there is a substantial understatement of income tax, section 6661(a) imposes an addition to tax equal to 25 percent of the underpayment attributable to the

---

[30] For 1986 and 1987, petitioners have the burden of establishing what portion, if any, of the understatement is not attributable to fraud. Sec. 6653(b)(2). They have failed to carry that burden.

understatement. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $5,000. Sec. 6661(b)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return. Excepting items attributable to tax shelters, the amount of the understatement is reduced by items with respect to which the taxpayer had substantial authority for his or her position or for which relevant facts affecting the tax treatment were adequately disclosed. Sec. 6661(b)(2)(B).

Petitioners provided no evidence to show that they had substantial authority for the understatements, and their tax returns did not disclose the relevant facts sufficiently to enable respondent to identify the potential controversy involved. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). Instead, petitioners relied on the evidence they presented to prove that Frank and Katherine did not underreport their income for any of the years in issue, and hence there were no deficiencies for those years, to prove that the additions to tax under section 6661 would not apply. We have found that the evidence supports respondent's position that Frank and Katherine understated their income for the years in issue. Accordingly, we sustain respondent's determination under section 6661 for 1983 through 1988.

II.   Issues Relating to Transferee Liability

       A.  Background

       Respondent contends that Larry, Ronnie, and Sylvia are liable as transferees of Frank and Katherine's Federal income tax liabilities for the years in issue because Frank and Katherine fraudulently conveyed funds and assets to Larry, Ronnie, and Sylvia.  Petitioners contend that Larry, Ronnie, and Sylvia are not liable as transferees because Frank and Katherine did not have the requisite fraudulent intent.

       Section 6901(a) provides that the liability of a transferee of property "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred".  Section 6901 does not impose liability on the transferee, but merely gives the Commissioner a procedure or remedy to enforce the transferor's existing liability.  See Commissioner v. Stern, 357 U.S. 39, 42 (1958); see also Hagaman v. Commissioner, 100 T.C. 180, 183 (1993).  Respondent bears the burden of proving that Larry, Ronnie, and Sylvia are liable as transferees of Frank and Katherine.  See sec. 6902(a); Rule 142(d).

       To prevail under section 6901(a), respondent must show the existence and extent of transferee liability as determined under the law of the State in which the transfer occurred.  See

Commissioner v. Stern, supra at 45; Hagaman v. Commissioner, supra at 183-184.

The transfers involved in the instant cases occurred in the State of Florida; therefore, the question of whether transferee liability applies must be determined under the applicable Florida law. Florida revised its statutory provisions relating to fraudulent conveyances for years after 1987. Thus, Florida Statutes sections 726.01-726.201 apply to transfers occurring before January 1, 1988, while Florida Uniform Fraudulent Transfer Act (FUFTA), Chapter 726 applies to transfers occurring after December 31, 1987. See 1987 Fla. Laws, ch. 87-79, se. 13; Advest, Inc. v. Rader, 743 F. Supp. 851, 853 (S.D. Fla. 1990). Nonetheless, the legal and equitable principles of Fla. Stat. section 726.01 continue to apply to post-1987 transfers. See Fla. Stat. sec. 726.111 (1988);[31] Advest, Inc. v. Rader, supra at 853-854.

---

[31] Fla. Stat. sec. 726.111 (1988) provides as follows:

726.111. Supplemental provisions

Unless displaced by the provisions of ss. 726.101-726.112, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement those provisions.

B.  Florida's Statutory Provisions

  1.  Pre-1988 Transfers

Under Fla. Stat. section 726.01 (1987),[32] any conveyance of lands, goods, and chattels made with the intent to delay, hinder, or defraud creditors is void as to creditors, unless the transferee gave "good consideration" and did not have knowledge or notice of the fraud at the time of the transfer.  See also In

---

[32]  Fla. Stat. sec. 726.01 (1987) reads in pertinent part as follows:

726.01  Fraudulent Conveyance Void

  Every feoffment, gift, grant, alienation, bargain, sale, conveyance, transfer and assignment of lands, tenements, hereditaments, and of goods and chattels, or any of them, * * * by writing or otherwise, and every bond, note, contract, suit, judgment and execution which shall at any time hereafter be had, made or executed, contrived or devised of fraud, covin, collusion or guile, to the end, purpose or intent to delay, hinder or defraud creditors or others of their just and lawful actions, suits, debts, accounts, * * * shall be from henceforth as against the person or persons, * * * his, her or their successors, executors, administrators and assigns, and every one of them so intended to be delayed, hindered or defrauded, deemed, held, adjudged and taken to be utterly void, frustrate and of none effect, any pretense, color, feigned consideration, expressing of use or any other matter or thing to the contrary notwithstanding; provided, that this section, or anything therein contained, shall not extend to any estate or interest in lands, tenements, hereditaments, * * * goods or chattels which shall be had, made, conveyed or assured if such estate shall be, upon good consideration and bona fide, lawfully conveyed or assured to any person or persons * * * not having at the time of such conveyance or assurance to them made any manner of notice or knowledge of such covin, fraud or collusion as aforesaid, anything in this section to the contrary notwithstanding.

re Smith, 120 Bankr. 588, 591-592 (M.D. Fla. 1990); Sebring Co. v. O'Rourke, 101 Fla. 885, 134 So. 556, 562 (1931).  "Good consideration is that which would support a simple contract."  In re Smith, supra at 592 (citing Parts Depot, Inc. v. Bullock, 545 So. 2d 468, 471 (Fla. Dist. Ct. App. 1989)).  Thus, "To constitute a fraudulent conveyance, there must be a creditor to be defrauded, a debtor intending fraud, and a conveyance of property which is applicable by law to the payment of the debt due."  Bay View Estates Corp. v. Southerland, 114 Fla. 635, 650, 154 So. 894, 900 (1934), overruled en banc on another issue Lott, Inc. v. Padgett, 153 Fla. 304, 14 So. 2d 667, 669 (1943); see also United States v. Fernon, 640 F.2d 609, 613 (5th Cir. 1981).  Under Florida case law, "a creditor is one who has asserted a legal claim or demand of contractual nature when the alleged fraudulent conveyance is made."  Advest, Inc. v. Rader, supra at 854, (citing Whetstone v. Coslick, 117 Fla. 203, 157 So. 666 (1934)).

To prove a fraudulent conveyance under Fla. Stat. section 726.01, a creditor may (1) establish a prima facie case by showing the presence of certain "badges of fraud" which gave a rebuttable inference of fraud, or (2) demonstrate actual fraudulent intent.  Advest, Inc. v. Rader, supra.  The "badges of fraud" include, among other things: (1) The transfer of property without valuable consideration, (2) a family relationship between

the transferor and transferee, (3) retention of possession of the property by the transferor, (4) the transfer of the debtor's entire estate, (5) reservation of benefits, control, or dominion by the debtor, (6) insolvency of the transferor at the time or after the conveyance, (7) the pendency or threat of litigation against the transferor, and (8) secrecy or concealment of the transaction.  See, e.g, <u>United States v. Horton</u>, 760 F.2d 1225, 1228 (11th Cir. 1985);  <u>United States v. Fernon</u>, <u>supra</u>; <u>Harper v. United States</u>, 769 F. Supp. 362, 367 (M.D. Fla. 1991); <u>Advest, Inc. v. Rader</u>, <u>supra</u>; <u>United States v. Ressler</u>, 433 F. Supp. 459, 464 (S.D. Fla. 1977), affd. per curiam on another issue 576 F.2d 650 (5th Cir. 1978); <u>Money v. Powell</u>, 139 So. 2d 702, 703-704 (Fla. Dist. Ct. App. 1962); <u>Banner Const. Corp. v. Arnold</u>, 128 So. 2d 893, 896 (Fla. Dist. Ct. App. 1961); <u>Cleveland Trust Co. v. Foster</u>, 93 So. 2d 112, 114 (Fla. 1957).  Furthermore, intent need not be actual.  See <u>United States v. Ressler</u>, <u>supra</u>, <u>Stelle v. Dennis</u>, 104 Fla. 384, 140 So. 194, 195 (1932);  A transfer that has the legal effect of causing delay or hindrance to creditors constitutes fraud in law regardless of the actual motives of the debtor.  See <u>Whetstone v. Coslick</u>, <u>supra</u> at 668; <u>Livesay Indus., Inc. v. Livesay Window Co.</u>, 305 F.2d 934, 940 (5th Cir. 1962).

## 2.  Post-1987 Transfers

Under Fla. Stat. section 726.105 (1988),[33] transfers made with the actual intent to hinder, delay, or defraud any creditor are fraudulent.  See Fla. Stat. 726.105(1)(a) (1988); Veigle v. United States, 873 F. Supp. 623, 626 (M.D. Fla. 1994), affd. without published opinion sub nom. Ariko v. United States, 92 F.3d 1199 (11th Cir. 1996).  Courts may consider the following factors, among others, as evidence of fraudulent intent:  (a) The transfer or obligation was to an insider, (b) the debtor retained possession or control of the property transferred after the transfer, (c) the transfer or obligation was disclosed or

---

[33]  Fla. Stat. sec. 726.105 (1988) provides as follows:

726.105.  Transfers fraudulent as to present and future creditors

   (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

   (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

   (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

   1. Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

   2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

concealed, (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (e) the transfer was of substantially all the debtor's assets, (f) the debtor absconded, (g) the debtor removed or concealed assets, (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (i) the debtor was insolvent[34] or became insolvent shortly after the transfer was made or the obligation was incurred, (j) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  See Fla. Stat. sec. 726.105(2)(a)-(k)(1988).  Although one badge of fraud "may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, * * * several of them when considered together may afford a basis to infer fraud."  See, e.g., Johnson v. Dowell, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992); Banner Constr. Corp. v. Arnold, 128 So. 2d at 896; United States v. Fernon, 640 F.2d at 613; see also Advest, Inc. v. Rader, 743 F. Supp. at 854; Harper v. Commissioner, T.C. Memo. 1993-126.  Fraudulent conveyances also include transfers made without fair

---

[34] Under Fla. Stat. sec. 726.103(1), a debtor is insolvent if the total of his or her debts exceed the total of his or her assets at a fair valuation.

consideration when the debtor intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due. See sec. 726.105(1)(b) (1988).

Furthermore, Fla. Stat. section 726.106,[35] disregards intent and provides a transfer per se fraudulent where the creditor's claim arose before the transfer, the transfer lacked valid consideration, and the debtor was insolvent at that time or became insolvent as a result of the transfer.

C. Discussion

Respondent contends that Frank's and Katherine's transfers to Larry, Ronnie, and Sylvia are fraudulent under either Fla. Stat. section 726.01 or FUFTA. For the post-1987 transfers, respondent contends that Larry, Ronnie, and Sylvia are liable as

---

[35] Fla. Stat. sec. 726.106 (1988) provides as follows:

726.106. Transfers fraudulent as to present creditors

   (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

   (2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

transferees under either Fla. Stat. sec. 726.105(1)(a) or sec. 726.106(1).

Petitioners, however, contend that the transfers to Larry, Ronnie, and Sylvia were not fraudulent conveyances because Frank and Katherine's primary motives in making the transfers were personal gratification and estate planning, not to hinder or delay the collection of a creditor's claim or otherwise to defraud any creditor. Petitioners maintain that the transfers were in accord with gypsy custom of parents giving their eldest son everything they own before or after they die. Thus, petitioners contend, Frank and Katherine had no fraudulent intent in making the transfers to Larry, Ronnie, and Sylvia. Additionally, petitioners assert that the fact that there were no known threats of lawsuits or creditors claims against Frank and Katherine supports the contention that they were not attempting to defraud creditors when they made the transfers.

There is no dispute that Frank and Katherine transferred funds or specific property to Larry, Ronnie, and Sylvia without consideration during and after the years in issue. Indeed, Katherine testified that she had provided the funds for all of Larry's, Ronnie's, and Sylvia's purchases of assets, and they affirmed Katherine's statement.

Respondent contends that respondent became a creditor of Frank and Katherine for unpaid tax liabilities and additions to

tax and penalties for 1983 through 1990 on the last day of each of those taxable periods during which the tax liability accrued. Thus, respondent asserts, Frank and Katherine owed the tax liabilities, additions to tax and penalties to respondent before Frank and Katherine made the subject transfers to Larry, Ronnie, and Sylvia.  We agree that respondent was a creditor of Frank and Katherine at least by April 16, 1984, because Federal taxes are considered due and owing, and constitute a liability regardless of when they are assessed, no later than the date the tax return for the particular period is required to be filed.  See United States v. Hickox, 356 F.2d 969, 972-973 (5th Cir. 1966); Hagaman v. Commissioner, 100 T.C. at 185; Papineau v. Commissioner, 28 T.C. 54, 58 (1957); Veigle v. United States, 873 F. Supp. at 625; Harper v. United States, 769 F. Supp. at 366-367; United States v. Ressler, 433 F. Supp. at 463.

Respondent contends that the following badges of fraud apply to the transfers Frank and Katherine made to Larry, Ronnie, and Sylvia: (1) Lack of consideration, (2) close family relationship, (3) concealment of assets as a result of the difficulty in tracing cash, (4) the transfer of virtually all of their assets, and (5) insolvency resulting from the pattern of transfers.

Petitioners deny that Frank and Katherine concealed any gifts to Larry, Ronnie, and Sylvia.  They also contend that Frank and Katherine were not insolvent after the transfers were made.

Petitioners assert that subsequent to 1990 Frank and Katherine still owned substantial assets, including a home valued at $311,000, other real property valued at $8,000, and other assets valued at $84,900.

Respondent, however, asserts that by the time Katherine died all of her and Frank's assets had been transferred to Larry, Ronnie, and Sylvia. Respondent maintains that in each of the years in issue Frank's and Katherine's known assets were less than their tax liabilities. Thus, respondent asserts, Frank and Katherine were insolvent or rendered insolvent by virtue of the transfers to Larry, Ronnie, and Sylvia.

We agree with respondent that the series of transfers to Larry, Ronnie, and Sylvia rendered Frank and Katherine insolvent. Insolvency may be measured after a series of related transfers which in total leave the transferor insolvent. See Botz v. Helvering, 134 F.2d 538, 543 (8th Cir. 1943), affg. 45 B.T.A. 970 (1941); see also Hagaman v. Commissioner, supra; Gumm v. Commissioner, 93 T.C. 475, 480 (1989); Leach v. Commissioner, 21 T.C. 70, 75 (1953). Frank and Katherine's tax liability began accruing at the close of 1983, and that liability increased at the close of each additional year in issue. See Hagaman v. Commissioner, supra. Thus, by the end of 1990 Frank and Katherine's tax liabilities exceeded the assets enumerated by petitioners. Those assets were further reduced during 1991 when

Frank and Katherine transferred their interest, except for a life-estate, in the Longwood property to Larry and Ronnie for nominal consideration, and in 1992 when Frank transferred his interests in a Rolls Royce and a Lamborghini to Larry for no consideration.  Katherine herself testified that by June 14, 1995, she and Frank had given away all of their assets except for the life estate and $300 to $500 maintained in a bank account.

Applying the Florida statutory provisions to the transfers at issue, we conclude that, under either the pre-1988 or post-1987 law, Frank's and Katherine's transfers to Larry, Ronnie, and Sylvia constitute fraudulent conveyances.  The lack of consideration for the transfers, their close family relationship, Frank and Katherine's retention of possession of the Longwood property, the transfer of essentially all of Frank and Katherine's estates, and their substantial indebtedness to respondent establish fraudulent intent.[36]

In Florida, existing creditors have the benefit of a presumption of fraudulent intent where the conveyance is voluntary and there is a close relationship between the transferor and the transferee.  See Hagaman v. Commissioner, 100 T.C. at 188.  The presumption is warranted in the instant cases.

---

[36]  For post-1987 transfers, the lack of consideration, insolvency, and preexisting tax liabilities also would render the transfers fraudulent conveyances under Fla. Stat. sec. 726.106 (1988).  See also Advest, Inc. v. Rader, 743 F. Supp. 851, 855 (S.D. Fla. 1990).

Petitioners, however, failed to meet their burden of rebutting that presumption of fraudulent intent.

Additionally, petitioners contend that transferee liability should not be assessed against Larry, Ronnie, or Sylvia because respondent made no attempt to assess or collect taxes from Frank or Katherine until 10 months after Katherine's death. Thus, petitioners assert, respondent failed to make reasonable efforts to assess and collect tax liabilities against Frank and Katherine before their deaths.

It is apparent from the record that attempts to collect Frank and Katherine's tax liabilities from their estates would be futile. By 1995, Katherine and Frank already had given away all of their assets except for a life estate in the Longwood property and $300 to $500 in a bank account. Thus, it is apparent that Frank and Katherine's estates were insolvent by the time respondent mailed the notices of transferee liability to Larry, Ronnie, and Sylvia. See Gumm v. Commissioner, supra at 485. We do not agree with petitioners that respondent unduly delayed assessment of the deficiencies. Katherine did not reveal the transfers to Larry, Ronnie, and Sylvia until June 14, 1995, when she gave her deposition.

Respondent has shown under applicable State law that Larry, Ronnie, and Sylvia are liable as transferees of Frank and Katherine's tax liabilities for the years in issue. Accordingly,

we hold that Larry, Ronnie, and Sylvia are liable as transferees under section 6901(a). Their liability is limited, however, to the value of the cash and other assets Frank and Katherine transferred to them. Except for those items addressed <u>supra</u>, the parties have agreed to the amounts of those transfers. Accordingly, in determining transferee liability the cash and other assets must be adjusted to accord with the agreement of the parties and our holdings in the instant cases.[37] See <u>Hagaman v. Commissioner</u>, <u>supra</u> at 180 n.1; <u>Gumm v. Commissioner</u>, <u>supra</u> at 480.

    To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[37] We note that for purposes of the notices of transferee liability in determining the value of assets transferred upon which transferee liability attached for Larry and Ronnie respondent used the total fair market value for the Longwood property for each of them without regard to the fact that they each had only a one-half interest in that property. An appropriate adjustment is needed to account for the one-half interest.

Appendix A

SOURCE AND APPLICATION OF FUNDS
FRANK AND KATHERINE JOHNSON

<u>1983</u>

<u>Source of Funds:</u>
| | |
|---|---|
| Schedule C gross receipts | $16,550 |
| Social Security--Frank (estimated) | 2,500 |
| Interest income | 344 |
| Freedom Savings Bank #3058417 | 4,874 |
|   Total source of funds | 24,268 |

<u>Application of Funds:</u>
| | |
|---|---|
| Schedule C expenditures | 10,069 |
| Freedom Savings Bank #3058417 | 6,588 |
| Suburban (1983) | 15,434 |
| Gifts to Larry | [1]34,317 |
| Gifts to Ronnie | [1]35,946 |
| Personal living expenses for 2 persons | [1]19,377 |
|   Less: Housing costs    [1]$3,280 | |
|        Vehicle acquisition costs  [1]1,502 | (4,782) |
|   Total application of funds | 116,949 |

Excess of applications over sources of funds     $92,681

[1]Petitioners do not agree with the amounts reflected for these items.

<u>1984</u>

<u>Source of Funds:</u>
| | |
|---|---|
| Schedule C gross receipts | $15,800 |
| Social Security--Frank (estimated) | 2,500 |
| Interest income | 229 |
| Freedom Savings Bank #3058417 | 6,588 |
|   Total source of funds | 25,117 |

Application of Funds:
  Schedule C expenditures                                        9,609
  Freedom Savings Bank #3058417                                  2,367
  Freedom Savings Bank CD #4006814                               6,373
  Gifts to Larry                                       [1,2]37,270
  Gifts to Ronnie                                        [1]52,672
  Personal living expenses for 2 persons                [1]20,561
    Less: Housing costs                    [1]$3,485
          Vehicle acquisition costs        [1]1,733          (5,218)
    Total application of funds                               123,634

Excess of applications over sources of funds            $98,517

    [1]Petitioners do not agree with the amounts reflected for these items.
    [2]Appendix C (Larry) shows $32,770.  Respondent concedes that the $37,270 is overstated by $4,500.  See Appendix C (Larry) for an explanation of the difference.

## 1985

Source of Funds:
  Schedule C gross receipts                                    $19,550
  Social Security--Frank                                         2,574
  Net process from sale of lot                                  24,757
  Interest income                                                1,196
  Freedom S&L #3058417                                           2,367
  Freedom S&L CD #4006814                                        6,373
    Total source of funds                                       56,817

Application of Funds:
  Schedule C expenditures                                       11,009
  Freedom Savings Bank #3058417                                 28,191
  Freedom Savings Bank CD #4006814                               7,191
  Gifts to Larry                                        [1]53,357
  Gifts to Ronnie                                       [1]30,834
  Gifts to Sylvia                                       [1]20,862
  Personal living expenses for 2 persons                [1]22,056
    Less: Housing costs                    [1]$3,873
          Vehicle acquisition costs        [1]1,833          (5,706)
    Total application of funds                               167,794

Excess of applications over sources of funds            $110,977

    [1]Petitioners do not agree with the amounts reflected for these items.

## 1986

Source of Funds:

| | |
|---|---|
| Social Security--Frank (estimated) | $2,500 |
| Social Security--Katherine | 1,914 |
| Interest income | 922 |
| Freedom S&L #3058417 | 28,191 |
| Freedom S&L CD #4006814 | 7,191 |
| Total source of funds | 40,718 |

Application of Funds:

| | | |
|---|---|---|
| Freedom Savings Bank #3058417 | | 4,534 |
| Freedom Savings Bank CD #4006814 | | 8,113 |
| Corvette (1970) | | 4,200 |
| Sanford Property gifted to Larry | | 25,000 |
| Diamond ring gifted to Janie Johnson | | 8,500 |
| Gifts to Larry | | [1,2]39,723 |
| Gifts to Ronnie | | [1,3]27,525 |
| Gifts to Sylvia | | [1]19,775 |
| Personal living expenses for 2 persons | | [1]23,442 |
| Less: Housing costs | [1]$3,999 | |
| Vehicle acquisition costs | [1]2,449 | (6,448) |
| Total application of funds | | 154,364 |

Excess of applications over sources of funds     $113,646

[1]Petitioners do not agree with the amounts reflected for these items.

[2]Appendix E (Larry) shows $69,150.  See therein (Larry) for an explanation of the difference.

[3]Appendix E (Ronnie) shows $26,063.  See therein (Ronnie) for an explanation of the difference.

## 1987

Source of Funds:

| | |
|---|---|
| Social Security--Frank | $2,686 |
| Social Security--Katherine | 2,770 |
| Interest income | 1,040 |
| Freedom S&L #3058417 | 4,534 |
| Freedom S&L CD #4006814 | 8,113 |
| Total source of funds | 19,143 |

Application of Funds:
```
  Freedom Savings Bank #3058417                           4,545
  Freedom Savings Bank CD #4006814                        9,154
  Gifts to Larry                                    [1]95,819
  Gifts to Ronnie                                [1, 2]48,010
  Gifts to Sylvia                                   [1]23,946
  Personal living expenses for 2 persons            [1]24,761
    Less: Housing costs               [1]$4,108
          Vehicle acquisition costs   [1]1,950      (6,058)
    Total application of funds                      200,177
```

Excess of applications over sources of funds      $181,034

    [1]Petitioners do not agree with the amounts reflected for these items.
    [2]Appendix F (Ronnie) shows $49,760.  See therein (Ronnie) for an explanation of the difference.

1988

Source of Funds:
```
  Social Security--Frank                             $2,793
  Social Security--Katherine                          3,670
  Interest income                                     1,438
  Freedom S&L #3058417                                4,545
  Freedom S&L CD #4006814                             9,154
  Trade in for Suburban                               2,500
    Total source of funds                            24,100
```

Application of Funds:
```
  Freedom Savings Bank #3058417                       4,546
  Freedom Savings Bank CD #4006814                   10,327
  Cadillac (1986)                                    16,713
  Chevy truck (1986)                                 13,855
  Gifts to Larry                                 [1, 2]68,359
  Gifts to Ronnie                                [1, 3]64,360
  Gifts to Sylvia                                   [1]52,197
  Personal living expenses for 2 persons            [1]26,350
    Less: Housing costs               [1]$4,420
          Vehicle acquisition costs   [1]2,581      (7,001)
    Total application of funds                      249,706
```

Excess of applications over sources of funds      $225,606

    [1]Petitioners do not agree with the amounts reflected for these items.
    [2]Appendix G (Larry) shows $94,067.  See therein (Larry) for an explanation of the difference.

[3]Appendix G (Ronnie) shows $63,860.  See therein (Ronnie) for an explanation of the difference.

### 1989

Source of Funds:

| | |
|---|---|
| Social Security--Frank | $2,902 |
| Social Security--Katherine | 3,070 |
| Green Cove Springs Sale | 23,978 |
| Gambling income | 1,002 |
| Interest income | 2,847 |
| Freedom S&L #3058417 | 4,546 |
| Freedom S&L CD #4006814 | 10,327 |
| Total source of funds | 48,672 |

Application of Funds:

| | | |
|---|---|---|
| Freedom Savings Bank #3058417 | | 1,939 |
| Glendale Federal #601219-0 | | 39,919 |
| Corvette (1976) | | 7,672 |
| Gifts to Larry | | [1]38,018 |
| Gifts to Ronnie | | [1]73,937 |
| Gifts to Sylvia | | [1]50,359 |
| Wedding ceremony for Sylvia | | [1]10,000 |
| Personal living expenses for 2 persons | | [1]28,622 |
| Less: Housing costs | [1]$4,903 | |
| Vehicle acquisition costs | [1]2,301 | (7,204) |
| Total application of funds | | 243,262 |

Excess of applications over sources of funds     $194,590

[1]Petitioners do not agree with the amounts reflected for these items.

### 1990

Source of Funds:

| | |
|---|---|
| Gross receipts--Schedule C | $8,000 |
| Social Security--Frank | 3,044 |
| Social Security--Katherine | 3,212 |
| Gambling income | 2,452 |
| Interest income | 3,316 |
| NCNB Savings  #3058417 | 1,939 |
| Glendale Federal #601006-0 | 39,919 |
| Total source of funds | 61,882 |

Application of Funds:

| | |
|---|---:|
| Business deduction--Schedule C | 250 |
| NCNB CD #4006814 | 5,543 |
| Cash at home | 30,000 |
| Jewelry | 100,000 |
| Corvette (1978) | 6,360 |
| Legal fees | 13,500 |
| Investigative fees (Dennis Dayle) | [1]7,000 |
| Room and board for Janie Johnson and children | [1]6,000 |
| Gift to Larry and Ronnie (Glendale Federal) | 43,101 |
| Gifts to Larry | [1,2]43,404 |
| Gifts to Ronnie | [1,3]60,223 |
| Gifts to Sylvia | [1,4]62,546 |
| Less duplications re Johnson limo | [1](46,490) |
| Personal living expenses for 2 persons | [1]28,836 |

| | | |
|---|---:|---:|
| Less: Housing costs | [1]$4,930 | |
| Vehicle acquisition costs | [1]2,026 | (6,956) |
| Total application of funds | | 353,317 |

Excess of applications over sources of funds    $291,435

[1]Petitioners do not agree with the amounts reflected for these items.

[2]Appendix I (Larry) shows $41,404.  See therein (Larry) for an explanation of the difference.

[3]Appendix I (Ronnie) shows $60,923.  See therein (Ronnie) for an explanation of the difference.

[4]Appendix I (Sylvia) shows $60,546.  See therein (Sylvia) for an explanation of the difference.

Appendix B

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1983

### Larry Johnson

Source of Funds:
| | |
|---|---:|
| Schedule C gross receipts | $20,160 |
| Gambling income | 25,000 |
| Interest income | 392 |
| First Union Bank accounts (estimated balance) | 3,000 |
|   Total source of funds | 48,552 |

Application of Funds:
| | | |
|---|---:|---:|
| Schedule C expenditures (less interest & depreciation) | | 12,428 |
| First Union Bank accounts (estimated balance) | | 6,000 |
| U.S Savings Bonds purchases | | 7,200 |
| Callahan Property payments | | 2,400 |
| Allendale Property payments | | 1,125 |
| Mercedes purchase | | 34,800 |
| Personal living expenses for 4 persons | | [1]24,959 |
|   Less: Housing costs | [1]$4,191 | |
|       Vehicle acquisition costs | [1]1,852 | (6,043) |
|   Total application of funds | | 82,869 |

| | |
|---|---:|
| Excess of applications over sources of funds | $34,317 |

[1]Petitioners do not agree with the amounts reflected for these items.

### Ronnie Johnson

| | |
|---|---:|
| Source of Funds: | -0- |

Application of Funds:
| | |
|---|---:|
| Porsche (1983) purchase | $25,200 |
| Personal living expenses for 1 person | [1]11,469 |
|   Less: Housing costs and | |
|       Vehicle acquisition costs | [1](723) |
|   Total application of funds | 35,946 |

| | |
|---|---:|
| Excess of applications over sources of funds | $35,946 |

[1]Petitioners do not agree with the amounts reflected for these items.

## Sylvia Johnson

Information not provided.

Appendix C

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1984

Larry Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $20,500 |
| Schedule E income (rental) | 1,750 |
| Interest income | 647 |
| First Union Bank accounts (estimated balance) | 6,000 |
| GMAC loan | 10,015 |
| Total source of funds | 38,912 |

Application of Funds:

| | | |
|---|---|---|
| Schedule C expenditures | | $630 |
| Expenditures adjusted per audit | | 10,596 |
| First Union savings account ending balance | | 397 |
| First Union CDs ending balance | | 6,236 |
| First Union IRA-Larry | | 1,000 |
| First Union IRA-Nancy | | 582 |
| U.S Savings bonds purchases | | 7,500 |
| Callahan Property payments | | 2,400 |
| Allendale Property payments | | [1]4,500 |
| Suburban purchase | | 17,257 |
| Note payments | | 584 |
| Personal living expenses for 4 persons | | [2]26,815 |
| Less: Housing costs | [2]$4,426 | |
| Vehicle acquisition costs | [2]2,389 | (6,815) |
| Total application of funds | | 71,682 |

Excess of applications over sources of funds    [1]$32,770

[1]The source and application of funds analysis used for the notice of deficiency (original S&A) reflects $9,000 for this item and reflects an excess of applications over sources of funds of $37,270. The parties agree that the correct amount for this item should be $4,500. Respondent now contends that the excess of applications over sources of funds is $32,770.

[2]Petitioners do not agree with the amounts reflected for these items.

### Ronnie Johnson

Source of Funds                                             -0-

Application of Funds:
  U.S. Saving Bonds purchases                          $40,925
  Personal living expenses for 1 person                [1]12,623
    Less: Housing costs and
          Vehicle acquisition costs                   [1](876)
    Total application of funds                          52,672

Excess of applications over sources of funds     $52,672

    [1]Petitioners do not agree with the amounts reflected for
these items.

### Sylvia Johnson

Information not provided.

Appendix D

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1985

Larry Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $28,500 |
| Schedule E income (rental) | 2,272 |
| Gambling income | 10,000 |
| Interest income | 639 |
| First Union Bank savings accounts | 397 |
| First Union CDs | 6,236 |
| First Union IRA-Larry | 1,000 |
| First Union IRA-Nancy | 582 |
| Trade in for Mercedes | 28,150 |
| Total source of funds | 77,776 |

Application of Funds:

| | | |
|---|---:|---:|
| Schedule C expenditures | | $16,201 |
| Schedule E expenditures | | 1,094 |
| First Union savings account | | 1,495 |
| First Union CDs | | 6,856 |
| First Union IRA-Larry | | 3,000 |
| First Union IRA-Nancy | | 582 |
| U.S Savings Bonds purchases | | 200 |
| Callahan Property payments | | 2,400 |
| Chris Craft boat (titled to Larry and Frank) | | 35,000 |
| Ford truck (1974) | | 300 |
| Ferrari (1982) purchase | | 38,447 |
| GMAC note payments for Suburban | | 3,504 |
| Personal living expenses for 4 persons | | [1]29,972 |
| Less: Housing costs | [1]$4,817 | |
| Vehicle acquisition costs | [1]3,101 | (7,918) |
| Total application of funds | | 131,133 |

Excess of applications over sources of funds          $53,357

[1]Petitioners do not agree with the amounts reflected for these items.

### Ronnie Johnson

Source of Funds:
| | |
|---|---|
| Schedule C gross receipts | $17,575 |
| Trade in for 1983 Porsche | 18,000 |
| Total source of funds | 35,575 |

Application of Funds:
| | | |
|---|---|---|
| Schedule C deductions | | $9,158 |
| Rent and security deposit | | 12,075 |
| Porsche (1985) purchase | | 28,826 |
| Personal living expenses for 2 persons | | [1]22,056 |
| Less: Housing costs | [1]$3,873 | |
| Vehicle acquisition costs | [1]1,833 | (5,706) |
| Total application of funds | | 66,409 |

| | |
|---|---|
| Excess of applications over sources of funds | $30,834 |

[1]Petitioners do not agree with the amounts reflected for these items.

### Sylvia Johnson

Source of Funds:
| | |
|---|---|
| Loan from First Union Bank | $22,300 |

Application of Funds:
| | |
|---|---|
| Corvette (1985) purchase | 27,875 |
| Note payments | 2,980 |
| Personal living expenses for 1 person | [1]13,353 |
| Less: Vehicle acquisition costs | [1](1,046) |
| Total application of funds | 43,162 |

| | |
|---|---|
| Excess of applications over sources of funds | $20,862 |

[1]Petitioners do not agree with the amounts reflected for these items.

Appendix E

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1986

Larry Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $33,800 |
| Schedule E income (rental) | 1,161 |
| Interest income | 428 |
| First Union Bank savings accounts | 1,495 |
| First Union CDs | 6,856 |
| First Union IRA-Larry | 3,000 |
| First Union IRA-Nancy | 582 |
| Trade in for Ferrari (1982) | 38,300 |
| Gifts from Frank | 25,000 |
| Credithrift mortgage ($83,684) | 74,995 |
| Credithrift mortgage ($56,346) | 45,078 |
| Ford truck (1974) | 600 |
| Total source of funds | 231,295 |

Application of Funds:

| | | |
|---|---:|---:|
| Schedule C expenditures | | $23,904 |
| Schedule E expenditures | | 290 |
| First Union savings account | | 1,684 |
| First Union IRA-Larry | | 3,000 |
| First Union IRA-Nancy | | 582 |
| Callahan Property payments | | 994 |
| Sun Bank checking account | | 2,598 |
| Sun Bank savings account | | 211 |
| Sanford rental property | | 149,500 |
| Deposit on Sanford property | | [1]10,000 |
| Closing on Sanford property | | [1]19,427 |
| Credithrift mortgage ($83,684) payment | | 6,000 |
| Credithrift mortgage ($56,346) payment | | 4,041 |
| Lamborghini purchase | | 52,735 |
| GMAC note payments for Suburban | | 3,504 |
| Personal living expenses for 4 persons | | [2]30,610 |
| Less: Housing costs | [2]$5,289 | |
| Vehicle acquisition costs | [2]3,346 | (8,635) |
| Total application of funds | | 300,445 |

Excess of applications over sources of funds    [3]$69,150

[1]These items were not included on the original S&A for Larry.  The parties agree that amounts for these items are correct.
[2]Petitioners do not agree with the amounts reflected for these items.
[3]Appendix A reflects $39,723.  The $29,427 difference represents the sum of those items addressed in footnote 1.

### Ronnie Johnson

| Source of Funds: | | |
| --- | --- | --- |
| Schedule C gross receipts | | $18,975 |

| Application of Funds: | | |
| --- | --- | --- |
| Schedule C deductions | | 9,487 |
| Rent | | 11,400 |
| Ford truck (1979) purchase | | [1]788 |
| Chevy Camaro (1968) purchase | | [2]1,050 |
| Chevy Camaro refurbishing costs | | 4,800 |
| Barnett Bank savings | | 519 |
| Personal living expenses for 2 persons | | [3]23,442 |
| Less: Housing costs | [1]$3,999 | |
| Vehicle acquisition costs | [1]2,449 | 6,448) |
| Total application of funds | | 45,038 |

| Excess of applications over sources of funds | [4]$26,063 |
| --- | --- |

[1]The original S&A for Ronnie reflects $788 for this item. The parties agree that $750 is the correct amount.
[2]The original S&A for Ronnie reflects $2,550 for this item. The parties agree that $1,050 is the correct amount.
[3]Petitioners do not agree with the amounts reflected for these items.
[4]The original S&A for Ronnie reflects $27,525.  The $1,462 difference represents the result of netting the adjustments addressed in footnotes 1 and 2.

### Sylvia Johnson

| Source of Funds | -0- |
| --- | --- |

| Application of Funds: | |
| --- | --- |
| Corvette (1985) note payments | $7,464 |
| Personal living expenses for 1 person | [1]13,309 |
| Less: Vehicle acquisition costs | [1](998) |
| Total application of funds | 19,775 |

| Excess of applications over sources of funds | $19,775 |
| --- | --- |

[1]Petitioners do not agree with the amounts reflected for these items.

Appendix F

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1987

Larry Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $36,325 |
| Interest income | 144 |
| First Union Bank savings accounts | 1,684 |
| First Union IRA-Larry | 3,000 |
| First Union IRA-Nancy | 582 |
| First Union IRA interest distribution | 249 |
| Sun Bank checking account | 2,598 |
| Sun Bank savings account | 211 |
| Contract deposit | 1,500 |
| Total source of funds | [1]46,293 |

Application of Funds:

| | | |
|---|---:|---:|
| Schedule C expenditures | | $26,453 |
| Schedule E expenditures | | 2,456 |
| Sun Bank checking account | | 5,283 |
| Sun Bank savings account | | 5,860 |
| Credithrift mortgage ($83,684) payment | | 14,400 |
| Credithrift mortgage ($56,346) payment | | 9,699 |
| Renovations per IRS appraisal | | 50,000 |
| GMAC note payments for Suburban | | 3,504 |
| Personal living expenses for 4 persons | | [2]32,753 |
| Less: Housing costs | [2]$5,288 | |
| Vehicle acquisition costs | [2]3,008 | (8,296) |
| Total application of funds | | 142,112 |

Excess of applications over sources of funds    $95,819

[1]The sources of funds itemized above does not reflect $14,000 in income from rents which respondent included and then took out of the source and application of funds analysis for Larry.  Respondent now concedes that Larry received $14,000 in rental income during 1987.

[2]Petitioners do not agree with the amounts reflected for these items.

## Ronnie Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $22,851 |
| Gambling income | 20,000 |
| Interest income | 77 |
| Barnett Bank saving account | 519 |
| Total source of funds | 43,447 |

Application of Funds:

| | | |
|---|---|---|
| Schedule C deductions | | 10,168 |
| Rent | | 8,550 |
| Barnett Bank savings | | 2,091 |
| Port Orange Property purchase cash deposit | | 8,000 |
| Port Orange Property cash and closing costs | | 8,165 |
| Port Orange Property seller note | | 9,000 |
| Port Orange Property seller mortgage | | 4,030 |
| Port Orange Property renovations | | [1]13,800 |
| Fishing boat (1977) | | 7,700 |
| Twin outboard motors | | 3,000 |
| Personal living expenses for 2 persons | | [2]24,761 |
| Less: Housing costs | [2]$4,108 | |
| Vehicle acquisition costs | [2]1,950 | (6,058) |
| Total application of funds | | 93,207 |

Excess of applications over sources of funds    [3]$49,760

[1]The original S&A for Ronnie reflects $12,050 for this item. The parties agree that the correct amount is $13,800. Appendix 5 (Ronnie 1987) reflects $31,800. That latter amount appears to be a transposition error.
[2]Petitioners do not agree with the amounts reflected for these items.
[3]Appendix A reflects $48,010 for this item. The $1,750 difference represents the adjustment addressed in footnote 1.

## Sylvia Johnson

Source of Funds:
  Schedule C gross receipts                          $10,450

Application of Funds:
  Schedule C deductions                               5,540
  Sun Bank savings account                            1,154
  U.S. Savings Bonds purchases                        5,000
  Gambling losses                                     1,100
  Personal expenses--COMPS                              356
  Corvette (1985) note payments                       7,564
  Personal living expenses for 1 person             [1]14,693
    Less: Vehicle acquisition costs                 [1](1,011)
    Total application of funds                       34,396

Excess of applications over sources of funds        $23,946


[1]Petitioners do not agree with the amounts reflected for these items.

Appendix G

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1988

Larry Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $39,455 |
| Schedule E gross receipts | [1]23,210 |
| Interest income | 52 |
| Sun Bank checking account | 5,283 |
| Sun Bank savings account | 5,860 |
| Callahan Property sales price | 100,000 |
| Mortgage note receivable | 2,550 |
| Credithrift mortgage ($52,300) | 49,621 |
| Constant notes (2) | 200,000 |
| Constant note due 3/20/88 | 25,000 |
| Total source of funds | 451,031 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | $18,579 |
| Schedule E expenditures | 5,396 |
| Sun Bank checking account | 1,341 |
| Sun Bank savings account | 923 |
| Credithrift mortgage ($83,684) payment | 17,483 |
| Credithrift mortgage ($56,346) payment | 4,041 |
| Credithrift mortgage ($56,346) payoff | 56,122 |
| Callahan Child Care purchase money mortgage | 20,000 |
| Settlement charges | 13,589 |
| Daytona Beach Shores Property purchase | 300,670 |
| Cash at closing | [2]27,048 |
| Constant note due 3/20/88 payment | 25,000 |
| Credithrift mortgage ($52,500) payment | [3]7,811 |
| Seller mortgage note payment | 14,031 |
| GMAC note payments for Suburban | 2,920 |
| Cadillac (1979) | 4,662 |
| Personal living expenses for 4 persons | [4]34,355 |

|  |  |  |
|---|---:|---:|
| Less: Housing costs | [4]$5,632 | |
| Vehicle acquisition costs | [4]3,241 | (8,873) |
| Total application of funds | | 545,098 |

Excess of applications over sources of funds    [5]$94,067

[1]The original S&A for Larry reflects $21,870.  The parties
agree that $23,210 is the correct amount for this item.

[2]This item was not included on the original S&A for Larry. The parties agree that the amount reflected for this item is correct.

[3]Appendix 5 (Larry 1988) reflects $8,611 for this item. That amount appears to be a typographical error.

[4]Petitioners do not agree with the amounts reflected for these items.

[5]Appendix A reflects $68,359.  The $25,708 difference represents the result of netting the adjustments addressed in footnotes 1 and 2.

### Ronnie Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $25,785 |
| Barnett Bank saving account | 2,091 |
| Trade in for Porsche | 14,000 |
| Florida National Bank loan | 40,129 |
| Sale of Ford truck (1979) | [1]500 |
| Total source of funds | 82,505 |

Application of Funds:

| | | |
|---|---|---|
| Schedule C deductions | | 11,781 |
| Barnett Bank savings | | 3,197 |
| Port Orange Property seller mortgage | | 16,119 |
| Port Orange Property renovations | | 1,750 |
| Legal fees | | 1,000 |
| Ford truck (1986) | | 10,563 |
| Ferrari GTS 328 (1987) | | 73,129 |
| Note payments | | 4,585 |
| Estimated tax payments (1988) | | [2]1,500 |
| Tax payments (1987) | | [2]5,319 |
| Personal living expenses for 2 persons | | [2]26,350 |
| Less: Housing costs | [2]$4,420 | |
| Vehicle acquisition costs | [2]2,581 | |
| Pension & Social Security | [2]1,927 | (8,928) |
| Total application of funds | | 146,365 |

Excess of applications over sources of funds      [3]$63,860

[1]This item was not included on the original S&A for Ronnie. Respondent concedes that the $500 additional source of funds is correct.

[2]Petitioners do not agree with the amounts reflected for these items.

[3]Appendix A reflects $64,360.  The $500 difference represents the adjustment addressed in footnote 1.

### Sylvia Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $12,350 |
| Gambling income | 1,727 |
| Interest income | 29 |
| Sun Bank savings account | 1,154 |
| Trade in for Corvette (1985) | 15,000 |
| First Union Bank loan | 36,287 |
| Winnings from gambling activities 12-23-88 | 38,550 |
| Total source of funds | 105,097 |

Application of Funds:

| | |
|---|---:|
| Schedule C deductions | 5,650 |
| Sun Bank savings account | 946 |
| U.S. Savings Bonds purchases | 200 |
| Cash for gambling | 38,550 |
| Net gambling losses | 8,350 |
| Personal expenses--COMPS (1988) | 1,697 |
| Note payments for Corvette (1985) | 3,502 |
| Payoff of note for Corvette | 5,618 |
| Porsche 928 purchase (1988) | 61,287 |
| Note payments for Porsche | 4,880 |
| Birthing costs-Nicole Johnson | [1]2,500 |
| Withholding on gambling winnings (estimated) | [1]345 |
| Personal living expenses for 2 persons | [1]26,350 |
| Less: Vehicle acquisition costs | [1](2,581) |
| Total application of funds | 157,294 |

| | |
|---|---:|
| Excess of applications over sources of funds | $52,197 |

[1]Petitioners do not agree with the amounts reflected for these items.

Appendix H

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1989

Larry Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $40,060 |
| Schedule E gross receipts | 27,698 |
| Interest income | 2,058 |
| Sun Bank checking account | 1,341 |
| Sun Bank savings account | 923 |
| Callahan Property note receivable | 5,100 |
| Trade in for Suburban | 6,829 |
| Sun Bank Loan | 7,500 |
| Sale of Cadillac (1979) | 4,662 |
| Total source of funds | 96,171 |

Application of Funds:

| | | |
|---|---|---|
| Schedule C expenditures | | $14,764 |
| Schedule E expenditures | | 5,465 |
| Sun Bank checking account | | 2,018 |
| Sun Bank savings account | | 473 |
| Sun Bank CD #48290 | | 1,500 |
| Sec First CD # 788961830 | | 3,500 |
| Credithrift mortgage ($83,684) payment | | 18,000 |
| Constant notes payments | | 15,600 |
| Credithrift mortgage ($52,500) payment | | 9,600 |
| Renovation: Alexander Construction | | 8,790 |
| Ford T-Bird (1964) | | 2,000 |
| Jeep CJ-7 (1985) | | 4,285 |
| Chevrolet Astro Van (1989) | | [1]19,329 |
| Note payments for van | | 1,800 |
| Personal living expenses for 4 persons | | [2]35,803 |
| Less: Housing costs | [2]$5,481 | |
| Vehicle acquisition costs | [2]3,257 | (8,738) |
| Total application of funds | | 134,189 |

Excess of applications over sources of funds      $38,018

[1]The original S&A for Larry reflects $19,829 for this item and $38,518 for excess of applications over sources of funds. The parties can not explain the $500 difference.

[2]Petitioners do not agree with the amounts reflected for these items.

## Ronnie Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $39,410 |
| Interest income | 321 |
| Barnett Bank saving account | 3,197 |
| Trade in for Jeep (1980) | 3,000 |
| Loan from Barnett Bank for boat | 3,200 |
| Total source of funds | 49,128 |

Application of Funds:

| | | |
|---|---|---|
| Schedule C deductions | 24,761 | |
| Less: Depreciation | 10,350 | 14,411 |
| Barnett Bank checking account | | 631 |
| Barnett Bank savings | | 8,097 |
| Port Orange Property seller mortgage | | 16,119 |
| Port Orange Property improvements | | 13,200 |
| Ferrari GTS 328 (1987) payments | | 11,004 |
| Corvette (1974) | | 11,500 |
| Jeep (1980) | | 2,156 |
| Jeep (1982) | | 3,025 |
| Boat | | 4,000 |
| Note Payments on boat | | 504 |
| Paving equipment | | 17,000 |
| Personal living expenses | | [1]28,622 |
| Less: Housing costs | [1]$4,903 | |
| Vehicle acquisition costs | [1]2,301 | (7,204) |
| Total application of funds | | 123,065 |

| | |
|---|---|
| Excess of applications over sources of funds | $73,937 |

[1]Petitioners do not agree with the amounts reflected for these items.

## Sylvia Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $19,710 |
| Gambling income | 38,550 |
| Interest income | 153 |
| Sun Bank savings account | 945 |
| Total source of funds | 59,358 |

Application of Funds:
  Schedule C deductions                            8,597
  Sun Bank savings account                           545
  Glendale Federal Bank                            1,047
  U.S. Savings Bonds purchases                     3,450
  Net gambling losses                             16,940
  Porsche 928 (1988) payments                      9,419
  Corvette-Greenwood (1984)                       12,000
  Personal expenses--COMPS (1988)                  3,008
  Personal expenses--jewelry                      25,000
  Personal living expenses for 3 persons       [1]32,643
    Less: Vehicle acquisition costs             [1](2,932)
    Total application of funds                   109,717

Excess of applications over sources of funds     $50,359

        [1]Petitioners do not agree with the amounts reflected for
these items.

Appendix I

SOURCE AND APPLICATION OF FUNDS
LARRY, RONNIE, & SYLVIA JOHNSON
1990

Larry Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $40,820 |
| Schedule E gross receipts | 29,780 |
| Interest income | 2,770 |
| Sun Bank checking account | 2,018 |
| Sun Bank savings account | 473 |
| Sun Bank CD #48290 | 1,500 |
| Sec First Cd #788961830 | 3,500 |
| Callahan Property note receivable | 5,100 |
| Total source of funds | 85,961 |

Application of Funds:

| | | |
|---|---:|---:|
| Schedule C expenditures | | [1]$13,176 |
| Schedule E expenditures | | 4,682 |
| Sun Bank checking account | | 1,043 |
| Sun Bank savings account | | 568 |
| Sun Bank CD #48290 | | 1,500 |
| Sun Bank CD #55551 (estimated) | | 4,000 |
| Glendale Federal | | 3,806 |
| Credithrift mortgage ($83,684) payment | | 18,500 |
| Constant notes payments | | 15,600 |
| Credithrift mortgage ($52,500) payment | | 9,600 |
| Note payments for van | | 3,600 |
| Investment--Johnson Limo (1988 Cadillac Limo) | | 8,831 |
| Lincoln Limo (1985) | | [2]14,414 |
| Personal living expenses for 4 persons | | [3]37,477 |
| Less: Housing costs | [3]$6,275 | |
| Vehicle acquisition costs | [3]3,157 | (9,432) |
| Total application of funds | | 127,365 |

Excess of applications over sources of funds      [4]$41,404


[1]Appendix 5 (Larry 1990) reflects $19,176.  That amount appears to be a typographical error.
[2]The original S&A for Larry reflects $14,900 for this item. The parties agree that $14,414 is the correct amount.
[3]Petitioners do not agree with the amounts reflected for these items.
[4]Appendix A reflects $43,404.  The $2,000 difference represents a $2,000 item for a jet ski reflected in the original

S & A for Larry but not included in Appendix 5 (Larry 1990).  See Appendix L for our total adjustments to the source and application of funds analysis for Larry for 1983 through 1990.

### Ronnie Johnson

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $36,580 |
| Interest income | 310 |
| Barnett Bank checking account | 631 |
| Barnett Bank saving account | 8,097 |
| Trade in for Ford Truck (1986) | 8,659 |
| Loan from FMCC for Bronco (1990) | 10,806 |
| Credit Life Insurance financing for Bronco | [1]570 |
| Total source of funds | 65,653 |

Application of Funds:

| | | |
|---|---:|---:|
| Schedule C deductions | | 19,915 |
| Barnett Bank checking account | | 698 |
| Barnett Bank savings | | 6,192 |
| Port Orange Property seller mortgage | | 16,119 |
| Ferrari GTS 328 (1987) payments | | 11,004 |
| Note payments on boat | | 1,512 |
| Triumph (1979) | | 1,200 |
| Bronco (1990) | | [2]24,035 |
| Payments on FMCC note | | 776 |
| Investment-Johnson Limo | | 8,831 |
| Lincoln Limo (1985) | | 14,414 |
| Personal living expenses | | [3]28,836 |
| Less: Housing costs | [3]$4,930 | |
| Vehicle acquisition costs | [3]2,026 | (6,956) |
| Total application of funds | | 126,576 |

| | |
|---|---:|
| Excess of application over source of funds | [4]$60,923 |

[1]This item was not included on the original S&A for Ronnie.

[2]The original S&A for Ronnie reflects $23,465 for this item. The parties agree that $24,035 is the correct amount for this item.

[3]Petitioners do not agree with the amounts reflected for these items.

[4]Appendix A reflects $60,223.  The $700 difference reflects a $700 reduction of Schedule C business expenses reflected in the original S&A for Ronnie but not reflected in Appendix 5 (Ronnie 1990).  We assume the $700 represents depreciation.  We have found supra that Ronnie's application of funds analysis for 1990 should be reduced by $700 to account for depreciation.  See

Appendix M for our total adjustments to the source and application of funds analysis for Ronnie for 1983 through 1990.

### Sylvia Johnson

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $24,510 |
| Interest income | 130 |
| Sun Bank savings account | 545 |
| Glendale Federal Bank | 1,047 |
|   Total source of funds | 26,232 |

Application of Funds:

| | | |
|---|---|---|
| Schedule C deductions | | 12,804 |
| Sun Bank savings account | | 835 |
| Glendale Federal Bank | | 1,130 |
| U.S. Savings Bonds purchases | | 2,250 |
| State Road Lease security deposit | | 3,000 |
| Rent | | 7,579 |
| Porsche 928 (1988) payments | | [1]7,618 |
| Investment--Johnson Limo | | [2]8,831 |
| Lincoln Limo (1985) | | 14,414 |
| Personal living expenses | | [3]33,672 |
|   Less: Housing costs | [3]$2,270 | |
|       Vehicle acquisition costs | [3]3,085 | (5,355) |
|   Total application of funds | | 86,778 |

Excess of applications over sources of funds     [4]$60,546

[1]The original S&A for Sylvia reflects $8,618 for this item. The parties agree that $7,618 is correct.
[2]The original S&A for Sylvia reflects $9,831 for this item. The parties agree that $8,831 is correct.
[3]Petitioners do not agree with the amounts reflected for these items.
[4]Appendix A reflects $62,546.  The $2,000 reflects the adjustments addressed in footnotes 1 and 2.  See Appendix N for our total adjustments to the source and application of funds analysis for Sylvia for 1985 through 1990.

Appendix J

COURT'S REVISED PERSONAL LIVING EXPENDITURES
FOR FRANK AND KATHERINE, LARRY, RONNIE, AND SYLVIA
1983 THROUGH 1990

## 1983

Frank and Katherine
| | | |
|---|---:|---:|
| Average annual expenditures for 4 persons | | $24,959 |
| Reductions: | | |
| Shelter | $4,191 | |
| Vehicles | 1,852 | |
| Public transportation | 203 | |
| Reading | 149 | |
| Education | 432 | |
| Tobacco | 267 | |
| Personal insurance and pensions | 2,326 | |
| Total reductions | | 9,420 |
| Personal living expenditures, as revised | | 15,539 |

Larry
| | | |
|---|---:|---:|
| Average annual expenditures for 4 persons | | $24,959 |
| Reductions: | | |
| Shelter | $4,191 | |
| Vehicles | 1,852 | |
| Public transportation | 203 | |
| Personal insurance and pensions | 2,326 | |
| Total reductions | | 8,572 |
| Personal living expenditures, as revised | | 16,387 |

Ronnie
Personal living expenditures included with Frank and Katherine's.

## 1984

Frank and Katherine
| | | |
|---|---:|---:|
| Average annual expenditures for 4 persons | | $26,815 |
| Reductions: | | |
| Shelter | $4,426 | |
| Vehicles | 2,389 | |
| Public transportation | 237 | |
| Reading | 150 | |
| Education | 374 | |
| Tobacco | 280 | |
| Personal insurance and pensions | 2,698 | |
| Total reductions | | 10,554 |
| Personal living expenditures, as revised | | 16,261 |

Larry
Average annual expenditures for 4 persons            $26,815
Reductions:
 Shelter                                $4,426
 Vehicles                               2,389
 Public transportation                    237
 Personal insurance and pensions        2,698
   Total reductions                                   9,750
     Personal living expenditures, as revised        17,065

Ronnie
Personal living expenditures included with Frank and Katherine's.

1985

Frank and Katherine
Average annual expenditures for 3 persons            $26,781
Reductions:
 Shelter                                $4,353
 Vehicles                               2,910
 Public transportation                    282
 Reading                                   159
 Education                                 419
 Tobacco                                   267
 Personal insurance and pensions        2,672
   Total reductions                                  11,062
     Personal living expenditures, as revised        15,719

Larry
Average annual expenditures for 4 persons            $29,972
Reductions:
 Shelter                                $4,817
 Vehicles                               3,101
 Public transportation                    276
 Personal insurance and pensions        3,069
   Total reductions                                  11,263
     Personal living expenditures, as revised        18,709

Ronnie
Average annual expenditures for 2 persons            $22,056
Reductions:
 Shelter                                $3,873
 Vehicles                               1,833
 Public transportation                    297
 Education                                 177
 Personal insurance and pensions        1,963
   Total reductions                                   8,143
     Personal living expenditures, as revised        13,913

Sylvia
Personal living expenditures included with Frank and Katherine's.

<u>1986</u>

Frank and Katherine
| | | |
|---|---|---|
| Average annual expenditures for 3 persons | | $26,540 |
| Reductions: | | |
| Shelter | $4,387 | |
| Vehicles | 3,107 | |
| Public transportation | 234 | |
| Reading | 145 | |
| Education | 324 | |
| Tobacco | 289 | |
| Personal insurance and pensions | <u>2,655</u> | |
|   Total reductions | | <u>11,141</u> |
|     Personal living expenditures, as revised | | 15,399 |

Larry
| | | |
|---|---|---|
| Average annual expenditures for 4 persons | | $30,610 |
| Reductions: | | |
| Shelter | $5,289 | |
| Vehicles | 3,346 | |
| Public transportation | 305 | |
| Personal insurance and pensions | <u>3,138</u> | |
|   Total reductions | | <u>12,078</u> |
|     Personal living expenditures, as revised | | 18,532 |

Ronnie
| | | |
|---|---|---|
| Average annual expenditures for 2 persons | | $23,442 |
| Reductions: | | |
| Shelter | $3,999 | |
| Vehicles | 2,449 | |
| Public transportation | 289 | |
| Education | 215 | |
| Personal insurance and pensions | <u>2,275</u> | |
|   Total reductions | | <u>9,227</u> |
|     Personal living expenditures, as revised | | 14,215 |

Sylvia
Personal living expenditures included with Frank and Katherine's.

- 148 -

1987

Frank and Katherine
Average annual expenditures for 4 persons          $32,753
Reductions:
 Shelter                          $5,288
 Vehicle purchases                 3,008
 Public transportation               255
 Reading                             173
 Education                           494
 Tobacco                             296
 Personal insurance and pensions   3,194
   Total reductions                                 12,708
     Personal living expenditures, as revised       20,045

Larry
Average annual expenditures for 4 persons          $32,753
Reductions:
 Shelter                          $5,288
 Vehicle purchases                 3,008
 Public transportation               255
 Personal insurance and pensions   3,194
   Total reductions                                 11,745
     Personal living expenditures, as revised       21,008

Ronnie
Average annual expenditures for 2 persons          $24,761
Reductions:
 Shelter                          $4,108
 Vehicle purchases                 1,950
 Public transportation               302
 Education                           208
 Personal insurance and pensions   2,248
   Total reductions                                  8,816
     Personal living expenditures, as revised       15,945

Sylvia
Personal living expenditures included with Frank and Katherine's.

<u>1988</u>

<u>Frank and Katherine</u>
Average annual expenditures for 4 persons          $34,455
Reductions:
 Shelter                           $5,632
 Vehicle purchases             3,241
 Public transportation         272
 Reading                         182
 Education                      542
 Tobacco                       309
 Personal insurance and pensions    <u>3,252</u>
   Total reductions                     <u>13,430</u>
     Personal living expenditures, as revised   21,025

<u>Larry</u>
Average annual expenditures for 4 persons          $34,455
Reductions:
 Shelter                           $5,632
 Vehicle purchases             3,241
 Public transportation         272
 Personal insurance and pensions    <u>3,252</u>
   Total reductions                     <u>12,397</u>
     Personal living expenditures, as revised   22,058

<u>Ronnie</u>
Average annual expenditures for 2 persons          $26,350
Reductions:
 Shelter                           $4,420
 Vehicles                        2,581
 Public transportation         333
 Education                      202
 Personal insurance and pensions    <u>2,298</u>
   Total reductions                     <u>9,834</u>
     Personal living expenditures, as revised   16,516

<u>Sylvia</u>
Personal living expenditures included with Frank and Katherine's.

- 150 -

<u>1989</u>

<u>Frank and Katherine</u>
Average annual expenditures for 5 persons                    $35,871
Reductions:
 Shelter                             $5,921
 Vehicle purchases                    3,097
 Public transportation                 278
 Reading                               160
 Education                             664
 Tobacco                               345
 Personal insurance and pensions     <u>3,163</u>
   Total reductions                                         <u>13,628</u>
     Personal living expenditures, as revised               22,243

<u>Larry</u>
Average annual expenditures for 4 persons                    $35,803
Reductions:
 Shelter                             $5,841
 Vehicle purchases                    3,357
 Public transportation                 289
 Personal insurance and pensions     <u>3,388</u>
   Total reductions                                         <u>12,875</u>
     Personal living expenditures, as revised               22,928

<u>Ronnie</u>
Average annual expenditures for 2 persons                    $28,622
Reductions:
 Shelter                             $4,903
 Vehicle purchases                    2,301
 Public transportation                 330
 Education                             236
 Personal insurance and pensions     <u>2,508</u>
   Total reductions                                         <u>10,278</u>
     Personal living expenditures, as revised               18,344

<u>Sylvia</u>
Personal living expenditures included with Frank and Katherine's.

1990

Frank and Katherine

| | | |
|---|---:|---:|
| Average annual expenditures for 5 persons for 7 months and 2 persons for 5 months: | | $35,871 |
| Reductions: | | |
| Shelter | $5,611 | |
| Vehicle purchases | 2,497 | |
| Public transportation | 322 | |
| Reading | 168 | |
| Education | 495 | |
| Tobacco | 344 | |
| Personal insurance and pensions | 2,556 | |
| Total reductions | | 11,993 |
| Personal living expenditures, as revised | | 23,878 |

Larry

| | | |
|---|---:|---:|
| Average annual expenditures for 4 persons | | $37,477 |
| Reductions: | | |
| Shelter | $6,275 | |
| Vehicle purchases | 3,157 | |
| Public transportation | 308 | |
| Personal insurance and pensions | 3,744 | |
| Total reductions | | 13,484 |
| Personal living expenditures, as revised | | 23,993 |

Ronnie

| | | |
|---|---:|---:|
| Average annual expenditures for 2 persons | | $28,836 |
| Reductions: | | |
| Shelter | $4,930 | |
| Vehicle purchases | 2,026 | |
| Public transportation | 335 | |
| Education | 263 | |
| Personal insurance and pensions | 2,575 | |
| Total reductions | | 10,129 |
| Personal living expenditures, as revised | | 18,707 |

Sylvia

| | | |
|---|---:|---:|
| Average annual expenditures for 3 persons for 5 months | | $14,030 |
| Reductions: | | |
| Shelter | $2,270 | |
| Vehicle purchases | 3,085 | |
| Public transportation | 125 | |
| Education | 190 | |
| Personal insurance and pensions | 1,410 | |
| Total reductions | | 7,080 |
| Personal living expenditures, as revised | | 6,950 |

Appendix K

COURT'S REVISED SOURCE AND APPLICATION OF FUNDS
FOR FRANK AND KATHERINE JOHNSON

1983

Source of Funds:
| | |
|---|---|
| Schedule C gross receipts | $16,550 |
| Social Security--Frank (estimated) | 2,500 |
| Interest income | 344 |
| Freedom Savings Bank #3058417 | 4,874 |
|   Total source of funds | 24,268 |

Application of Funds:
| | |
|---|---|
| Schedule C expenditures | 10,069 |
| Freedom Savings Bank #3058417 | 6,588 |
| Suburban (1983) | 15,434 |
| Gifts to Larry | 31,788 |
| Gifts to Ronnie | 25,200 |
| Personal living expenses for 4 persons | 15,539 |
|   Total application of funds | 104,618 |

Excess of applications over sources of funds    $80,350

1984

Source of Funds:
| | |
|---|---|
| Schedule C gross receipts | $15,800 |
| Social Security--Frank (estimated) | 2,500 |
| Interest income | 229 |
| Freedom Savings Bank #3058417 | 6,588 |
|   Total source of funds | 25,117 |

Application of Funds:
| | |
|---|---|
| Schedule C expenditures | 9,609 |
| Freedom Savings Bank #3058417 | 2,367 |
| Freedom Savings Bank CD #4006814 | 6,373 |
| Gifts to Larry | 29,835 |
| Gifts to Ronnie | 40,925 |
| Personal living expenses for 4 persons | 16,261 |
|   Total application of funds | 105,370 |

Excess of applications over sources of funds    $80,253

## 1985

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $19,550 |
| Social Security--Frank | 2,574 |
| Net process from sale of lot | 24,757 |
| Interest income | 1,196 |
| Freedom S&L #3058417 | 2,367 |
| Freedom S&L CD #4006814 | 6,373 |
| Total source of funds | 56,817 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | 11,009 |
| Freedom Savings Bank #3058417 | 28,191 |
| Freedom Savings Bank CD #4006814 | 7,191 |
| Gifts to Larry | 50,012 |
| Gifts to Ronnie | 23,897 |
| Gifts to Sylvia | 8,555 |
| Personal living expenses for 3 persons | 15,719 |
| Total application of funds | 144,574 |

| | |
|---|---:|
| Excess of applications over sources of funds | $87,757 |

## 1986

Source of Funds:

| | |
|---|---:|
| Social Security--Frank (estimated) | $2,500 |
| Social Security--Katherine | 1,914 |
| Interest income | 922 |
| Freedom S&L #3058417 | 28,191 |
| Freedom S&L CD #4006814 | 7,191 |
| Total source of funds | 40,718 |

Application of Funds:

| | |
|---|---:|
| Freedom Savings Bank #3058417 | 4,534 |
| Freedom Savings Bank CD #4006814 | 8,113 |
| Corvette (1970) | 4,200 |
| Sanford Property gifted to Larry | 25,000 |
| Diamond ring gifted to Janie Johnson | 8,500 |
| Gifts to Larry | [1]39,723 |
| Gifts to Ronnie | 18,774 |
| Gifts to Sylvia | 7,464 |
| Personal living expenses for 3 persons | 15,399 |
| Total application of funds | 131,707 |

| | |
|---|---:|
| Excess of applications over sources of funds | $90,989 |

[1]Our revisions to Larry's source and application of funds analysis for this year indicates an excess application of funds of $65,707.  See Appendix L.  Respondent's Appendix 5 (Frank) uses $39,723 for gifts to Larry for this year even though respondent shows an excess application of funds for Larry on his source and application of funds analysis for 1986 of $69,150.  See Appendices A and E.  We use $39,723 for our revisions to Frank and Katherine's source and application of funds analysis for 1986 because, on the basis of Joint Finding of Fact No. 4, we deem the lower amount to be a concession by respondent that such amount is the proper amount to use.

## 1987

Source of Funds:

| | |
|---|---|
| Social Security--Frank | $2,686 |
| Social Security--Katherine | 2,770 |
| Interest income | 1,040 |
| Freedom S&L #3058417 | 4,534 |
| Freedom S&L CD #4006814 | 8,113 |
| Total source of funds | 19,143 |

Application of Funds:

| | |
|---|---|
| Freedom Savings Bank #3058417 | 4,545 |
| Freedom Savings Bank CD #4006814 | 9,154 |
| Gifts to Larry | 78,370 |
| Gifts to Ronnie | 42,068 |
| Gifts to Sylvia | 10,264 |
| Personal living expenses for 4 persons | 20,045 |
| Total application of funds | 164,446 |

Excess of applications over sources of funds     $145,303

## 1988

Source of Funds:

| | |
|---|---|
| Social Security--Frank | $2,793 |
| Social Security--Katherine | 3,670 |
| Interest income | 1,438 |
| Freedom S&L #3058417 | 4,545 |
| Freedom S&L CD #4006814 | 9,154 |
| Trade in for Suburban | 2,500 |
| Total source of funds | 24,100 |

Application of Funds:
Freedom Savings Bank #3058417                        4,546
Freedom Savings Bank CD #4006814                    10,327
Cadillac (1986)                                     16,713
Chevy truck (1986)                                  13,855
Gifts to Larry                                    [1]68,359
Gifts to Ronnie                                     56,734
Gifts to Sylvia                                     25,928
Personal living expenses for 4 persons              21,025
  Total application of funds                       217,487

Excess of applications over sources of funds    $193,387


    [1]Our revisions to Larry's source and application of funds
analysis for this year indicates an excess application of funds
of $90,643.  See Appendix L.  Respondent's Appendix 5 (Frank)
uses $68,359 for gifts to Larry for this year even though
respondent shows an excess application of funds for Larry on his
source and application of funds analysis for 1988 of $94,067.
See Appendices A and G.  We use $68,359 for our revisions to
Frank and Katherine's source and application of funds analysis
for 1988 because, on the basis of Joint Findings of Fact No. 4,
we deem the lower amount to be a concession by respondent that
such amount is the proper amount to use.

                              1989


Source of Funds:
Social Security--Frank                              $2,902
Social Security--Katherine                           3,070
Green Cove Springs Sale                             23,978
Gambling income                                      1,002
Interest income                                      2,847
Freedom S&L #3058417                                 4,546
Freedom S&L CD #4006814                             10,327
  Total source of funds                             48,672

Application of Funds:
Freedom Savings Bank #3058417                        1,939
Glendale Federal #601219-0                          39,919
Corvette (1976)                                      7,672
Gifts to Larry                                      10,094
Gifts to Ronnie                                     65,174
Gifts to Sylvia                                     20,648
Personal living expenses for 5 persons              22,243
  Total application of funds                       167,689

Excess of applications over sources of funds    $119,017

## 1990

Source of Funds:

| | |
|---|---:|
| Gross receipts--Schedule C | $8,000 |
| Social Security--Frank | 3,044 |
| Social Security--Katherine | 3,212 |
| Gambling income | 2,452 |
| Interest income | 3,316 |
| NCNB Savings #3058417 | 1,939 |
| Glendale Federal #601006-0 | 39,919 |
| Total source of funds | 61,882 |

Application of Funds:

| | |
|---|---:|
| Business deduction--Schedule C | 250 |
| NCNB CD #4006814 | 5,543 |
| Corvette (1978) | 6,360 |
| Legal fees | 13,500 |
| Investigative fees (Dennis Dayle) | 7,000 |
| Gift to Larry and Ronnie (Glendale Federal) | 43,404 |
| Gifts to Larry | 16,091 |
| Gifts to Ronnie | 51,361 |
| Gifts to Sylvia | 36,299 |
| Less duplications re Johnson limo | (46,490) |
| Personal living expenses for 5 persons for 7 month and 2 persons for 5 months | 21,173 |
| Total application of funds | 154,491 |

| | |
|---|---:|
| Excess of applications over sources of funds | $92,609 |

Appendix L

COURT'S REVISED SOURCE AND APPLICATION OF FUNDS
FOR LARRY JOHNSON

<u>1983</u>

| | |
|---|---:|
| Source of Funds: | |
| Schedule C gross receipts | $20,160 |
| Gambling income | 25,000 |
| Interest income | 392 |
| First Union Bank accounts (estimated balance) | <u>3,000</u> |
| Total source of funds | 48,552 |
| Application of Funds: | |
| Schedule C expenditures | |
| (less interest & depreciation) | 12,428 |
| First Union Bank accounts (estimated balance) | 6,000 |
| U.S. Savings Bonds purchases | 7,200 |
| Callahan Property payments | 2,400 |
| Allendale Property payments | 1,125 |
| Mercedes purchase | 34,800 |
| Personal living expenses for 4 persons | <u>16,387</u> |
| Total application of funds | 80,340 |
| | |
| Excess of applications over sources of funds | $31,788 |

<u>1984</u>

| | |
|---|---:|
| Source of Funds: | |
| Schedule C gross receipts | $20,500 |
| Schedule E income (rental) | 1,750 |
| Interest income | 647 |
| First Union Bank accounts (estimated balance) | 6,000 |
| GMAC loan | <u>10,015</u> |
| Total source of funds | 38,912 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | $630 |
| Expenditures adjusted per audit | 10,596 |
| First Union savings account ending balance | 397 |
| First Union CDs ending balance | 6,236 |
| First Union IRA-Larry | 1,000 |
| First Union IRA-Nancy | 582 |
| U.S Savings bonds purchases | 7,500 |
| Callahan Property payments | 2,400 |
| Allendale Property payments | 4,500 |
| Suburban purchase | 17,257 |
| Note payments | 584 |
| Personal living expenses for 4 persons | 17,065 |
| Total application of funds | 68,747 |
| | |
| Excess of applications over sources of funds | $29,835 |

## 1985

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $28,500 |
| Schedule E income (rental) | 2,272 |
| Gambling income | 10,000 |
| Interest income | 639 |
| First Union Bank savings accounts | 397 |
| First Union CDs | 6,236 |
| First Union IRA-Larry | 1,000 |
| First Union IRA-Nancy | 582 |
| Trade in for Mercedes | 28,150 |
| Total source of funds | 77,776 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | $16,201 |
| Schedule E expenditures | 1,094 |
| First Union savings account | 1,495 |
| First Union CDs | 6,856 |
| First Union IRA-Larry | 3,000 |
| First Union IRA-Nancy | 582 |
| U.S Savings Bonds purchases | 200 |
| Callahan Property payments | 2,400 |
| Chris Craft boat (titled to Larry and Frank) | 35,000 |
| Ford truck | 300 |
| Ferrari purchase (titled to Larry and Frank) | 38,447 |
| GMAC note payments for Suburban | 3,504 |
| Personal living expenses for 4 persons | 18,709 |
| Total application of funds | 127,788 |
| | |
| Excess of applications over sources of funds | $50,012 |

## 1986

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $33,800 |
| Schedule E income (rental) | 1,161 |
| Interest income | 428 |
| First Union Bank savings accounts | 1,495 |
| First Union CDs | 6,856 |
| First Union IRA-Larry | 3,000 |
| First Union IRA-Nancy | 582 |
| Trade in for Ferrari (1982) | 38,300 |
| Gifts from Frank | 25,000 |
| Credithrift mortgage ($83,684) | 74,995 |
| Credithrift mortgage ($56,346) | 45,078 |
| Ford truck (1974) | 600 |
| Total source of funds | 231,295 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | $23,904 |
| Schedule E expenditures | 290 |
| First Union savings account | 1,684 |
| First Union IRA-Larry | 3,000 |
| First Union IRA-Nancy | 582 |
| Callahan Property payments | 994 |
| Sun Bank checking account | 2,598 |
| Sun Bank savings account | 211 |
| Sanford rental property | 149,500 |
| Deposit on Sanford property | 10,000 |
| Closing on Sanford property | 19,427 |
| Credithrift mortgage ($83,684) payment | 6,000 |
| Credithrift mortgage ($56,346) payment | 4,041 |
| Lamborghini purchase | 52,735 |
| GMAC note payments for Suburban | 3,504 |
| Personal living expenses for 4 persons | 18,532 |
| Total application of funds | 297,002 |

| | |
|---|---:|
| Excess of applications over sources of funds | $65,707 |

## 1987

```
Source of Funds:
Schedule C gross receipts                          $36,325
Schedule E gross receipts                           14,000
Interest income                                        144
First Union Bank savings accounts                    1,684
First Union IRA-Larry                                3,000
First Union IRA-Nancy                                  582
First Union IRA interest distribution                  249
Sun Bank checking account                            2,598
Sun Bank savings account                               211
Contract deposit                                     1,500
   Total source of funds                            60,293
Application of Funds:
Schedule C expenditures                            $26,453
Schedule E expenditures                              2,456
Sun Bank checking account                            5,283
Sun Bank savings account                             5,860
Credithrift mortgage ($83,684) payment              14,400
Credithrift mortgage ($56,346) payment               9,699
Renovations per IRS appraisal                       50,000
GMAC note payments for Suburban                      3,504
Personal living expenses for 4 persons              21,008
   Total application of funds                      138,663

Excess of applications over sources of funds       $78,370
```

### 1988

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $39,455 |
| Schedule E gross receipts | 23,210 |
| Interest income | 52 |
| Sun Bank checking account | 5,283 |
| Sun Bank savings account | 5,860 |
| Callahan Property sales price | 100,000 |
| Mortgage note receivable | 2,550 |
| Credithrift mortgage ($52,300) | 49,621 |
| Constant notes (2) | 200,000 |
| Constant note due 3/20/88 | 25,000 |
| Total source of funds | 451,031 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | $18,579 |
| Schedule E expenditures | 5,396 |
| Sun Bank checking account | 1,341 |
| Sun Bank savings account | 923 |
| Credithrift mortgage ($83,684) payment | 17,483 |
| Credithrift mortgage ($56,346) payment | 4,041 |
| Credithrift mortgage ($56,346) payoff | 56,122 |
| Callahan Child Care purchase money mortgage | 20,000 |
| Settlement charges | 13,589 |
| Daytona Beach Shores Property purchase | 300,670 |
| Cash at closing | 27,048 |
| Constant note due 3/20/88 payment | 25,000 |
| Credithrift mortgage ($52,500) payment | 7,811 |
| Seller mortgage note payment | 14,031 |
| GMAC note payments for Suburban | 2,920 |
| Cadillac (1979) | 4,662 |
| Personal living expenses for 4 persons | 22,058 |
| Total application of funds | 541,674 |

| | |
|---|---:|
| Excess of applications over sources of funds | $90,643 |

## 1989

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $40,060 |
| Schedule E gross receipts | 27,698 |
| Interest income | 2,058 |
| Sun Bank checking account | 1,341 |
| Sun Bank savings account | 923 |
| Callahan Property note receivable | 5,100 |
| Trade in for Suburban | 6,829 |
| Sun Bank Loan | 7,500 |
| Sale of Cadillac (1979) | 4,662 |
| Compromise agreement (53.6% of $44,566) | 23,887 |
| Total source of funds | 120,058 |

Application of Funds:

| | |
|---|---|
| Schedule C expenditures | $14,764 |
| Schedule E expenditures | 5,465 |
| Sun Bank checking account | 2,018 |
| Sun Bank savings account | 473 |
| Sun Bank CD #48290 | 1,500 |
| Sec First CD # 788961830 | 3,500 |
| Credithrift mortgage ($83,684) payment | 18,000 |
| Constant notes payments | 15,600 |
| Credithrift mortgage ($52,500) payment | 9,600 |
| Renovation: Alexander Construction | 8,790 |
| Ford T-Bird (1964) | 2,000 |
| Jeep CJ-7 (1985) | 4,285 |
| Chevrolet Astro Van (1989) | 19,329 |
| Note payments for van | 1,800 |
| Personal living expenses for 4 persons | 23,028 |
| Total application of funds | 130,152 |

Excess of applications over sources of funds    $10,094

## 1990

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $40,820 |
| Schedule E gross receipts | 29,780 |
| Interest income | 2,770 |
| Sun Bank checking account | 2,018 |
| Sun Bank savings account | 473 |
| Sun Bank CD #48290 | 1,500 |
| Sec First Cd #788961830 | 3,500 |
| Callahan Property note receivable | 5,100 |
| Compromise agreement (40.1% of $53,021) | 21,261 |
| Total source of funds | 107,222 |

Application of Funds:

| | |
|---|---:|
| Schedule C expenditures | $13,176 |
| Schedule E expenditures | 4,682 |
| Sun Bank checking account | 1,043 |
| Sun Bank savings account | 568 |
| Sun Bank CD #48290 | 1,500 |
| Sun Bank CD #55551 (estimated) | 4,000 |
| Glendale Federal | 3,806 |
| Credithrift mortgage ($83,684) payment | 18,500 |
| Constant notes payments | 15,600 |
| Credithrift mortgage ($52,500) payment | 9,600 |
| Note payments for van | 3,600 |
| Investment--Johnson Limo (1988 Cadillac Limo) | 8,831 |
| Lincoln Limo (1985) | 14,414 |
| Personal living expenses for 4 persons | 23,993 |
| Total application of funds | 123,313 |
| | |
| Excess of applications over sources of funds | $16,091 |

Appendix M

COURT'S REVISED SOURCE AND APPLICATION OF FUNDS
FOR RONNIE JOHNSON

<u>1983</u>

Source of Funds:                                          -0-

Application of Funds:
Porsche (1983) purchase                          $25,200
  Total application of funds                      25,200

Excess of applications over sources of funds  $25,200

<u>1984</u>

Source of Funds:                                          -0-

Application of Funds:
U.S. Saving Bonds purchases                      $40,925
  Total application of funds                      40,925

Excess of applications over sources of funds    $40,925

<u>1985</u>

Source of Funds:
Schedule C gross receipts                        $17,575
Trade in for 1983 Porsche                        <u>18,000</u>
  Total source of funds                           35,575

Application of Funds:
Schedule C deductions                             9,158
Rent and security deposit(less $4,500 claimed
 on Schedule C                                    7,575
Porsche (1985) purchase                          28,826
Personal living expenses for 2 persons           <u>13,913</u>
   Total application of funds                  59,472

Excess of applications over sources of funds    $23,897

## 1986

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $18,975 |

Application of Funds:

| | |
|---|---|
| Schedule C deductions | 9,487 |
| Rent (less $4,500 claimed on Schedule C) | 6,900 |
| Ford truck (1979) purchase | 788 |
| Chevy Camaro (1968) purchase | 1,050 |
| Chevy Camaro refurbishing costs | 4,800 |
| Barnett Bank savings | 519 |
| Personal living expenses for 2 persons | 14,205 |
| Total application of funds | 37,749 |

| | |
|---|---|
| Excess of applications over sources of funds | $18,774 |

## 1987

Source of Funds:

| | |
|---|---|
| Schedule C gross receipts | $22,851 |
| Gambling income | 20,000 |
| Interest income | 77 |
| Barnett Bank saving account | 519 |
| Total source of funds | 43,447 |

Application of Funds:

| | |
|---|---|
| Schedule C deductions | 10,168 |
| Rent (less $3,375 claimed on Schedule C) | 5,175 |
| Barnett Bank savings | 2,091 |
| Port Orange Property purchase cash deposit | 8,000 |
| Port Orange Property cash and closing costs | 8,165 |
| Port Orange Property seller note | 9,000 |
| Port Orange Property seller mortgage | 4,030 |
| (less $1,559 claimed on Schedule C) | 2,471 |
| Port Orange Property renovations | 13,800 |
| Fishing boat (1977) | 7,700 |
| Twin outboard motors | 3,000 |
| Personal living expenses for 2 persons | 15,945 |
| Total application of funds | 89,545 |

| | |
|---|---|
| Excess of applications over sources of funds | $46,098 |

## 1988

| | |
|---|---:|
| Source of Funds: | |
| Schedule C gross receipts | $25,785 |
| Barnett Bank saving account | 2,091 |
| Trade in for Porsche | 14,000 |
| Florida National Bank loan | 40,129 |
| Sale of Ford truck (1979) | 500 |
| Total source of funds | 82,505 |
| | |
| Application of Funds: | |
| Schedule C deductions | 11,781 |
| Barnett Bank savings | 3,197 |
| Port Orange Property seller mortgage | |
| (less $6,117 claimed on Schedule C) | 10,002 |
| Port Orange Property renovations | 1,750 |
| Legal fees | 1,000 |
| Ford truck (1986) | 10,563 |
| Ferrari GTS 328 (1987) | 73,129 |
| Note payments | 4,585 |
| Estimated tax payments (1988) | 1,500 |
| Tax payments (1987) | 5,216 |
| Personal living expenses for 2 persons | 16,516 |
| Total application of funds | 139,239 |
| | |
| Excess of applications over sources of funds | $56,734 |

## 1989

```
Source of Funds:
Schedule C gross receipts                       $39,410
Interest income                                     321
Barnett Bank saving account                       3,197
Trade in for Jeep (1980)                          3,000
Loan from Barnett Bank for boat                   3,200
 Total source of funds                           49,128

Application of Funds:
Schedule C deductions              24,761
 Less: Depreciation                10,350        14,411
Barnett Bank checking account                       631
Barnett Bank savings                              8,097
Port Orange Property seller mortgage
 (less $5,689 claimed on Schedule C)             10,430
Port Orange Property improvements                13,200
Ferrari GTS 328 (1987) payments                  11,004
Corvette (1974)                                  11,500
Jeep (1980)                                       2,156
Jeep (1982)                                       3,025
Boat                                              4,000
Note Payments on boat                               504
Paving equipment                                 17,000
Personal living expenses for 2 persons           18,344
  Total application of funds                    114,302

Excess of applications over sources of funds    $65,174
```

## 1990

```
Source of Funds:
Schedule C gross receipts                            $36,580
Interest income                                          310
Barnett Bank checking account                            631
Barnett Bank saving account                            8,097
Trade in for Ford Truck (1986)                         8,659
Loan from FMCC for Bronco (1990)                      10,806
Credit Life Insurance financing for Bronco               570
 Total source of funds                                65,653

Application of Funds:
Schedule C deductions (less $700 depreciation)        19,215
Barnett Bank checking account                            698
Barnett Bank savings                                   6,192
Port Orange Property seller mortgage
  (less $5,689 claimed on Schedule C)                 10,430
Ferrari GTS 328 (1987) payments                       11,004
Note payments on                                       1,512
Triumph (1979)                                         1,200
Bronco (1990)                                         24,035
Payments on FMCC note                                    776
Investment-Johnson Limo                                8,831
Lincoln Limo (1985)                                   14,414
Personal living expenses for 2 persons                18,707
  Total application of funds                         117,014

Excess of applications over sources of funds         $51,361
```

Appendix N

COURT'S REVISED OF SOURCE AND APPLICATION OF FUNDS
FOR SYLVIA JOHNSON

<u>1985</u>

| | |
|---|---:|
| Source of Funds: | |
| Loan from First Union Bank | $22,300 |
|   Total source of funds | 22,300 |
| | |
| Application of Funds: | |
| Corvette (1985) purchase | 27,875 |
| Note payments | <u>2,980</u> |
|   Total application of funds | 30,855 |
| | |
| Excess of applications over sources of funds | $8,555 |

<u>1986</u>

| | |
|---|---:|
| Source of Funds: | -0- |
| | |
| Application of Funds: | |
| Corvette (1985) note payments | $7,464 |
|   Total application of funds | 7,464 |
| | |
| Excess of applications over sources of funds | $7,464 |

<u>1987</u>

| | |
|---|---:|
| Source of Funds: | |
| Schedule C gross receipts | $10,450 |
|   Total source of funds | 10,450 |
| | |
| Application of Funds: | |
| Schedule C deductions | 5,540 |
| Sun Bank savings account | 1,154 |
| U.S. Savings Bonds purchases | 5,000 |
| Gambling losses | 1,100 |
| Personal expenses--COMPS | 356 |
| Corvette (1985) note payments | <u>7,564</u> |
|   Total application of funds | 20,714 |
| | |
| Excess of applications over sources of funds | $10,264 |

## 1988

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $12,350 |
| Gambling income | 1,727 |
| Interest income | 29 |
| Sun Bank savings account | 1,154 |
| Trade in for corvette (1985) | 15,000 |
| First Union Bank loan | 36,287 |
| Winnings from gambling activities 12-23-88 | 38,550 |
| Total source of funds | 105,097 |

Application of Funds:

| | |
|---|---:|
| Schedule C deductions | 5,650 |
| Sun Bank savings account | 946 |
| U.S. Savings Bonds purchases | 200 |
| Cash for gambling | 38,550 |
| Net gambling losses | 8,350 |
| Personal expenses--COMPS (1988) | 1,697 |
| Note payments for Corvette (1985) | 3,502 |
| Payoff of note for Corvette | 5,618 |
| Porsche 928 purchase (1988) | 61,287 |
| Note payments for Porsche | 4,880 |
| Withholding on gambling winnings | 345 |
| Total application of funds | 131,025 |

Excess of applications over sources of funds   $25,928

## 1989

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $19,710 |
| Gambling income | 38,550 |
| Interest income | 153 |
| Sun Bank savings account | 945 |
|   Total source of funds | 59,358 |

Application of Funds:

| | |
|---|---:|
| Schedule C deductions | 8,597 |
| Sun Bank savings account | 545 |
| Glendale Federal Bank | 1,047 |
| U.S. Savings Bonds purchases | 3,450 |
| Net gambling losses | 16,940 |
| Porsche 928 (1988) payments | 9,419 |
| Corvette-Greenwood (1984) | 12,000 |
| Personal expenses--COMPS (1988) | 3,008 |
| Personal expenses--jewelry | 25,000 |
|   Total application of funds | 80,006 |

| | |
|---|---:|
| Excess of applications over sources of funds | $20,648 |

## 1990

Source of Funds:

| | |
|---|---:|
| Schedule C gross receipts | $24,510 |
| Interest income | 130 |
| Sun Bank savings account | 545 |
| Glendale Federal Bank | 1,047 |
|   Total source of funds | 26,232 |

Application of Funds:

| | |
|---|---:|
| Schedule C deductions | 12,804 |
| Sun Bank savings account | 835 |
| Glendale Federal Bank | 1,130 |
| U.S. Savings Bonds purchases | 2,250 |
| State Road Lease security deposit | 3,000 |
| Rent (less $2,880 claimed on Schedule C) | 4,699 |
| Porsche 928 (1988) payments | 7,618 |
| Investment--Johnson Limo | 8,831 |
| Lincoln Limo (1985) | 14,414 |
| Personal living expenses for 3 persons for 5 months | 6,950 |
|   Total application of funds | 62,531 |

| | |
|---|---:|
| Excess of applications over sources of funds | $36,299 |